COPY

1   SHELDON EISENBERG (SBN 100626)
2   sheldon.eisenberg@dbr.com
    PAUL M. GELB (SBN 214439)
3   paul.gelb@dbr.com
    DRINKER BIDDLE & REATH LLP
4   1800 Century Park East, Suite 1400
5   Los Angeles, CA 90067-1517
    Telephone: (310) 203-4000
6   Facsimile: (310) 229-1285
7

8   Attorneys for Defendants
    Cabazon Band of Mission Indians, and
9   East Valley Tourist Development Authority

FILED
CLERK, U.S. DISTRICT COURT

AUG - 1 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                                   DEPUTY

10

11           **UNITED STATES DISTRICT COURT**

12           **CENTRAL DISTRICT OF CALIFORNIA**

EDCV12-1278VAP(SPx)

13   WELLS FARGO BANK, NA, as     Case No. _____
14   Trustee,

15             Plaintiff,     [Riverside County Court Case No. INC
16   vs.     1205391]

17   CABAZON BAND OF MISSION     **DEFENDANTS' NOTICE OF**
    INDIANS, a federally recognized     **REMOVAL PURSUANT TO 28**
18   Indian tribe; and EAST VALLEY     **U.S.C. §1441(b) (FEDERAL**
19   TOURIST DEVELOPMENT     **QUESTION)**
    AUTHORITY, an unincorporated
20   entity,
21

22             Defendants.

23

24

25

26

27

28

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

    **PLEASE TAKE NOTICE** that Defendants Cabazon Band of Mission Indians and East Valley Tourist Development Authority (collectively, "Defendants"), hereby remove this action from the Superior Court of the State of California for the County of Riverside, Case No. INC 1205391:

<b><u>PLEADINGS</u></b>

    1.    On July 31, 2012, Plaintiff Wells Fargo Bank, N.A. ("Plaintiff") commenced this action in the Superior Court of the State of California in and for the Court of Riverside (the "Superior Court"). A true and correct copy of the *Complaint for Breach of Contract and Injunctive Relief* (the "Complaint"), along with the summons, certificate of counsel, and notice of assignment, is attached to this notice of removal as Exhibit "A."

    2.    On August 1, 2012, Plaintiff served its *Ex Parte Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction; Memorandum of Points and Authorities in Support Thereof; Declaration of Ira Bibbero and Exhibit Thereto*, a true and correct copy of which is attached to this notice of removal as Exhibit "B." A true and correct copy of Plaintiff's accompanying *Appendix of Declarations and Exhibits in Support of Ex Parte Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction* is attached to this notice of removal as Exhibit "C."

<b><u>TIMELINESS OF REMOVAL</u></b>

    3.    Defendants' removal is timely under 28 U.S.C. § 1446(b) as it is being filed within 30 days of receipt by the defendant, through service or otherwise, of a copy of an amended pleading from which it may first be ascertained that the case is removable. The Complaint was filed on July 31, 2012, and notice was provided to Defendants on August 1, 2012. This notice of removal is being filed the same day that notice of the action was provided to Defendants, and one day after this action was filed.

## JURISDICTION

4.    This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and, accordingly, is removable under 28 U.S.C. § 1441(b), because this is a civil action "arising under the Constitution, laws, or treaties of the United States."

5.    This action "seeks to specifically enforce certain covenants of the Tribe under the Trust Indenture[.]" Exh. "A" (Complaint) ¶ 1.  This dispute potentially involves claims under Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, and, accordingly, invokes federal jurisdiction.  For example, the U.S. District Court for the Eastern District of Wisconsin held last year that federal subject matter jurisdiction was established on the face of the complaint because a claim against a Tribe for breach of a Trust Indenture is not a routine contract dispute, and involved potential application of IGRA:

> Wells Fargo's claim for breach of the Indenture does not present a routine contract dispute, but rather a specific issue under a highly regulated area of federal law. *See Gaming World*, 317 F.3d at 848. ("since this case raises issues under the extensive regulatory framework of IGRA, it is not a routine contract dispute."). Wells Fargo's action on the Indenture and Bonds necessarily raise federal questions concerning whether the Indenture is a management contract within the meaning of the IGRA and, if so, whether the Tribe's waiver of sovereign immunity is valid. Wells Fargo's complaint therefore invokes federal jurisdiction[.]

*Wells Fargo Bank, N.A. v. Sokagon Chippewa Community*, 787 F. Supp. 2d 867, 875 (E.D. Wis. 2011).

6.    The Seventh Circuit further underscored the significance and applicability of federal law to actions such as this one.  In *Wells Fargo Bank, N.A. v. Lake of the Torches Economic Dev. Corp.*, 658 F.3d 684 (7th Cir. 2011), Wells

1   Fargo filed a complaint and motion for preliminary injunction seeking assets
2   pledged as security for bonds.  The U.S. District Court determined the contract
3   provision at issue there was subject to IGRA, and the Seventh Circuit affirmed that
4   such IGRA issues must be determined on a "case by case" approach:

> [W]e must resign ourselves to the fact that we do not have the
> definitive guidance from the Commission that Congress had
> anticipated. In the absence of such careful and comprehensive
> regulation by NIGC, we are left with the task of determining whether
> the provisions of this particular financial arrangement require the
> Chairman's scrutiny. In these circumstances, we must rely on the
> general standards outlined in the Act, the sparse regulatory provisions
> and, to the extent that they are informative, the informal
> pronouncements of the NIGC in order to ascertain whether the
> agreement before us is within the sphere of regulation established by
> Congress.

16   *Lake of the Torches*, 658 F.3d at 697.
17       7.     Moreover, the Complaint seeks to enjoin Defendants "from
18   transferring or in any manner distributing any Distributable Authority Revenues to
19   or for the benefit of the Tribe[.]"  Complaint, Prayer ¶ 4.b.  This flat out prohibition
20   on distributions to the Tribe violates the Revenue Allocation Plan ("RAP")
21   approved by the by the Department of the Interior ("DOI"), which raises federal
22   law issues of federal preemption by IGRA and its implementing regulatory scheme.
23   *See, e.g., Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 547 (8th
24   Cir.1996) ("IGRA completely preempts state law with respect to Indian gaming. …
25   A long line of Supreme Court decisions illustrates the importance of the federal and
26   tribal interests in Indian cases and the authority of Congress to protect those
27   interests."); *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 63 F.3d 1030,
28   1033 (11th Cir.1995) ("The occupation of this field by (IGRA) is evidenced by the

1  broad reach of the statute's regulatory and enforcement provisions and is

2  underscored by the comprehensive regulations promulgated under the statute.").

3        8.    Additionally, the DOI's exclusive jurisdiction over any revision to the

4  RAP is implicated by the Complaint's requested relief under the primary

5  jurisdiction doctrine. *See, e.g., United States v. Culliton*, 328 F.3d 1074, 1081 (9th

6  Cir. 2003) ("When there is a basis for judicial action, independent of agency

7  proceedings, courts may route the threshold decision as to certain issues to the

8  agency charged with primary responsibility for governmental supervision or control

9  of the particular industry or activity involved. ... Whether the doctrine of primary

10  jurisdiction applies in any particular situation depends on the extent to which

11  Congress, in enacting a regulatory scheme, intends an administrative body to have

12  the first word on issues arising in judicial proceedings.") (citations omitted).

13        9.    The Complaint renders IGRA central to this action and necessarily

14  raises numerous federal questions under IGRA's broad scope, including, without

15  limitation, those mentioned above. "Wells Fargo's complaint therefore invokes

16  federal jurisdiction[.]" *Wells Fargo Bank, N.A. v. Sokagon Chippewa Community*,

17  *supra*, 787 F. Supp. 2d at 875.

## INTRADISTRICT ASSIGNMENT

19       10.   The United States District Court for the Central District of California,

20  Eastern Division, embraces the district and division in which the state court action

21  is now pending, and thus this Court is a proper venue for the action pursuant to 28

22  U.S.C. § 84(c)(1).

## JOINDER OF ALL DEFENDANTS

24       11.   The removing Defendants are the only named defendants.

25  Accordingly, all named defendants have joined in this removal.

## NOTICE TO STATE COURT AND ADVERSE PARTY

27       12.   Defendants are filing written notice of this removal with the clerk of

28  the state court in which the action is currently pending pursuant to 28 U.S.C. §

1446(d).  Copies of notice to adverse party of removal to federal court, together with this notice of removal are being served upon Plaintiff's counsel pursuant to 28 U.S.C. § 1446(d).

## NO RELATED CASES PENDING

13.    To the best of Defendants' knowledge, there are no cases presently pending in this Court that relate to the action that is the subject of this notice of removal of action.

**WHEREFORE**, Defendants hereby remove to this Court from the Superior Court for the State of California in the County of Riverside.  Defendants pray for such other and further relief to which it may be entitled, both at law and in equity, both general and special.

Dated:    August 1, 2012

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: _Sheldon Eisenberg_

Sheldon Eisenberg

Attorneys for Defendants
Cabazon Band of Mission Indians, and
East Valley Tourist Development
Authority

## PROOF OF SERVICE

**STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Drinker Biddle & Reath LLP, 1800 Century Park East, Suite 1400, Los Angeles, California 90067.

    On August 1, 2012, I served the foregoing document described as: **DEFENDANTS' NOTICE OF INTERESTED PARTIES** on the interested parties in this action by transmitting a copy as follows:

Eric M. George, Esq., Ira Bibero, Esq. and Lori Sambol Brody, Esq.
Browne George Ross LLP
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
Emails: egeorge@bgrfirm.com; ibibbero@bgrfirm.com; and lbrody@bgrfirm.com
Attorneys for Plaintiff, Wells Fargo Bank, NA

  __X__  **By UNITED STATES MAIL** (I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.)

  ____  **By OVERNIGHT DELIVERY** (by causing such envelope to be delivered to the office of the addressee by overnight delivery via Federal Express or by other similar overnight delivery service.)

  ____  **By FAX TRANSMISSION**

  __X__  (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

    Executed on August 1, 2012, at Los Angeles, California.

_____
MARY T. AVILA
Name

_____
Signature

**PAGE 7 OF THIS REMOVAL DOCUMENT**

**IS INTENTIONALLY LEFT BLANK.**

**THE EXHIBITS START WITH PAGE 8.**

# EXHIBIT A

# TO REMOVAL

BY FAX                    ORIGINAL

**SUMMONS**                                                        SUM-100

**(CITACION JUDICIAL)**

|  | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
CABAZON BAND OF MISSION INDIANS, a federally reconized Indian Tribe;
and EAST VALLEY TOURIST DEVELOPMENT AUTHORITY, an
unincorporated entity

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**
WELLS FARGO BANK, NA, as Trustee

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUL 31 2012

B    Rivera

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is:<br>(El nombre y dirección de la corte es): | CASE NUMBER:<br>(Número del Caso): INC 1205391 |
|---|---|

Superior Court of the State of California
County of Riverside, Indio Judicial District
46-200 Oasis Street
Indio, CA 92201

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
BROWNE GEORGE ROSS LLP, Eric M. George, Ira Bibbero
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA 90067 Tel: 310. 274.7100

| DATE:<br>(Fecha) JUL 31 2012 | Clerk, by<br>(Secretario) | , Deputy<br>(Adjunto) |
|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc.<br>www.FormsWorkflow.com | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|---|

**9**



ORIGINAL

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE**

☐ **BANNING** 135 N. Alessandro Rd., Banning, CA 92220
☐ **BLYTHE** 265 N. Broadway, Blythe, CA 92225
☐ **HEMET** 880 N. State St., Hemet, CA 92543
☒ **INDIO** 46-200 Oasis St., Indio, CA 92201

☐ **MORENO VALLEY** 13800 Heacock St., Ste. D201, Moreno Valley, CA 92553
☐ **MURRIETA** 30755-D Auld Rd., Suite 1226, Murrieta, CA 92563
☐ **RIVERSIDE** 4050 Main St., Riverside, CA 92501
☐ **TEMECULA** 41002 County Center Dr., Ste. 100, Temecula, CA 92591

RI-030

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar Number and Address)<br>Eric M. George (SBN 166403); Ira Bibbero (SBN 217518)<br>BROWNE GEORGE ROSS LLP<br>2121 Avenue of the Stars, Suite 2400<br>Los Angeles, CA  90067<br>TELEPHONE NO: (310) 274-7100   FAX NO. (Optional):  (310) 275-5697<br>E-MAIL ADDRESS (Optional): egeorge@bgrfirm.com; ibibbero@bgrfirm.com<br>ATTORNEY FOR (Name): Plaintiff, Wells Fargo Bank, NA | FOR COURT USE ONLY<br>F I L E D<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF RIVERSIDE<br>JUL 31 2012<br>By _____ Rivera |
|---|---|
| PLAINTIFF/PETITIONER: WELLS FARGO BANK, NA<br><br>DEFENDANT/RESPONDENT: CABAZON BAND OF MISSION INDIANS, et al | CASE NUMBER:<br>INC 1 2 0 5 3 9 1 |

**CERTIFICATE OF COUNSEL**

The undersigned certifies that this matter should be tried or heard in the court identified above for the reasons specified below:

☐   The action arose in the zip code of: _____

☐   The action concerns real property located in the zip code of: _____

☒   The Defendant resides in the zip code of: _92203-3495_____

For more information on where actions should be filed in the Riverside County Superior Courts, please refer to Local Rule 1.0015 at www.riverside.courts.ca.gov.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date ___July 31, 2012_____

_____Ira Bibbero_____          ► _____
(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY MAKING DECLARATION)                    (SIGNATURE)

Approved for Mandatory Use
Riverside Superior Court
RI-030 [Rev. 07/01/12]

**CERTIFICATE OF COUNSEL**

Page 1 of 1
Local Rule 1.0015
riverside.courts.ca.gov/localforms/localforms.shtml

**10**

ORIGINAL

1  BROWNE GEORGE ROSS LLP
   Eric M. George (State Bar No. 166403)
2    egeorge@bgrfirm.com
   Ira Bibbero (State Bar No. 217518)
3    ibibbero@bgrfirm.com
   Lori Sambol Brody (State Bar No. 150545)
4    lbrody@bgrfirm.com
   2121 Avenue of the Stars, Suite 2400
5  Los Angeles, California 90067
   Telephone: (310) 274-7100
6  Facsimile: (310) 275-5697

7  Attorneys for Plaintiff, Wells Fargo Bank, NA

8

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUL 31 2012

B        Rivera

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                  COUNTY OF RIVERSIDE, INDIO JUDICIAL DISTRICT

12

13  WELLS FARGO BANK, NA, as Trustee,        Case No.  INC  1 2 0 5 3 9 1

14            Plaintiff,                      COMPLAINT FOR BREACH OF
                                             CONTRACT AND INJUNCTIVE RELIEF
15        vs.
                                             Trial Date:  None Set
16  CABAZON BAND OF MISSION INDIANS,
    a federally recognized Indian tribe; and EAST
17  VALLEY TOURIST DEVELOPMENT
    AUTHORITY, an unincorporated entity,
18
              Defendants.
19

20

21

22

23

24

25

26

27

28

335715.1

COMPLAINT

11

Plaintiff Wells Fargo Bank, National Association ("Wells Fargo") hereby alleges as follows:

## INTRODUCTION

1.     This action stems from the default and repudiation of a Senior Note and a Trust Indenture issued by defendant Cabazon Band of Mission Indians (the "Tribe") to evidence and secure a $56,570,000 loan to Tribe dated as of June 1, 2006, as amended and restructured as of May 1, 2010.  In addition to collecting the moneys due under the Senior Note, it seeks to specifically enforce certain covenants of the Tribe under the Trust Indenture, and of the East Valley Tourist Development Authority (the "Authority") under a certain Amended and Restated Pledge and Transfer Agreement dated as of May 1, 2010.  The Authority is the instrumentality of the Tribe through which the Tribe operates a Class III casino and related facilities in Indio, Riverside County, California, known as Fantasy Springs Resort and Casino.

## PARTIES

2.     Wells Fargo is a national banking association with trust powers, with its principal place of business in Sioux Falls, South Dakota; Wells Fargo's Corporate Trust Division has its principal place of business in Minneapolis, Minnesota.  Wells Fargo is the trustee under a Trust Indenture executed by the Tribe dated as of June 1, 2006, as amended (in such capacity, the "Trustee").

3.     The Tribe is a federally recognized Indian tribe existing under the laws of the United States with a principal place of business at 84-245 Indio Springs Drive, Indio, CA 92203. Wells Fargo is informed and believes that the Tribe has fewer than 50 members, makes annual distributions and payments to or for the direct personal benefit of its members in an amount exceeding $4,000,000 from operations of its Fantasy Springs Casino and Resort (the "Casino Facility"), and has distributed over $62 million to its tribal members through March 31, 2012.

4.     The Authority is a single purpose instrumentality of the Tribe created and existing under Tribal law to own and operate the Casino Facility, with a principal place of business at 84-245 Indio Springs Drive, Indio, CA 92203.

335715.1

-1-

COMPLAINT

**12**

**JURISDICTION AND VENUE**

5.     Venue is proper in this Court because defendants have their principal place of business in Riverside County, California.

6.     Defendants expressly waived their sovereign immunity and consented to this Court's jurisdiction in multiple agreements and resolutions, as discussed below.

**FACTUAL BACKGROUND**

**The 2006 Senior Notes Transaction**

7.     In order to finance the construction of a parking garage and refinance certain Tribal and Authority debt, the Tribe entered into an Indenture dated as of June 1, 2006 with the Trustee (the "Original Indenture"), and issued a Senior Note under the Original Indenture in the amount of $56,570,000 (the "Original Senior Note"; collectively, the Original Indenture, the Original Senior Note and related documents are referred to as the 2006 Senior Note Transaction). True and correct copies of the Original Indenture and the Original Senior Note are attached hereto as Exhibits A and B, respectively.

8.     The Tribe sold the Original Senior Note to The GMS Group, LLC as initial purchaser, for $56,570,000 less original discount. The GMS Group, LLC immediately sold the Original Senior Note to Fantasy Springs Acquisition, LLC (the "Noteholder"), a special purpose vehicle formed by Saybrook Capital LLC to hold the Original Senior Note, for $56,570,000.

9.     In connection with the 2006 Senior Note Transaction, the Tribe also executed and delivered various other loan documents, including without limitation:

    a.   Pledge and Transfer Agreement dated as of June 1, 2006, a true and correct copy of which is attached hereto as Exhibit C (the "Original Pledge Agreement");

    b.   UCC-1 financing statement duly filed with the California Secretary of State on June 23, 2006, a true and correct copy of which is attached hereto as Exhibit D. The financing statement was continued by continuation statement filed with the Secretary of State on April 26, 2011, a true and correct copy of which is attached hereto as Exhibit E;

c.   Note Purchase Agreement dated as of June 22, 2006, a true and correct copy of which is attached hereto as Exhibit F;

d.   Limited Offering Memorandum dated as of June 23, 2006, a true and correct copy of which is attached hereto as Exhibit G (the "Offering Memorandum"); and

e.   Tribal Certificate dated June 23, 2006, a true and correct copy of which is attached hereto as Exhibit H.  Attached as the last document to the Tribal Certificate dated June 23, 2006 is Tribal Resolution No. 6-21-06-2 (the "2006 Resolution") adopted by the Tribe's Business Committee, which is authorized under tribal law to authorize Tribal borrowings and other contracts, and to waive sovereign immunity.

### The 2010 Restructuring

10.   In 2010 the 2006 Senior Note Transaction was restructured at the request of the Tribe (the "2010 Restructuring"; together with the 2006 Senior Note Transaction, the "Transaction").  In connection with that restructuring, the Tribe executed and delivered various loan documents, including without limitation:

a.   Amended and Restated Note dated as of May 1, 2010 in the original principal amount of $41,070,000, a true and correct copy of which is attached hereto as Exhibit I (the "Amended Note");

b.   First Supplemental Trust Indenture dated as of May 1, 2010, a true and correct copy of which is attached hereto as Exhibit J (the "Supplemental Indenture"; the term "Indenture" refers to the terms of the Original Indenture as amended and supplemented by the Supplemental Indenture);

c.   Amended and Restated Pledge and Transfer Agreement dated as of May 1, 2010, a true and correct copy of which is attached hereto as Exhibit K (the "Amended Pledge Agreement");

d.   UCC-1 financing statement duly filed with the California Secretary of State on May 18, 2010, a true and correct copy of which is attached hereto as Exhibit L; and

e.   Tribal Certificate dated May 12, 2010, a true and correct copy of which is attached hereto as Exhibit M.  Attached to the Tribal Certificate dated May 12, 2010 is

1   Tribal Resolution No. 5-11-10-1 (the "2010 Resolution") adopted by the Tribe's

2   Business Committee.

3   11.   As a result of payments made under the 2010 Restructuring, the principal balance

4   under the Original Note was reduced to $41,070,000.  That principal balance remains outstanding

5   under the Amended Note, together with interest (including PIK interest and default interest), fees

6   and costs.

7   12.   The Noteholder held 100% of the Original Senior Note at all relevant times prior to

8   the 2010 Restructuring, and at all times thereafter has held and now holds 100% of the Amended

9   Note.

10   13.   Under section 3 of the Amended Pledge Agreement, the Trustee holds a perfected

11   security interest in Distributable Authority Revenues securing the Amended Note.  Distributable

12   Authority Revenues, a term defined in the Indenture, are the monthly distributions from the

13   Authority to the Tribe.  They are revenues not needed for ongoing Authority operations (i.e. funds

14   remaining after payment of the Authority's operating expenses, capital expenditures, and

15   reimbursements to the Tribe for the cost of all services provided by the Tribe to the

16   Authority).  Distributable Authority Revenues are the primary collateral of the Trustee under the

17   Amended Pledge Agreement.

18   **The Tribe's Waivers of Sovereign Immunity and Consent to Jurisdiction**

19   14.   In connection with the Transaction, the Tribe issued various documents and

20   commitments confirming that it waived its sovereign immunity and consented to jurisdiction in

21   this court.

22   a.   Section 8.9 of the Indenture provides in relevant part as follows:

23   SECTION 8.9   Limited Waiver of Sovereign Immunity.

24   (a) The Tribe does not consent to the entry, enforcement, levy or other
     execution of any judgment for money or other damages against any assets,

25   real or personal, of the Tribe, except that the Tribe waives its sovereign
     immunity from unconsented suit or other legal proceeding, and any

26   defense based thereon, as authorized herein, whether such suit or

27   proceedings be brought in law or in equity, or in administrative
     proceedings or proceedings in arbitration, with respect to enforcement of

28   the covenants and obligations of the Tribe under this Indenture and the

333715.1

-4-

COMPLAINT

**15**

Notes and the transactions contemplated hereby, or for the commencement and maintenance of any action by the Note Trustee (or by the Owners or Beneficial Owners of the Notes) to interpret or enforce the terms of this Indenture, the Notes and each other Note Document, and to enforce and execute any order, judgment or ruling resulting therefrom against any assets or revenues of the Tribe other than real property held in trust for the Tribe by the United States, and in all circumstances, as may be necessary to obtain specific performance of the provisions of this Indenture, the Notes and each other Note Document.

(b) The Tribe waives its immunity from unconsented suit and other legal proceedings, and any defense based thereon, to permit suit by the parties identified in subsection (a) above in the United States District Court for the Central District of California and the California Superior Court for the County of Riverside and all courts to which appeals therefrom are available, and enforcement of any judgment of such court in any court of competent jurisdiction, or arbitrators, appointed and acting under the commercial arbitration rules of the American Arbitration Association, to:

(i)      enforce any remedy provided under the Note Documents, order the Tribe to perform or comply with any of the provisions applicable to it of the Note Documents, order amounts payable under the Note Documents to be paid in accordance with the terms thereof, award and enforce the award of damages owing as a consequence of a breach of the Note Documents, whether such order or award is the product of litigation, administrative proceedings, or arbitration;

(ii)      order the seizure and sale of any assets of the Tribe, other than any interest in property held in trust for the Tribe by the United States of America, or the exercise of any other remedy available generally in the State of California for judgment creditors;

(iii)      determine whether any consent or approval of the Tribe has been improperly granted or unreasonably withheld;

(iv)      enforce any judgment prohibiting the Tribe from taking any action, or mandating or obligating the Tribe to take any action; and

(v)      as to a court of competent jurisdiction only, but not arbitration, adjudicate any claim under the Indian Civil Rights Act of 1968, 25 U.S.C. § 1302 (or any successor statute).

(c) The Tribe expressly waives any right it may otherwise have to require that foregoing matter be considered or heard first in any tribal court of the Tribe, now or hereafter existing, whether because of the doctrine of exhaustion of tribal remedies or as a matter of comity or abstention.

335715.1

(d) The Tribe expressly and irrevocably acknowledges and agrees that the rights and remedies of any Owner of the Notes hereunder, and the rights, duties and obligations of the Note Trustee hereunder, shall be governed by and construed in accordance with the laws of the State of California. In particular, the Tribe further acknowledges and agrees, to the extent necessary for the enforcement and perfection of any lien created hereunder or to secure the indebtedness of the Tribe created hereunder that the California Commercial Code, as now or hereunder in effect (the "State UCC"), shall each be applicable to this Indenture, providing the Note Trustee with all rights available to secured parties under the State UCC. The rights of the Note Trustee hereunder shall attach, be effective, and be perfected immediately and without possession by the Note Trustee and without filing or other act (other than the proper recording of any financing statements under the State UCC) notwithstanding the fact that the Tribe might be deemed a "state" or "governmental unit" whose transfers might otherwise be excluded from coverage under the State UCC. The Tribe expressly submits itself to the jurisdiction and applicability of California law with respect to the recordation of any and all documents necessary to perfect or record the pledge and assignment granted herein to the Note Trustee.

b.   The Tribe also gave substantially the same waiver of immunity and consent to jurisdiction in the Offering Memorandum and the Amended Note; and in the Original Pledge Agreement and the Amended Pledge Agreement, as to enforcement of the covenants and obligations of the Tribe and the Authority under those Agreements.

15.   The waivers of immunity and consents to jurisdiction were duly authorized and approved by the Business Committee on behalf of the Tribe through the 2006 Resolution and the 2010 Resolution.

16.   The Tribe has effectively waived its immunity and consented to the jurisdiction of this Court as to all claims, remedies and causes of action asserted in this complaint.

**Tribal and Authority Covenants**

17.   Section 8.6(b) of the Indenture (the "Prior Consent Covenant") provides:

[T]he Tribe will not, and will not authorize or permit any Tribal Borrowing Entity to, alter any of the terms, covenants, or other conditions of the Authority Senior Debt, or any other indebtedness issued by the Tribe or any Tribal Borrowing Entity having any claim to the revenues of the [Authority] or otherwise derived from the Resort (including any of the Distributable Authority Revenues), without the written consent of a Majority of Owners.

The Authority is a Tribal Borrowing Entity and the Noteholder is the Majority of Owners for purposes of this section.

18.    Section 8.7(b) of the Indenture (the "Tribal Custodial Account Covenant") provides:

> [T]he Tribe shall deposit or cause to be deposited all of the Distributable Authority Revenues into the Custodial Account promptly after receipt thereof.  The Tribe shall not establish, or permit any subsidiary, agency, authority, instrumentality or other sub-unit of the Tribe (including the [Authority]), to establish, any other deposit or investment account for the collection of the Distributable Authority Revenues unless prior thereto, the Tribe, the [Authority], the Custodian, the [Trustee], and the custodian for such other account shall have entered into an amendment to, or replacement of the Pledge Agreement preserving the rights of the [Trustee] with respect to the Distributable Authority Revenues in form and substance reasonably satisfactory to the [Trustee] and approved by in writing by an Majority of Owners.

19.    In section 2 of the Amended Pledge Agreement the Authority made the following acknowledgment and covenant (the "Authority Custodial Account Covenant"):

> The Authority hereby expressly acknowledges the pledge by the Tribe to the [Trustee] . . . as herein provided and further agrees that, so long as any of the Senior Notes . . . are outstanding, on or before the first day of each calendar month the Authority shall deposit in the Custodial Account Distributable Authority Revenues equal to the Permitted Aggregate Monthly Distribution . . . .

Permitted Aggregate Monthly Distribution is defined in the Amended Pledge Agreement as "the aggregate amount (other than any reimbursement payment) permitted to be distributed by the Authority to the Tribe on a monthly basis" under a certain Bridge Loan Agreement dated as of August 6, 2007 among the Tribe, the Authority, Merrill Lynch Capital Corporation, as administrative agent, and certain lenders party thereto, as amended (the "Bridge Loan").  Wells Fargo is informed, and based thereon believes, that the current principal balance on the Bridge Loan is approximately $153,000,000.  The Bridge Loan is the primary obligation of the Authority, is secured by a lien on revenues of the Authority, and constitutes Authority Senior Debt for purposes of the Prior Consent Covenant.

335715.1

-7-

18

**The Tribe's Repudiation and Default.**

20.     Under the terms of the Transaction, the Tribe is required, among other things, to make monthly payments into a Note Fund (as defined in the Indenture) established by the Trustee under section 4.1(a) of the Indenture, and to make semi-annual interest payments on January 1 and July 1 of each year to the Noteholder as provided under section 2.1(d) of the Indenture and the Amended Note.

21.     The Tribe and the Authority sent the Noteholder a Joint Notice dated April 2, 2012, a true and correct copy of which is attached hereto as Exhibit N.  The Joint Notice stated that the Tribe and the Authority intended to restructure their debts, and would cease making debt service payments to their lenders, including the Noteholder, pending that restructuring; but the Authority would continue making distributions to the Tribe in the monthly amount of approximately $680,000, and would continue making payments to one of its lenders.

22.     The Joint Notice constitutes a repudiation and anticipatory breach by the Tribe of its obligations under the Indenture and the Amended Note.

23.     The Tribe failed to make payments required under the Indenture and the Amended Note on and after April 1, 2012.

24.     Beginning on April 1, 2012, and continuing thereafter until the present, the Tribe and the Authority have failed to deposit Distributable Authority Revenues into the Custodial Account, as required under the Tribal Custodial Account Covenant and the Authority Custodial Account Covenant.  Wells Fargo believes, and based thereon alleges, that the Tribe and the Authority have instead diverted Distributable Authority Revenues into one or more other accounts not subject to the control of the Trustee, and the Tribe continues to distribute the bulk of such revenues directly to or for the personal benefit of members of the Tribe.  The Tribe has therefore breached its obligations under the Tribal Custodial Account Covenant, and the Authority has breached its obligations under the Authority Custodial Account Covenant.

25.     The Trustee sent the Tribe a notice of default dated July 17, 2012, a true and correct copy of which is attached hereto as Exhibit O.  The notice of default also accelerated all amounts outstanding under the Indenture and the Amended Note, in accordance with section 6.3 of the

335715.1

**19**

1  Indenture. All such amounts are now due and owing, including principal, interest, PIK and default

2  interest, fees and costs.

3       26.    The Trustee and the Noteholder have fully and wholly performed their obligations

4  under the Transaction, and all agreements related thereto, including the Indenture.

5       27.    The obligations of the Tribe under the Transaction are general recourse and may be

6  enforced against any and all assets of the Tribe, other than any interest in property held in trust for

7  the Tribe by the United States of America.

8       28.    Under section 6.5 and other provisions of the Indenture, the Trustee has the right

9  and power to enforce the Indenture, the Amended Pledge Agreement, and all other agreements

10  executed in connection with the Transaction, and to enforce and collect amounts due under the

11  Amended Note, all for the benefit of the Noteholder.

12  **First Cause of Action**

13  **For Breach of Contract –Action on Debt**

14  **(Against the Tribe)**

15       29.    Plaintiff realleges the allegations contained in paragraphs 1 through 28 as if set

16  forth fully herein.

17       30.    The Amended Note is a certificated security for purposes of Division 8 of the

18  California Uniform Commercial Code.  The Noteholder is a purchaser for value of the Original

19  Senior Note, as amended and restated in the Amended Note, without notice of any adverse claim

20  or defect; the Tribe received substantial consideration for the Original Senior Note, as amended

21  and restated in the Amended Note; and Noteholder at all relevant times had control of the Original

22  Senior Note and, after the 2010 Restructuring, at all times has had control of the Amended Note.

23  The Noteholder is a protected purchaser for purposes of Division 8 of the California Uniform

24  Commercial Code.

25       31.    There has been substantial compliance with the legal requirements governing the

26  Tribe's issuance of the Original Senior Note, as amended and restated by the Amended Note; the

27  Tribe received substantial consideration for the issue; and a stated purpose of the issue is one for

28

335715.1

-9-

COMPLAINT

**20**

1  which the Tribe has power to borrow money or issue the Original Senior Note, as amended and

2  restated by the Amended Note.

3       32.   The Tribe promised to pay all amounts outstanding under the Amended Note in

4  accordance with the terms of the Amended Note and the Indenture.

5       33.   The Tribe has breached and repudiated its obligations under the Amended Note and

6  the Indenture.

7       34.   The Noteholder has been damaged by that breach and repudiation.

8       35.   All amounts outstanding under the Amended Note, including, without limitation,

9  principal in the amount of $41,070,000, interest (including default interest and PIK interest), fees

10  and costs, are presently due and owing.

11      36.   Wherefore, the Trustee has been damaged by the Tribe in an amount to be proven

12  at trial exceeding $41,070,000, consisting of principal in the amount of $41,070,000, interest

13  (including default interest and PIK interest, as set forth in the Indenture and the Amended Note),

14  fees and costs.

15                        **Second Cause of Action**

16                        **For Injunctive Relief**

17  **Deposit of Distributable Authority Revenues into Custodial Account**

18                        **(Against All Defendants)**

19      37.   Plaintiff realleges the allegations contained in paragraphs 1 through 36 as if set

20  forth fully herein.

21      38.   The Tribe and the Authority covenanted and agreed to deposit all Distributable

22  Authority Revenues into the Custodial Account under the control of the Trustee as Custodian.

23      39.   The Distributable Authority Revenues are subject to a perfected security interest in

24  favor of the Trustee.

25      40.   The Tribe and Authority have intentionally and fraudulently diverted and converted

26  Distributable Authority Revenues into one or more accounts maintained by the Tribe that are not

27  under the control of the Trustee as Custodian, in violation of their express covenants and

28  agreements.

335715.1

41.     The Tribe informed the Noteholder through the Joint Notice that it will continue to spend the diverted Distributable Authority Revenues on governmental programs.  Based on prior Tribal financial statements and Tribal practice, Wells Fargo believes that these programs include, without limitation, making ongoing substantial distribution payments to or for the benefit of Tribal members.  Based on financial statements provided to it and Noteholder by the Tribe pursuant to the Indenture, Wells Fargo believes that the bulk of such diverted Distributable Authority Revenues are being paid by the Tribe directly to Tribal members for their personal use and personal benefit.

42.     The diverted Distributable Authority Revenues constitute a wasting asset of the Tribe.

43.     The Tribe and the Authority stated in the Joint Notice that they are unwilling to pay their respective debt service as it comes due.  Wells Fargo is informed, and based thereon believes, that the Tribe and the Authority are also unable to pay their respective debts as they come due.  Based upon the Tribe's financial statements dated as of March 31, 2012, the Tribe's liabilities exceed its assets by $57,879,967; and based upon the Authority's financial statements dated as of March 31, 2012, the Authority's liabilities exceed its assets by $23,965,736.  The Tribe and the Authority are insolvent, and the Trustee will be unable to collect the amount of diverted Distributable Authority Revenues from the Tribe or the Authority through an action at law.

44.     The Trustee and the Noteholder will be irreparably harmed if the Authority and the Tribe fail to account for Distributable Authority Revenues distributed to the Tribe after April 1, 2012, and if they continue to divert Distributable Authority Revenues in violation of their covenants and agreements.

45.     The Trustee has no adequate remedy at law.

46.     Wherefore, the Trustee requests that the Court enter:

     a.     a temporary restraining order and preliminary injunction to:

          i.     Enjoin the Tribe, its agents, servants, employees, representatives, and all other persons and/or entities acting in concert with it, from commingling, transferring, spending, investing, distributing, or otherwise

1    disposing of all or any part of the Distributable Authority Revenues paid by

2    the Authority to the Tribe after the date of the temporary restraining order

3    and/or preliminary injunction orders;

4    ii.    Enjoin the Authority, its agents, servants, employees,

5    representatives, and all other persons and/or entities acting in concert with

6    it, from transferring or in any manner distributing any Distributable

7    Authority Revenues to or for the benefit of the Tribe after the date of the

8    temporary restraining order and/or preliminary injunction orders, other than

9    distributions expressly subject to the injunction issued pursuant to

10   subparagraph (a)(i); and

11   iii.   Account to Wells Fargo for all Distributable Authority Revenues

12   paid by the Authority to any person or entity other than Wells Fargo on and

13   after April 1, 2012.

14   b.    a permanent injunction requiring the Tribe and the Authority to:

15   i.    Account to the Trustee for all Distributable Authority Revenues paid

16   by the Authority to any person or entity other than Wells Fargo on and after

17   April 1, 2012;

18   ii.    Transfer to the Custodial Account (A) all such moneys held by the

19   Tribe subject to the temporary restraining order or injunctions issued

20   pursuant to subparagraph (a)(i) above, as well as (B) any other such moneys

21   paid to the Tribe prior the date of the injunction, to the extent they are in the

22   possession, custody, or control of the Tribe as of the date of the injunction;

23   and

24   iii.   Promptly deposit into the Custodial Account all Distributable

25   Authority Revenues paid or payable to the Tribe by the Authority after the

26   date of such injunction, without diversion to any other account.

27

28

335715.1

-12-
COMPLAINT

**23**

### Third Cause of Action

### For Declaratory Judgment and Injunctive Relief

### Noteholder's Right of Prior Consent

### to Restructuring or Amendment of Authority and Tribal Debt

### (Against All Defendants)

47.     Plaintiff realleges the allegations contained in paragraphs 1 through 46 as if set forth fully herein.

48.     The Tribe covenanted and agreed in the Prior Consent Covenant that it will not, and will not authorize or permit any Tribal Borrowing Entity (including the Authority) to, alter any of the terms, covenants, or other conditions of the Authority Senior Debt, or any other indebtedness issued by the Tribe or any Tribal Borrowing Entity having any claim to the revenues of the Authority or otherwise derived from the Casino Facility (including any of the Distributable Authority Revenues), without the written consent of the Noteholder.

49.     The Trustee, at Noteholder's direction, sent a letter to the Tribe dated July 12, 2012 (the "Further Assurances Letter"), a true and correct copy of which is attached hereto as Exhibit P, demanding further assurances from the Tribe that it will, as required by section 8.6(b) of the Indenture, not enter into a restructuring or amendment of the Bridge Loan without the prior written consent of the Noteholder.  As of the date of this complaint, the Tribe did not respond in writing to letter in Exhibit P.

50.     The Noteholder was informed by counsel to the lenders under the Bridge Loan on July 19, 2012 that those lenders are currently engaged in negotiations with the Tribe and the Authority regarding restructuring or amending the terms of the Bridge Loan; drafts have been circulated; and execution of a restructuring agreement was a matter of weeks, not months – more like two weeks from that date.

51.     Based on the statements of the counsel to the Bridge Lenders and the Tribe's failure to reply to the Further Assurances Letter, it is highly likely that the Authority and the Tribe will enter into a restructuring of the Bridge Loan without the consent of Noteholder, and will present the terms of that restructuring – including the amount of Distributable Authority Revenues

335715.1

-13-

COMPLAINT

1  available to fund payments on the Amended Note – to the Trustee and Noteholder as a "done deal"

2  or fait accompli.

3      52.    Noteholder will be irreparably harmed if it does not have the bargained-for right, as

4  provided in section 8.6 of the Indenture, to prior written approval of any restructuring of the

5  Bridge Loan, because the terms of any restructuring of the Authority's Bridge Loan will determine

6  the amount, if any, of Distributable Authority Revenues that will be available, after such

7  restructuring, to make payments on the Amended Note.

8      53.    The Trustee and Noteholder have no adequate remedy at law.

9      54.    An actual controversy exists as to the validity and effect of the Prior Consent

10  Covenant on a restructuring of the Bridge Loan, including, without limitation, the validity and

11  effect of any agreement entered into by the Tribe or the Authority in violation of that covenant.

12      55.    Wherefore, the Trustee requests that the Court enter (a) a declaratory judgment

13  declaring that any agreement entered into by the Tribe or the Authority amending or restructuring

14  the Bridge Loan in violation of the Prior Consent Covenant is void and of no effect; and (b) a

15  temporary restraining order, and preliminary and permanent injunctions enjoining the Tribe from

16  entering into, consenting to, or authorizing or permitting the Authority to enter into, any

17  restructuring or amendment of the Bridge Loan without the prior written consent of Noteholder.

18      **PRAYER**

19  Wherefore, Plaintiff Wells Fargo prays as follows:

20  On the first cause of action against the Tribe, for

21      1.    damages exceeding $41,070,000;

22      2.    prejudgment interest, including without limitation PIK and default interest,

23  according to the terms of the Indenture and the Amended Note; and

24      3.    post-judgment interest as permitted by law.

25  On the second cause of action, for:

26      4.    a temporary restraining order and preliminary order to:

27          a.    Enjoin the Tribe, its agents, servants, employees, representatives, and all

28  other persons and/or entities acting in concert with it, from commingling, transferring, spending,

335715.1

-14-

COMPLAINT

1  investing, distributing, or otherwise disposing of all or any part of the Distributable Authority

2  Revenues paid by the Authority to the Tribe after the date of the temporary restraining order

3  and/or preliminary injunction orders;

4        b.    Enjoin the Authority, its agents, servants, employees, representatives, and

5  all other persons and/or entities acting in concert with it, from transferring or in any manner

6  distributing any Distributable Authority Revenues to or for the benefit of the Tribe after the date of

7  the temporary restraining order and/or preliminary injunction orders, other than distributions

8  expressly subject to the injunction issued pursuant to subparagraph (a); and

9        c.    account to Wells Fargo for all Distributable Authority Revenues paid by the

10  Authority to any person or entity other than Wells Fargo on and after April 1, 2012; and for

11      5.    a permanent injunction requiring the Tribe and the Authority to:

12        a.    account to the Trustee for all Distributable Authority Revenues paid by the

13  Authority to any person or entity other than Wells Fargo on and after April 1, 2012;

14        b.    transfer to the Custodial Account (i) all such moneys held by the Tribe

15  subject to the temporary restraining order or injunctions issued pursuant to subparagraph 4(a)

16  above, as well as (ii) any other such moneys paid to the Tribe prior the date of the injunction, to

17  the extent they are in the possession, custody, and control of the Tribe as of the date of the

18  injunction; and

19        c.    promptly deposit into the Custodial Account all Distributable Authority

20  Revenues paid or payable to the Tribe by the Authority after the date of such injunction, without

21  diversion to any other account.

22      6.    On the third cause of action, for:

23        a.    a declaratory judgment declaring that any agreement entered into by the

24  Tribe or the Authority amending or restructuring the Bridge Loan without the prior written

25  consent of Noteholder in violation of the Prior Consent Covenant is void and of no effect; and

26        b.    a temporary restraining order, and preliminary and permanent injunctions

27  enjoining the Tribe from entering into, consenting to, or authorizing or permitting the Authority to

28

335715.1

enter into, any restructuring or amendment of the Bridge Loan without the prior written consent of Noteholder.

On all causes of action, for:

6.     reasonable attorney's fees as permitted by contract;

7.     costs of suit incurred herein, as permitted by law and by contract; and

8.     such other and further relief as may be deemed just and proper.

DATED: July 31, 2012

BROWNE GEORGE ROSS LLP
Eric M. George
Ira Bibbero
Lori Sambol Brody

By _____
Ira Bibbero
Attorneys for Plaintiff
Wells Fargo Bank, NA

335715.1

-16-
COMPLAINT

**27**

*INDENTURE*

*Between*

*CABAZON BAND OF MISSION INDIANS*

*And*

*WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee*

---

*Dated as of June 1, 2006*

---

*Relating to*
*$56,570,000 Senior Notes Due July 1, 2026*

**EXHIBIT A**

## TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS ............................................................................................ 2
    SECTION 1.1      Definitions of Terms. .......................................................... 2
    SECTION 1.2      Rules of Interpretation. ....................................................... 8
ARTICLE 2. CONCERNING THE NOTES ................................................................... 9
    SECTION 2.1      Form and Terms of Notes. .................................................. 9
    SECTION 2.2      Additional Notes. ............................................................... 10
    SECTION 2.3      Registration of Notes; Beneficial Owners. ........................ 10
    SECTION 2.4      No Transfers or Exchanges During Certain Periods. .......... 11
    SECTION 2.5      Manner of Effecting Transfer or Exchange. ...................... 11
    SECTION 2.6      Status of Owners. ............................................................... 11
    SECTION 2.7      Identification Numbers. ...................................................... 11
    SECTION 2.8      Execution, Authentication and Delivery. ........................... 11
    SECTION 2.9      Mutilated, Lost or Destroyed Notes. .................................. 12
    SECTION 2.10    Notes to be Substantially of Same Tenor. .......................... 12
    SECTION 2.11    Book-Entry System for Notes. ........................................... 12
    SECTION 2.12    Restrictions on Transferability of Notes. ........................... 14
ARTICLE 3. EXECUTION AND DELIVERY OF NOTES ........................................ 15
    SECTION 3.1      Execution and Delivery of Notes. ...................................... 15
ARTICLE 4. NOTE PAYMENTS; FUNDS AND ACCOUNTS ................................ 15
    SECTION 4.1      Note Payments. ................................................................... 15
    SECTION 4.2      Note Fund. .......................................................................... 15
    SECTION 4.3      Note Reserve Fund ............................................................. 17
    SECTION 4.4      Project Fund. ....................................................................... 18
    SECTION 4.5      Construction of the Parking Garage. .................................. 19
    SECTION 4.6      Moneys to Be Held for All Owners, with Certain Exceptions. ........ 20
    SECTION 4.7      Payments through Paying Agent. ....................................... 21
    SECTION 4.8      Moneys to be Trust Funds. ................................................. 21
    SECTION 4.9      Investment or Deposit of Funds. ........................................ 21
ARTICLE 5. REDEMPTION OF NOTES. .................................................................. 22
    SECTION 5.1      Notes Subject to Redemption. ........................................... 22
    SECTION 5.2      Notice and Effective Date of Redemptions; Redemption in Part. .......... 22
ARTICLE 6. EVENTS OF DEFAULT AND REMEDIES ......................................... 24
    SECTION 6.1      Events of Default Defined. ................................................. 24
    SECTION 6.2      Notice to Owners of Default. ............................................. 25
    SECTION 6.3      Acceleration. ....................................................................... 25
    SECTION 6.4      Rescission or Annulment of Defaults. ............................... 25
    SECTION 6.5      Remedies. ........................................................................... 25
    SECTION 6.6      Powers of Owners. ............................................................. 27
    SECTION 6.7      Limitations on Actions by Owners. .................................... 27
    SECTION 6.8      Application of Moneys. ...................................................... 28
    SECTION 6.9      Trustee May File Proofs of Claim. .................................... 29
ARTICLE 7. THE NOTE TRUSTEE .......................................................................... 30
    SECTION 7.1      Acceptance of Trust. .......................................................... 30
    SECTION 7.2      Recitals Made by Tribe. ..................................................... 32
    SECTION 7.3      Trustee May Act Through Agents. .................................... 32

**TABLE OF CONTENTS**
(continued)

Page

SECTION 7.4   Compensation and Indemnification of Trustee............................32
SECTION 7.5   Trustee Not Liable for Insurance. ...........................................33
SECTION 7.6   Trustee May Require Information. ...........................................33
SECTION 7.7   Trustee Not Obligated to Act. ................................................33
SECTION 7.8   Trustee May Make Advances. .................................................33
SECTION 7.9   Trustee May Rely in Good Faith Upon Others...........................34
SECTION 7.10  Trustee May Deal in Notes. ...................................................34
SECTION 7.11  Trustee May Construe Indenture. ...........................................34
SECTION 7.12  Resignation of Trustee. .........................................................34
SECTION 7.13  Removal of Trustee...............................................................34
SECTION 7.14  Successor Trustees. ..............................................................35
SECTION 7.15  Required Capital of Trustee...................................................35
SECTION 7.16  Acknowledgment by Successor Trustee. ..................................35
SECTION 7.17  Merger of Trustee. ...............................................................36
SECTION 7.18  Reports of Trustee................................................................36
SECTION 7.19  Financing Statements. ..........................................................36

ARTICLE 8. GENERAL COVENANTS AND REPRESENTATIONS OF THE TRIBE .......36
SECTION 8.1   Payment of Principal, Interest and Premium. ............................36
SECTION 8.2   Covenant to Perform and Authority of Tribe.............................37
SECTION 8.3   Covenants as to Existence, Maintenance of Properties, Etc. .........37
SECTION 8.4   Consolidation, Merger, Sale or Conveyance. .............................38
SECTION 8.5   Books and Records; Financial Statements and Other Information...........38
SECTION 8.6   Additional Indebtedness; Indebtedness of the Authority...............39
SECTION 8.7   Pledge Agreement.................................................................40
SECTION 8.8   Rating of Notes. ...................................................................41
SECTION 8.9   Limited Waiver of Sovereign Immunity. ...................................41
SECTION 8.10  Certain Approvals.................................................................43

ARTICLE 9. AMENDMENTS AND SUPPLEMENTS .........................................43
SECTION 9.1   Amendments and Supplements Without Consent of Owners............43
SECTION 9.2   Amendments With Consent of Owners. .....................................44
SECTION 9.3   Trustee Authorized to Join in Amendments and Supplements;
              Reliance on Counsel. ..............................................................44
SECTION 9.4   Execution of Supplemental Indentures. .....................................44
SECTION 9.5   Authentication of Notes After Execution and Delivery of
              Supplemental Indenture. .........................................................45

ARTICLE 10. DEFEASANCE ......................................................................45
SECTION 10.1  Defeasance of Notes. ............................................................45
SECTION 10.2  Deposit of Funds for Payment of Notes.....................................46
SECTION 10.3  Discharge of Indenture..........................................................46

ARTICLE 11. MISCELLANEOUS .................................................................47
SECTION 11.1  Limitation on Beneficiaries. ...................................................47
SECTION 11.2  Severability. ........................................................................47
SECTION 11.3  Unclaimed Funds. ................................................................47
SECTION 11.4  Notices. ..............................................................................47
SECTION 11.5  Notices to Beneficial Owners. ................................................48

**TABLE OF CONTENTS**
(continued)

Page

SECTION 11.6    Owners' Consents..................................................................48
SECTION 11.7    Successors..............................................................................48
SECTION 11.8    Indenture is a Security Agreement.........................................49
SECTION 11.9    Counterparts...........................................................................49

EXHIBIT A    FORM OF SENIOR NOTE
EXHIBIT B    FORM OF PROJECT FUND REQUISITION

**31**

## INDENTURE

THIS TRUST INDENTURE, dated as of June 1, 2006 (the "Indenture"), between the CABAZON BAND OF MISSION INDIANS, a federally recognized Indian tribe existing under the laws of the United States of America and governed by its articles of association approved April 13, 1965, as amended (the "Tribe"), and WELLS FARGO BANK, NATIONAL ASSOCIATION (the "Note Trustee"), as trustee, a national banking association, having a corporate trust office in Los Angeles, California;

### WITNESSETH:

WHEREAS, the Tribe has determined to incur indebtedness in an aggregate principal amount of $56,570,000 for the purpose of (i) financing the costs of constructing and equipping the Parking Garage (which capitalized term and other capitalized terms used in these recitals are defined in Article 1 hereof); (ii) financing certain payments due from the Tribe to the City of Indio, California, pursuant to the Agreement To Fund Traffic Impact Mitigation Measures dated November 25, 2002 between the City of Indio and the Tribe, and that certain Inducement Agreement by and between the Tribe and the California Statewide Communities Development Authority, dated as of June 20, 2003, (iii) refinancing the obligations of the East Valley Authority (which capitalized term and other used in these recitals are defined in Article 1 hereof) with respect to the Subordinated Revenue Bonds (East Valley Tourist Development Authority), Series 2003B, issued by the California Statewide Communities Development Authority in the outstanding amount of $35,000,000 under the Resort Development Bond Indenture, through the current refunding of such Bonds, (iv) funding the Note Reserve Fund; and (iv) paying the costs of issuing the Notes; and

WHEREAS, for the purpose of evidencing such indebtedness, the Tribe desires to issue hereunder its Senior Notes, due July 1, 2026, in aggregate principal amount of $56,570,000 (the "Notes"); and

WHEREAS, the Notes will constitute a general obligation of the Tribe to which its full faith and credit are pledged; and

WHEREAS, payment of the principal and Redemption Price of, and all interest on, the Notes, when and as the same shall become due, shall be further secured as provided in that certain Pledge and Transfer Agreement dated of even date herewith (the "Pledge Agreement") among the Tribe, the East Valley Authority, the Resort Development Bond Trustee and the Note Trustee, by the pledge and assignment in favor of the Note Trustee, for the equal and ratable benefit and security of the Notes, of the Distributable Authority Revenues having a first and senior claim to the Distributable Authority Revenues as provided in the Pledge Agreement; and

WHEREAS, all things necessary to make the Notes, when issued, executed and delivered by the Tribe and authenticated by the Note Trustee as provided in this Indenture, the valid and legally binding limited obligations of the Tribe, and to constitute this Indenture a valid and legally binding agreement and assignment and pledge of the revenue and other property described herein, in each case to provide for and secure the payment of the principal of, premium, if any, and all interest on the Notes issued hereunder have been done and performed, and the execution and delivery of this Indenture and the execution and issuance of the Notes, subject to the terms hereof, have in all respects been duly authorized;

NOW, THEREFORE, THIS INDENTURE WITNESSETH that the Tribe, in consideration of the premises, the acceptance by the Note Trustee of the trusts hereby created, the purchase and acceptance of the Notes by the Owners thereof, and of other good and valuable consideration the receipt and sufficiency

**32**

of which is hereby acknowledged, and in order to secure the payment of the principal and Redemption Price of, and all interest on, all of the Notes issued and Outstanding from time to time under this Indenture according to their tenor and effect, and to secure the performance and observance by the Tribe of all the covenants, agreements and conditions herein and in the Notes contained, does hereby, absolutely and irrevocably, pledge, assign and transfer to the Note Trustee and its successors and assigns in trust forever:

      (a)     all funds held in trust pursuant to this Indenture; and

      (b)     all right, title and interest of the Tribe in and to the Distributable Authority Revenues as further provided in the Pledge Agreement (herein defined); and

      (c)     any and all other real or personal property of every kind and nature from time to time hereafter, by delivery or by writing of any kind, pledged, assigned or transferred as and for additional security hereunder by the Tribe or by anyone in its behalf, or with its written consent, to the Note Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof;

TO HAVE AND TO HOLD the same with all rights and privileges hereby pledged and assigned, or agreed or intended so to be, to the Note Trustee and its successors and assigns forever;

IN TRUST NEVERTHELESS, upon the terms and subject to the conditions herein set forth, for the equal and proportionate benefit, protection and security of, the Owners from time to time of the Notes issued and Outstanding under this Indenture, without preference, priority or distinction as to lien or otherwise of any of the Notes over any other of the Notes, except as otherwise expressly provided herein;

PROVIDED, HOWEVER, that if the Tribe shall well and truly pay, or cause to be paid, the principal or Redemption Price of, and all interest on, all of the Notes, at the times and in the manner mentioned in the Notes according to the true intent and meaning thereof, or shall provide for the payment thereof as provided in Article 10 hereof and shall pay or cause to be paid to the Note Trustee all other sums of money due or to become due to it in accordance with the terms and provisions hereof, then, upon such final payment and satisfaction, this Indenture and the rights hereby granted shall cease, determine and be void; otherwise, this Indenture shall be and remain in full force and effect.

THIS INDENTURE FURTHER WITNESSETH, and it is hereby expressly declared, covenanted and agreed by and between the parties hereto, that all Notes issued and secured hereunder are to be issued, authenticated and delivered, and that all of the property and rights pledged and assigned hereunder is to be held and applied, under, upon and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses and purposes as expressed in this Indenture, and the Tribe does hereby agree and covenant with the Note Trustee and with the respective Owners from time to time of the Notes, as follows:

ARTICLE 1.
<u>DEFINITIONS</u>

SECTION 1.1    <u>Definitions of Terms</u>.

    (a)    The following terms shall be as defined in the Recitals:

        Indenture                                   Notes
        Note Trustee

Pledge Agreement                                              Tribe

(b)     In addition to the words and terms defined in the recitals or elsewhere in this Indenture, the following words and terms as used in this Indenture and in the other Note Documents shall have the following meanings, unless some other meaning is plainly intended:

"Acceleration Premium" means an additional amount due in respect of the acceleration of the Notes upon the occurrence of any Event of Default equal to the then applicable redemption premium payable upon the optional redemption of the Notes or, if the Notes are not then redeemable by optional redemption, the highest such premium set forth in the Notes.

"Authorized Denomination" means $100,000 or any multiple of $5,000 in excess thereof.

"Authority Distributions" means all dividends and distributions from the East Valley Authority paid or available for payment to the Tribe, as reflected on the audited financial statements of the Tribe delivered in accordance with Section 8.5 hereof, including all Distributable Authority Revenues paid or set aside for payment to the Note Trustee under the Pledge Agreement, but not including any portion thereof applied to the payment of the Priority Term Loan.

"Authorized Tribal Representative" means the Tribal Chairman or any other person authorized by resolution of the Tribe, or an authorized committee thereof, a certified copy of which has been delivered to the Note Trustee, to perform any such act or execute such document.

"Beneficial Owner" means, for any Book-Entry Note, the beneficial owner of such Book-Entry Note.

"Book-Entry Notes" means all Notes for which the Securities Depository or its nominee is the Owner.

"Business Day" means any day other than a Saturday or a Sunday on which banks in New York, New York, and the other city or cities in which the Designated Office of the Note Trustee is located are open for commercial banking purposes and on which the Securities Depository is not closed.

"Certified Tribal Resolution" means a copy of a resolution or resolutions certified by an Authorized Tribal Representative to have been duly adopted by its governing council and to be in full force and effect on the date of such certification.

"Clearing Fund" means the fund so designated established in accordance with Section 3.1 hereof for the initial deposit and disbursement of the proceeds of the sale of the Notes.

"Closing" means the time of initial issuance and delivery of the Notes to the purchasers thereof and the payment by the purchasers of the purchase price therefor.

"Closing Statement" means a written direction of the Tribe to the Note Trustee regarding the disbursement of the initial sale proceeds of the Notes.

"Compact" means the Tribal Compact between the Tribe and the State of California initially entered into on September 10, 1999 as approved by the United States Secretary of the Interior May 16, 2000, as amended and supplemented from time to time.

**34**

"Construction Monitor" means Levien-Rich Associates or any other architectural or engineering firm retained by the Tribe for the purpose of performing the duties of the Construction Monitor hereunder and approved in writing by a Majority of Owners.

"Counsel" means an attorney-at-law or law firm (which may be counsel to the Tribe, the Note Trustee or any other applicable party) admitted to practice before the highest court of any state (or the District of Columbia) and not unsatisfactory to the Tribe or the Note Trustee.

"Custodial Account" means the custodial account established with the Resort Development Bond Trustee for the deposit of the Distributable Authority Revenues as described in the Pledge Agreement.

"Date of Issue" means the date of the execution and delivery of this Indenture and the initial delivery of the Notes in exchange for the purchase price therefor.

"Debt Service Requirements" means, for any period, all required payments of the principal of, including principal due by reason of any mandatory sinking fund redemption, and the interest on, the Notes, together with all other required payments in respect thereof, including any required deposit to the Note Reserve Fund.

"Depository Requirements" means the operational arrangements of DTC or other applicable Securities Depository applicable to the deposit, transfer, exchange, registration, redemption and payment of, and other matters pertaining to, any Book-Entry Notes, as established from time to time by DTC or such other Securities Depository and agreed to by the Tribe, the Note Trustee, and the Paying Agent, as applicable.

"Designated Office" means, with respect to the Note Trustee, the office specified in Section 11.4 hereof or such other address as may hereafter be specified in writing by the Note Trustee, for purposes of notices to be given and actions to be taken hereunder. References to the Designated Office of the Note Registrar and Paying Agent means the office of the Paying Agent specified in Section 11.4.

"Distributable Authority Revenues" means all of the gross revenues, receipts and income of the East Valley Authority deposited with the Resort Development Bond Trustee in accordance with the Resort Development Bond Indenture and available thereunder for general distribution to the East Valley Authority or the Tribe and not otherwise pledged, assigned, transferred or encumbered for the purpose of satisfying any obligation of the East Valley Authority.

"DTC" means The Depository Trust Company, a limited-purpose trust company organized under the New York Banking Law, and any successor company. References to DTC herein may include, as the context may require, its nominee, Cede & Co.

"East Valley Authority" means the East Valley Tourist Development Authority, an instrumentality of the Tribe.

"Eastern Time" means the time on any given day in Eastern Standard Time or Eastern Daylight Savings Time, as applicable.

"Event of Default" means any Event of Default as described in Section 6.1 of this Indenture.

"Fiscal Year" means the designated fiscal year of the Tribe which currently begins on each July 1 and ends on the following June 30.

"Government Securities" means (a) direct obligations of the United States of America (including obligations issued or held in book entry form on the books of the Department of the Treasury), (b) obligations the principal and interest on which are unconditionally guaranteed by the United States of America, and (c) securities or receipts evidencing ownership interests in obligations or specified portions (such as principal or interest) of obligations described in (a) or (b) provided that such obligations to which such certificates relate are held in the custody of a bank or trust company not unsatisfactory to the Note Trustee in a special account separate from the general assets of such custodian.

"Indenture" means this Indenture as amended or supplemented from time to time by all indentures supplemental hereto. The term "this Indenture" means this instrument.

"Indian Lands" has the meaning established under the federal laws of the United States of America.

"Initial Reserve Deposit" means an amount equal to $6,137,163.04 required to be deposited in the Note Reserve Fund upon the initial issuance of the Notes, in accordance with Section 4.3 hereof.

"Investment Securities" means any of the following:

(a)    Government Securities;

(b)    Notes, debentures, notes or other evidence of indebtedness issued or guaranteed by any of the Federal Home Loan Mortgage Corporation, the Federal Home Loan Banks, the Federal National Mortgage Association or the Student Loan Marketing Association, but, in each case, only if at the time of their purchase such obligations are rated in any of the three highest Rating Categories by any Rating Agency;

(c)    Repurchase agreements:  (i) with banking institutions (including the Note Trustee or any of its affiliates) having or the parent company of which shall have (provided such parent company shall have guaranteed or otherwise become obligated as to such repurchase agreement) a current long-term debt rating in any of the three highest Rating Categories by any Rating Agency, pursuant to which there shall have been delivered to the Note Trustee, or its designee, Government Securities having at all times a fair market value of at least 100% of the value of such agreement; or (ii) with banking institutions, including the Note Trustee or any of its affiliates if applicable, not meeting the rating requirements of (i) above pursuant to which there shall have been delivered to the Note Trustee or its designee, Government Securities having at all times a fair market value of at least 103% of the value of such agreement;

(d)    Investment agreements (including any agreement for the forward or future delivery to the Note Trustee of Government Securities and/or securities described in clause (b) or (c) of this definition) with a bank, trust company, national banking association (including the Note Trustee or any of its affiliates), insurance company, insurance holding company, investment banking company, financial services company or other similar organization which is, or the parent of which (if the parent has fully guaranteed its subsidiary's obligations) is, at the time the agreement is entered into, rated in any of the three highest Rating Categories by any Rating Agency;

(e)    Negotiable or non-negotiable certificates of deposit, time or demand deposits or other similar banking arrangements, issued by any bank or trust company (which may be the commercial banking department of the Note Trustee or any of its affiliates) or savings and loan association which are (i) insured by the Federal Deposit Insurance Corporation or (ii) to the extent not so insured, secured as to principal by Government Securities; and

(f)     Shares of an open-end, diversified investment company which is registered under Rule 2a-7 promulgated under the Investment Company Act of 1940, as amended, the shares of which are registered under the Securities Act of 1933, as amended, and having aggregate net assets of not less than $50,000,000 on the date of purchase (including, without limitation, any such mutual fund for which the Note Trustee or an affiliate of the Note Trustee serves as investment manager, administrator, shareholder servicing agent, and/or custodian or subcustodian, notwithstanding that (i) the Note Trustee or an affiliate of the Note Trustee receives fees from such funds for services rendered, (ii) the Note Trustee charges and collects fees for services rendered pursuant to this Indenture, which fees are separate from the fees received from such funds, and (iii) services performed for such funds and pursuant to this Indenture may at times duplicate those provided to such funds by the Note Trustee or its affiliates.

"Majority of Owners" means the Owners or Beneficial Owners at the time in question owning at least a majority in principal amount Outstanding of the Notes, determined in each case in accordance with Section 2.3(c) hereof.

"Maximum Annual Debt Service Requirements" means the highest aggregate amount of Debt Service Requirements payable on the Notes in any future annual period ending on July 1 in any year.  As of the Date of Issue, the Maximum Annual Debt Service Requirements on the Notes is $9,366,250.

"Note Documents" means any of this Indenture, the Notes, the Pledge Agreement, and any other instrument or agreement executed and delivered by the Tribe for the purpose of effecting the transactions contemplated thereby.

"Note Fund" means the Note Fund established by the Note Trustee in accordance with Section 4.2 of this Indenture.

"Note Registrar" means the Note Trustee, which shall serve as Note Registrar for the Notes.

"Note Reserve Fund" means the Note Reserve Fund established by the Note Trustee in accordance with Section 4.3 hereof.

"Opinion of Counsel" means a written opinion or opinions of Counsel.

"Outstanding," when used with reference to Notes, means, as of a particular date, all Notes theretofore authenticated and delivered under the Indenture, except:  (a) Notes theretofore paid in full and cancelled by the Note Trustee or delivered to the Note Trustee for cancellation; (b) Notes deemed paid in accordance with the provisions of Article 10 of this Indenture; and (c) Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture.

"Owner" means the Person in whose name any Note is registered in accordance with Section 2.3 hereof.

"Parking Garage" means an approximately 1,000-stall covered parking facility to be constructed by the Tribe in accordance with the Inducement Agreement dated as of July 1, 2003, as amended, between the Tribe and the California Statewide Communities Development Authority, for the payment of the costs of which (among other things) the Tribe is issuing the Series A Notes.

"Paying Agent" means the Note Trustee or any other bank or trust company designated pursuant to this Indenture as paying agent for the Notes at which the principal of, premium, if any, or interest on any such Notes shall be payable.

"Person" mean natural persons, firms, associations, corporations and public bodies.

"Priority Term Loan" means the $2,300,000 loan provided to the Tribe in accordance with the Term Loan Agreement dated December 30, 2003, between the Tribe and Lehigh Municipal Leasing, Inc. for the purpose of financing (among other things) the connection fees under the Wastewater Connection Agreement.

"Project Fund" means the fund so designated established in accordance with Section 4.4 hereof for the purpose of paying the costs of constructing and equipping the Parking Garage.

"Rating Agency" means, with respect to the Notes, any of (i) Standard & Poor's Ratings Services, (ii) Moody's Investors Service, Inc., (iii) Fitch Ratings, or (iv) other nationally recognized securities rating service, as shall at the time in question have issued or maintained a rating on the Notes upon application of the Tribe.

"Rating Category" means, with respect to a particular investment, or the provider thereof, any of the principal rating categories which are assigned by a Rating Agency to investments or providers of the type in question (without regard to any distinction within any such category, including, distinctions identified by numerical symbols or symbols such as "+" or "-").

"Redemption Price" means (a) for optional redemptions, the amounts expressed as a percentage of principal amounts set forth under the heading "Optional Redemption" in the form of Note attached hereto as Exhibit A, and (b) for mandatory sinking fund redemptions, 100% of the principal amount of Notes to be redeemed, plus, in each case, accrued and unpaid interest, if any, to the redemption dates.

"Regular Record Date" means the 15th day of the calendar month (whether or not a Business Day) immediately preceding each Scheduled Interest Payment Date.

"Resort" means the casino, hotel, conference and related entertainment, gaming and hospitality operations and amenities comprising the business activities of the East Valley Authority.

"Resort Development Bond Indenture" means the Trust Indenture dated as of June 1, 2003, as amended by the First Amendment to Loan Agreement dated as of November 1, 2005, each between the California Statewide Communities Development Authority and the Resort Development Bond Trustee, as the same may be further amended from time to time.

"Resort Development Bond Trustee" means Wells Fargo Bank, National Association, as trustee under the Resort Bond Development Bond Indenture.

"Resort Development Loan Agreement" means the Loan Agreement dated as of June 1, 2003, as amended by the First Amendment to Loan Agreement dated as of November 1, 2005, each between the Authority and the California Statewide Communities Development Authority, as the same may be further amended from time to time.

"Scheduled Interest Payment Date" means January 1 and July 1 of each year, commencing January 1, 2007.

"Securities Depository" means DTC or other Person registered as a clearing agency under Section 17A of the Securities Exchange Act of 1934, as amended, or whose business is confined to the

**38**

performance of the functions of a clearing agency with respect to exempted securities, as defined in Section 3(a)(12) of such Act for purposes of Section 17A thereof.

"Senior Resort Development Bonds" means the Revenue Bonds (East Valley Tourist Development Authority), Series 2003A, issued on behalf of the Authority by the California Statewide Communities Development Authority in the original aggregate principal amount of $110,500,000 under the Resort Development Bond Indenture.

"Sinking Fund Account" means the Sinking Fund Account established for the mandatory redemption of the Notes, as provided in Section 4.2(b) hereof.

"Special Record Date" shall have the meaning set forth in the Notes.

"Supplemental Indenture" means any indenture supplemental to the Indenture entered into between the Tribe and the Note Trustee in accordance with Article 9 hereof.

"Tribal Financial Statements" means the annual and interim financial statements of the Tribe for the periods specified in Section 8.5 hereof, including a balance sheet, statement of income and changes in tribal equity and statement of cash flows, prepared in accordance with generally accepted accounting principles consistently applied, except that financial information for the Tribe's subsidiaries and instrumentalities shall be excluded in a manner consistent with past practice.

"Underwriter" means The GMS Group, L.L.C., as the initial Underwriter with respect to the Notes.

"Wastewater Treatment Agreement" means the letter agreement dated October 3, 2003, between the Tribe and the Valley Sanitation District, as amended by a further letter agreement dated January 2, 2004, providing for certain payments by the Tribe to secure connection rights to the wastewater collection system and treatment facility of the Valley Sanitation District.

SECTION 1.2    Rules of Interpretation.

(a)    Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, the words importing the singular number shall include the plural and vice versa, and words importing persons shall include firms, partnerships, associations and corporations, including public bodies, as well as natural persons.

(b)    All references in this instrument to designated "Articles," "Sections" and other subdivisions are, unless otherwise specified, to the designated Articles, Sections and subdivisions of this instrument as originally executed. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or subdivision.

(c)    All references to any particular time of day shall refer to Pacific standard or daylight time, as applicable.

(d)    The Table of Contents and the descriptive headings of the several Articles and Sections of this Indenture are included for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

PHTRANS\4312165                                      - 8 -

**39**

### ARTICLE 2.
### CONCERNING THE NOTES

SECTION 2.1      Form and Terms of Notes.

(a)      There are hereby authorized for initial issuance under this Indenture $56,570,000 aggregate principal amount of the Notes.

(b)      The form of the Notes shall be as set forth on Exhibit A hereto with such additions, deletions and modifications as shall be necessary or appropriate to reflect the terms of the applicable Notes.  The Notes shall be issued only in Authorized Denominations and shall be initially dated and authenticated as their date of original issuance.

(c)      The Notes shall be subject to optional redemption prior to maturity as provided in the form of the Note attached as provided in each form of the Note attached as Exhibit A and in Article 5 hereof.

(d)      Interest shall accrue on the Notes at the rates stated therein, calculated on the basis of a 360-day year consisting of twelve 30-day months, and shall be paid as follows:

(i)      Except as otherwise provided below, any interest payable on any Scheduled Interest Payment Date will be paid to the Person in whose name such Note is registered as of the close of business on the Regular Record Date for such Scheduled Interest Payment Date.

(ii)      Interest shall be paid by check or draft mailed on the applicable Scheduled Interest Payment Date to each Owner at the address shown on the registration books maintained by the Note Registrar.

(iii)      Any interest which is not paid or duly provided for on any Scheduled Interest Payment Date shall forthwith cease to be payable to the registered Owner as of the applicable Regular Record Date as provided in (i) above and shall be paid instead to the Person in whose name the Note is registered at the close of business on a special record date established for the payment of such defaulted interest pursuant to the terms of such Notes, such date to be not less than ten days (whether or not a Business Day) prior to the date of proposed payment.  The Note Trustee shall, at the expense of the Tribe, cause notice of the proposed payment of such defaulted interest and the special record date therefor to be mailed, first-class postage prepaid, to each Owner as of the Business Day preceding the mailing date, at his address as it appears in the note register, not less than 10 days prior to such special record date (but in no event more than 30 days prior to the proposed payment date).

(iv)      Interest on any Note shall cease to accrue on the maturity date thereof or date fixed for the redemption thereof, provided in the case of redemption that proper notice thereof has been given and provided in each case that there has been irrevocably deposited with the Paying Agent an amount sufficient to pay the principal or Redemption Price thereof, as applicable, plus all unpaid interest accrued thereon to such date.

(e)      The principal or Redemption Price of the Notes, and all interest thereon, shall be payable in any coin or currency of the United States of America, which at the time of payment, is legal tender for the payment of public and private debts at the corporate trust agency office of the Paying Agent in Los

Angeles, California.  No payment of principal or Redemption Price shall be made on any Note, unless and until such Note is delivered to the Paying Agent for cancellation.

(f)     Notwithstanding the provisions of subsection (d) above, all interest on any Note and the Redemption Price of any Note redeemed by mandatory sinking fund redemption (i) shall be paid by of wire transfer of immediately available funds to the Securities Depository (if the Notes are in book-entry form), and (ii) may be paid by wire transfer in immediately available funds to an account in any member bank of the Federal Reserve System designated in writing by the Owner thereof in an aggregate principal amount of $1,000,000 or more not less than 20 days prior to the applicable Scheduled Interest Payment Date or redemption date; provided, however, that in the case of the payment of the Redemption Price, any Notes to be redeemed are presented to the Paying Agent for cancellation and that the Note Trustee's records with respect to the payment of the principal of any Note in accordance with this subsection shall be conclusive and binding on the Owner of any Note so paid and each successive Owner thereof.  Any such notice provided by an Owner in accordance with the preceding sentence may provide that it shall be effective for any and all future payment dates until otherwise specified in writing.

SECTION 2.2     Additional Notes.

The Notes shall be the only series authorized to be issued hereunder and shall be limited to $56,570,000 in outstanding principal amount in the aggregate.

SECTION 2.3     Registration of Notes; Beneficial Owners.

(a)     The Tribe shall keep or cause to be kept, at the corporate trust agency office of the Note Trustee, books for the registration, transfer or exchange of Notes entitled to registration, transfer and exchange; and the Tribe will register, transfer or exchange or cause to be registered, transferred or exchanged therein, as hereinafter provided and under such reasonable regulations as it may prescribe, any Notes entitled to be so registered, transferred or exchanged upon presentation thereof at such office or agency.

(b)     The Note Trustee shall also maintain a register of each Beneficial Owner of Notes upon receipt of written certification of such Beneficial Owner as to its beneficial ownership, accompanied by evidence thereof reasonably satisfactory to the Note Trustee and setting forth its address; provided, however that the initial Beneficial Owners of the Notes shall be the Persons set forth in a Certificate of the Underwriter delivered at the Closing.  Upon the transfer of a Note, the new Owner shall become the Beneficial Owner until another Beneficial Owner is designated.  A copy of any notice sent hereunder to Owners shall also be sent to Beneficial Owners and any consent, request, direction, approval, objection or other instrument or action required or permitted by this Indenture to be executed or taken by any Owner (other than the transfer of any Note) shall be fully effective if executed or taken by the Beneficial Owner thereof provided that, in the event of conflicting instruments executed by the Owner and the Beneficial Owner, the action of the Owner shall govern.

(c)     For purposes of determining whether any Beneficial Owner holds a certain percentage in aggregate principal amount of Notes Outstanding for the purposes of this Indenture, ownership by Beneficial Owners which are affiliates shall be aggregated. Any Beneficial Owner is an affiliate of another if the first controls the second, is controlled by the second or is under common control with the second, or if both Beneficial Owners share a common investment advisor (or affiliated investment advisors). The Note Trustee shall be entitled to rely upon a certificate of any Beneficial Owner with respect to such matters.

(d)     The Note Trustee shall, upon request of any Beneficial Owner and at the expense of the Tribe, provide to any requesting Beneficial Owner a list of the names and addresses of all Owners and Beneficial Owners of Notes Outstanding.

(e)     The Notes are subject to the restrictions on transfer set forth in Section 2.12 below, and each Note shall bear a legend to such effect in substantially the form provided in such Section and on the form of Note attached hereto as Exhibit A.

SECTION 2.4     No Transfers or Exchanges During Certain Periods.

The Note Trustee shall not be required to transfer or exchange any Note called for redemption in whole or in part.

SECTION 2.5     Manner of Effecting Transfer or Exchange.

Any Note may be exchanged, and the transfer of any Note may be registered, at the agency or agencies of the Tribe to be maintained by it as provided in Section 2.3 hereof, upon surrendering such Note for cancellation accompanied by delivery of a written instrument of transfer in a form approved by the Note Trustee, duly executed by the Owner of such Note or his duly authorized attorney or legal representative; and thereupon, but subject to such rights of transfer and exchange as such Note shall have, the Tribe shall execute in the name of the transferee or transferees or exchange for, and the Note Trustee shall authenticate and deliver, a new Note or Notes, in authorized forms of the same series and maturity, and for the same aggregate principal amount.  Such transfers and exchanges shall be made without cost to the Owner, but any taxes or other governmental charges required to be paid with respect to the same shall be paid by the Owner requesting such transfer or exchange as a condition precedent to the exercise of such privilege.

SECTION 2.6     Status of Owners.

The Person in whose name any Note shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes of this Indenture; and payment of or on account of the principal of, premium, if any, and interest on such Note shall be made only to or upon the order in writing of such Owner; but such registration may be changed as herein provided.  Each such payment shall be valid and effectual to satisfy and discharge the liability upon such Note to the extent of the sum or sums so paid.

SECTION 2.7     Identification Numbers.

Any Note may bear such numbers, letters, or other marks of identification or designation, including "CUSIP" numbers (if applicable), and may be endorsed with or have incorporated in the text thereof such legends or recitals with respect to transferability and may contain such provisions, specifications and descriptive words, not inconsistent in any case with the provisions of this Indenture, as may be determined by the Board of the Tribe and approved by the Note Trustee.  Neither the Tribe nor the Note Trustee makes any representation as to the accuracy or correctness of the "CUSIP" numbers printed on the Notes or if used with any redemption.

SECTION 2.8     Execution, Authentication and Delivery.

(a)     The Notes shall be executed by the manual or facsimile signature of any Authorized Tribal Representative.  The Notes shall not be valid for any purpose hereunder until the Certificate of

Authentication printed thereon is duly executed by the manual signature of an authorized signatory of the Note Trustee.

(b)    If any of Authorized Tribal Representative who shall have signed or sealed any of the Notes shall cease to be an authorized officer or agent of the Tribe before the Notes so signed and sealed shall have been actually authenticated by the Note Trustee or delivered by the Tribe, such Notes nevertheless may be authenticated and delivered with the same force and effect as though the Person who signed or sealed such Notes had not ceased to be such officer or agent of the Tribe and also any such Note may be signed on behalf of the Tribe, by such Persons as at the actual date of the execution of such Note shall be the proper officers or agents of the Tribe, although at the nominal date of such Note any such Person shall not have been such officer of the Tribe.

SECTION 2.9    Mutilated, Lost or Destroyed Notes.

Upon receipt by the Tribe and the Note Trustee of evidence satisfactory to each of them that any Outstanding Note has been mutilated, lost or destroyed and of indemnity satisfactory to each of them, in their discretion, the Tribe, in its discretion, may execute, and thereupon the Note Trustee shall authenticate and deliver, a new Note of the same series and maturity and of like tenor in exchange and substitution for, and upon surrender and cancellation of, the mutilated Note or in lieu of and in substitution for the Note so lost or destroyed.  The Tribe may, for each new Note authenticated and delivered under the provisions of this Section, require the payment of a fee and, in addition, the expenses, including counsel fees and disbursements and the allocated costs and expenses of in-house counsel and legal staff, which may be incurred by the Tribe and the Note Trustee in connection therewith.  Any Note issued under the provisions of this Section in lieu of any Note alleged to have been lost or destroyed, shall constitute an original additional contractual obligation on the part of the Tribe, whether or not the Note so alleged to have been lost or destroyed, be at any time enforceable by anyone, and shall be entitled to the benefits of this Indenture with all other Notes issued hereunder to the same extent as the Notes in substitution for which such Notes were issued.

SECTION 2.10    Notes to be Substantially of Same Tenor.

Subject to the qualifications hereinbefore set forth, the Notes to be secured hereby shall, subject to the provisions hereof, be substantially of the tenor and effect hereinbefore recited, and no Notes shall be or become valid or obligatory for any purpose, unless there shall be endorsed thereon a certificate of authentication, substantially in the form hereinbefore recited, executed by the Note Trustee; and such certificate on any Note issued by the Tribe shall be conclusive evidence and the only competent evidence that it has been duly authenticated and delivered hereunder.

SECTION 2.11    Book-Entry System for Notes.

(a)    The Notes shall be issued initially as Book-Entry Notes consisting of one fully-registered Note for the aggregate principal amount of the Notes of each series, which Notes shall be registered in the name of Cede & Co., as nominee of DTC.

(b)    All payments of principal of, redemption premium, if any, and interest on the Book-Entry Notes and all notices with respect thereto, including notices of full or partial redemption, shall be made and given  at the times and in the manner set out in the Depository Requirements, which shall govern in the event of any inconsistency between the provisions of this Indenture  and the Depository Requirements.  The Depository Requirements may be changed or amended at any time without the consent of the Owners.

(c)   The book-entry registration system for the Notes may be terminated and certificates delivered to and registered in the name of the Beneficial Owners, under either of the following circumstances:

(i)   The Securities Depository notifies the Tribe and the Note Trustee in writing that it is no longer willing or able to act as Securities Depository for the Book-Entry Notes and a successor Securities Depository for the Book-Entry Notes is not appointed by the Tribe prior to the effective date of such discontinuation; or

(ii)   The Tribe, with the written approval of a Majority of Owners, determines that continuation of the book-entry system through DTC (or a successor Securities Depository) is not in the best interest of the Tribe or the Beneficial Owners of the Book-Entry Notes.

In the event that the Securities Depository ceases to act as Security Depository in accordance with (i) above, the Tribe shall promptly appoint a successor Securities Depository which shall be approved in writing by a Majority of Owners. Upon the appointment of such successor Securities Depository, the Book-Entry Notes will be registered in the name of such successor Securities Depository or its nominee.

In the event certificates are required to be issued to Beneficial Owners, the Note Trustee, the Tribe shall be fully protected in relying upon a certificate of the Securities Depository as to the identity of and the principal amount of Book-Entry Notes held by such Beneficial Owners. The Beneficial Owners will not receive physical delivery of certificates except as provided herein.

(d)   For so long as there is a Securities Depository for a series of Notes: all of the Notes of such series shall be issued in a single denomination equal to the entire principal amount thereof and shall be registered in the name of the Securities Depository; all transfers of beneficial ownership interests in such Notes will be made in accordance with the Depository Requirements; and no investor or other party purchasing, selling or otherwise transferring beneficial ownership of Book-Entry Notes shall receive, hold or deliver any certificate. The Tribe and the Note Trustee shall have no responsibility or liability for transfers of beneficial ownership interests in such Notes.

(e)   The Tribe and the Note Trustee will recognize the Securities Depository or its nominee as the Owner for all Book-Entry Notes for all purposes, including receipt of payments, notices and voting; provided the Note Trustee may recognize votes by or on behalf of Beneficial Owners as if such votes were made by Owners of a related portion of the Notes when such votes are received in compliance with an omnibus proxy of the Securities Depository or otherwise pursuant to the Depository Requirements.

(f)   With respect to Book-Entry Notes, the Tribe and the Note Trustee shall be entitled to treat the Securities Depository (or its nominee as registered owner of such Notes) as the absolute owner of the Notes for all purposes of this Indenture, and neither the Tribe nor the Note Trustee shall have any responsibility or obligation to any Beneficial Owner of such Book-Entry Notes. Without limiting the immediately preceding sentence, neither the Tribe nor the Note Trustee shall have any responsibility or obligation with respect to (a) the accuracy of the records of any Securities Depository or any other Person with respect to any beneficial ownership interest in Book-Entry Notes, (b) the delivery to any Person, other than the Securities Depository, of any notice with respect to Book-Entry Notes, including any notice of redemption or refunding, (c) the selection of the particular Notes or portions thereof to be redeemed or refunded in the event of a partial redemption or refunding of part of the Notes Outstanding or (d) the payment to any Person, other than the Securities Depository, of any amount with respect to the principal or Redemption Price of, or any interest on, Book-Entry Notes.

SECTION 2.12    Restrictions on Transferability of Notes.

(a)    The Notes may only be transferred to investors who are purchasing the Notes for their own account and are each a "qualified institutional buyer" as defined in Rule 144A promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended. No transfer of a Note may be made unless such transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended, or an applicable exemption therefrom (including pursuant to Rule 144A) and any applicable state securities or "blue sky" law.

(b)    Each Note transferred pursuant to this Indenture shall contain a legend substantially to the following effect, and each Owner and Beneficial Owner of such Note, shall, by the acceptance thereof, be deemed to have agreed to the provisions thereof. Any transfer of a Note must comply with the restrictions described in such legend, as follows:

"THE OWNER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES AND AGREES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS (COLLECTIVELY, THE "ACTS"), HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR SALE THEREOF, AND MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF U.S. PERSONS EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE OWNER OF THIS NOTE ("HOLDER"): (1) REPRESENTS THAT IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT); (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) TO THE TRIBE, (B) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) WITH RESPECT TO NOTES INITIALLY OFFERED OR SUBSEQUENTLY TRANSFERRED IN RELIANCE ON RULE 144A, PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) INCLUDING WITHOUT LIMITATION THE EXPIRATION OF THE APPLICABLE HOLDING PERIOD PRESCRIBED BY RULE 144 UNDER THE SECURITIES ACT, (D) WITH RESPECT TO NOTES INITIALLY OFFERED OR SUBSEQUENTLY TRANSFERRED IN RELIANCE ON RULE 144A, IN RELIANCE ON ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE RECEIPT BY THE TRIBE AND THE NOTE TRUSTEE OF A CERTIFICATION OF THE TRANSFEROR AND TRANSFEREE AND AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SUCH PARTIES TO THE EFFECT THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT, OR (E) PURSUANT TO EFFECTIVE REGISTRATION STATEMENTS UNDER THE ACTS; AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND."

(c)    Notwithstanding the foregoing, so long as the Notes shall constitute Book-Entry Notes, the Note Trustee shall have no responsibility to determine the compliance by any Beneficial Owner with the terms of this Section. If at any time the Notes shall not constitute Book-Entry Notes, the Note Trustee may establish the compliance by any Owner with the provisions of this Section by requiring, upon the purchase of Notes by such Owner, a certificate and agreement of such Owner, in form and substance satisfactory to the Note Trustee and upon which the Note Trustee may conclusively rely, to the effect that such Owner is a "qualified institutional buyer" within the meaning of the Securities Act of 1933, as

**45**

amended, and otherwise confirming the agreement of such Owner with the restrictions upon transfer as set forth in the legend on the Notes provided in subsection (b) above.

## ARTICLE 3.
## EXECUTION AND DELIVERY OF NOTES

SECTION 3.1     Execution and Delivery of Notes.

The Notes shall be issued for the purpose of providing funds for the purposes described herein. The Notes shall be authenticated by the Note Trustee upon the written request and direction of the Tribe in the aggregate principal amount of $56,570,000, as provided in Section 2.1(a) above. Such Notes may forthwith be executed by the Tribe and delivered to the Note Trustee and shall be authenticated by the Note Trustee and delivered to or upon the written order of the Tribe. The proceeds shall be deposited in a Clearing Fund for the Notes which the Note Trustee is authorized and directed hereunder to create and shall be applied as provided in a Closing Statement delivered to the Note Trustee by the Tribe on the date of issuance of the Notes. Such Clearing Fund shall be closed upon depletion of the funds therein upon transfer in accordance with the Closing Statement.

## ARTICLE 4.
## NOTE PAYMENTS; FUNDS AND ACCOUNTS

SECTION 4.1     Note Payments.

(a)     The Tribe shall pay, or shall cause the Resort Development Bond Trustee to pay on behalf of the Tribe in accordance with the Pledge Agreement, to the Note Trustee for deposit in the Note Fund, the following sums in respect of the Notes at the following times:

(i)     On or before the first day of each calendar month, commencing the first day of the month next succeeding the issuance of the Notes, an amount which, together with other available funds on deposit with the Note Trustee in the Note Fund, is sufficient to accumulate in equal monthly installments the interest becoming due on the Notes on the next Scheduled Interest Payment Date; and

(ii)     On or before the first day of each calendar month, commencing on July 1, 2012, an amount which, together with other available funds on deposit with the Note Trustee in the Note Fund, is sufficient to accumulate in equal monthly installments the principal amount of the Notes becoming due (at stated maturity or through mandatory sinking fund redemption) on July 1, 2013 and on each July 1 thereafter.

(b)     In addition to the amounts described in (a) above, the Tribe shall pay, or cause the Resort Development Bond Trustee to pay on behalf of the Tribe in accordance with the Pledge Agreement, on or prior to each applicable monthly date an amount required to restore, in not more than six equal consecutive monthly installments, any amount required to replenish the Note Reserve Fund as more particularly provided in Section 4.3(c).

SECTION 4.2     Note Fund.

(a)     The Note Trustee shall establish a Note Fund for the purpose of providing for the payment of the principal of, and all interest on, the Notes when the same shall be due and payable. The

**46**

Note Trustee shall make deposits into the Note Fund of: (A) any amounts required to be deposited therein in accordance with the Closing Statement delivered in connection with the Notes as provided in Section 3.1 hereof; and (B) all other amounts required hereunder. Moneys on deposit in the Note Fund shall be applied to the payment of principal or Redemption Price of, and all interest on, the Notes.

(b)     As a part of the Note Fund, the Note Trustee shall further establish a separate Sinking Fund Account for the retirement of the Notes by mandatory sinking fund redemption in accordance with the terms thereof.  There shall be deposited in the Sinking Fund Account on July 1 of each year as set forth below (excluding each principal maturity date), the amount required to retire the Notes on such date (each a "Sinking Fund Date") in the following amounts in the following years through redemption, in direct order of maturity and within a maturity chosen by such method as the Note Trustee shall deem fair and appropriate and at a Redemption Price equal to the principal amount thereof plus all accrued and unpaid interest, or through purchase, as hereinafter provided:

| Date (July 1) | Principal Amount |
|---|---|
| 2013 | $  2,295,000 |
| 2014 | 2,310,000 |
| 2015 | 2,350,000 |
| 2016 | 2,420,000 |
| 2017 | 2,520,000 |
| 2018 | 2,660,000 |
| 2019 | 3,060,000 |
| 2020 | 3,520,000 |
| 2021 | 4,050,000 |
| 2022 | 4,655,000 |
| 2023 | 5,355,000 |
| 2024 | 6,155,000 |
| 2025 | 7,080,000 |
| 2026 | 8,140,000 |

* Principal maturity date

At its option, to be exercised on or before the 60th day prior to each Sinking Fund Date, the Tribe may do any one or more of the following:  (a) deliver Notes to the Note Trustee for cancellation, (b) receive a credit in respect of its sinking fund redemption obligation for any Notes which prior to said date have been redeemed or purchased (otherwise than through the operation of the Sinking Fund Account) and cancelled by the Note Trustee and not theretofore applied as a credit against such sinking fund redemption obligations, or (c) cause funds to be delivered to the Note Trustee, for deposit in the Sinking Fund Account, together with written instructions from the Tribe directing the Note Trustee to apply such funds on or before the 45th day prior to each Sinking Fund Date to the purchase of such Notes, and the Note Trustee shall thereupon use all reasonable efforts to expend such funds for the purchase of such Notes at a price or prices which shall not exceed the price or prices indicated in written instructions of the Tribe received by the Note Trustee.  Each Note so delivered, redeemed or purchased in accordance with this Section shall be credited by the Note Trustee at 100% of the principal amount thereof to the obligation of the Tribe with respect to the Sinking Fund Account; any excess over such amount shall be credited to such future obligations with respect to the Sinking Fund Account in accordance with the written instructions of the Tribe.  The Tribe, shall, on or before the 60th day next preceding each Sinking

Fund Date, furnish the Note Trustee with a written certificate indicating to what extent, if any, the provisions of this paragraph are to be availed of with respect to each such sinking fund payment.

If at any time all of the Notes shall have been purchased, redeemed or paid, the Note Trustee shall make no further transfers to the Sinking Fund Account and shall transfer any balance then in such Sinking Fund Account to the Note Fund.

(c)   All payments of the principal or Redemption Price of, and any interest on, the Notes shall be made by the Paying Agent. Not later than the close of business on the due date of each such payment, the Note Trustee (if other than the Paying Agent) shall transfer from the Note Fund, as applicable, to the Paying Agent such amount as shall be necessary to enable the Paying Agent to make the payment then coming due. Any such Paying Agent, upon receipt of funds from the Note Trustee, shall hold the same in trust for the Owners entitled thereto, subject to the provisions hereof, until such time as payment is made to the Owners.

SECTION 4.3    Note Reserve Fund.

(a)   There is hereby created a Note Reserve Fund to be held by the Note Trustee, in trust, solely for the equal and ratable benefit and security of the Owners of the Notes until applied as herein provided. Concurrently with the issuance of the Notes, the Tribe shall deposit, or cause to be deposited, with the Note Trustee, for deposit in the Note Reserve Fund, cash in an amount equal to the Initial Reserve Deposit. So long as any Notes shall be Outstanding hereunder the Note Trustee shall further retain or deposit in the Note Reserve Fund any and all investment earnings on amounts held in the Note Reserve Fund as and to the extent necessary to increase the amount on deposit therein to equal the Maximum Annual Debt Service Requirements with respect to the Notes.

(b)   Moneys available in the Note Reserve Fund shall be applied as follows:

(i)   On the date of each required payment from a Note Fund, moneys in the Note Reserve Fund shall be applied by the Note Trustee, without further direction from the Tribe, to cure any deficiency in the Note Fund; and

(ii)   Any cash in the Note Reserve Fund which causes the total amount therein to exceed the Maximum Annual Debt Service Requirements for the Notes as of any valuation date shall, at the written direction of the Tribe, be transferred to the Note Fund and credited against the payments next becoming due under Section 4.1 hereof in respect of the principal or Redemption Price of or, and any interest on, the Notes or against any concurrent or subsequent optional or mandatory redemption of the Notes.

(c)   The amount of any withdrawal from any Note Reserve Fund shall be restored by the Tribe in no more than six equal, consecutive monthly installments payable on the last Business Day of each month, commencing with the month in which such withdrawal occurs and the Note Trustee shall have notified the Tribe thereof in writing. If an additional withdrawal is made prior to the restoration of any prior withdrawal, such additional withdrawal shall be restored by the Tribe in equal monthly installments over the remainder of the restoration period for the initial withdrawal.

(d)   On the final maturity date of the Notes, amounts available in the Note Reserve Fund shall be credited against the payments otherwise due under Section 4.1 hereof in respect of principal of and all accrued and unpaid interest on, the Notes and shall be transferred to the Note Fund for the payment of such principal and interest; provided, however, that, in the case of the Scheduled Interest Payment Date

PHTRANS\431216\5                              - 17 -

**48**

immediately preceding such final maturity date, no such credit shall be given and no such transfer of amounts available in the Note Reserve Fund shall be made if and to the extent that, immediately thereafter, the value of the Note Reserve Fund would not at least equal the amount of the principal of and the remaining interest on the Notes due to be paid on the final maturity date thereof.

SECTION 4.4    Project Fund.

(a)    The Note Trustee shall establish a Project Fund for the payment of the costs of the Parking Garage. The Tribe shall deposit in the Project Fund the portion of the proceeds of the Series A Notes, and other amounts if any, specified for such purpose on the Closing Statement delivered to the Note Trustee by the Tribe in connection with the initial issuance of the Notes.

(b)    Except as provided in subsection (c) below, the Note Trustee shall make payments from the Project Fund only upon receipt of a requisition, in the form attached hereto as Exhibit B, properly completed and signed by an Authorized Tribal Representative.

(c)    Upon completion of the Parking Garage (as evidenced by a certificate of an Authorized Tribal Representative as provided in subsection (d) below), any moneys remaining in the Project Fund shall be transferred into the Note Fund for application as a credit against payments due from the Tribe in respect of the Notes or to such other purposes as the Tribe shall direct the Note Trustee in writing with the approval of a Majority of Owners.

(d)    Completion of the Parking Garage shall be evidenced by delivery to the Note Trustee of the Tribe's completion certificate signed by an Authorized Tribal Representative stating the date of completion of the Parking Garage and that, as of such date, except for amounts retained by the Note Trustee at the Tribe's written direction for any cost of the Parking Garage not then due and payable or, if due and payable, not then paid:

(i)    the Parking Garage has been completed;

(ii)    the cost of all labor, services, materials and supplies used in the Parking Garage have been paid or will be paid from amounts retained by the Note Trustee at the Tribe's written direction for any cost of the Parking Garage not then due and payable or, if due and payable, not then paid; and

(iii)    the Parking Garage has been constructed and installed to the Tribe's satisfaction, and all costs and expenses incurred in the acquisition, construction and installation of the Parking Garage have been paid, or will be paid from amounts retained by the Note Trustee at the Tribe's written direction for any cost of the Parking Garage not then due and payable or, if due and payable, not then paid.

(e)    Notwithstanding the foregoing, any such Tribe's completion certificate may state that it is given without prejudice to any rights against third parties which exist at the date of such certificate or which may subsequently come into being. Upon receipt of such certificate by the Note Trustee, the Tribe shall direct the Note Trustee in writing to transfer any amounts remaining in the Project Fund (except for amounts described above retained by the Note Trustee at the Tribe's direction) to the Note Fund for application to the payment of principal of and any interest on the Notes as provided in Section 4.2 hereof.

SECTION 4.5     Construction of the Parking Garage.

(a)     The Tribe shall cause the Parking Garage to be constructed, completed, furnished and equipped with reasonable dispatch in accordance with the plans and specifications and estimated time schedule delivered pursuant to subsection (c) below.

(b)     Prior to the commencement of the construction of the Parking Garage, the Tribe shall have retained the Construction Monitor for the purpose of reporting on matters relating to the construction of the Parking Garage for the benefit of the Trustee and the Owners of the Notes.

(c)     Prior to the first disbursement of funds from the Project Fund with respect to the Parking Garage, the Tribe shall file with the Note Trustee, the following:

(i)     a copy of the plans and specifications for the Parking Garage; and

(ii)     a construction budget and the estimated schedule for the completion of each phase of the Parking Garage construction and for the payment of all amounts due with respect to such construction.

(iii)     a construction contract with respect to the Parking Garage providing for all principal construction with respect to the Parking Garage at a fixed cost or guaranteed maximum price;

(iv)     a surety bond of a qualified and responsible insurance or bonding company covering performance of contracts, including coverage for correction of defects discovered within one year after completion and acceptance, and payment for labor and materials; and

(v)     a report of the Construction Monitor with respect to the general feasibility of the construction of the Parking Garage and the plans and specifications therefor, the reasonableness of the costs of construction and the and construction schedule, the sufficiency of funds for construction and other matters as the Construction Monitor shall deem appropriate.

(d)     Provided that no Event of Default has occurred and is continuing, changes relating to the Parking Garage, or to the construction contract, or any estimate, schedule or plans and specifications therefor, including any change orders, may be made at the discretion of the Tribe; provided that such changes are filed with the Note Trustee and are in compliance with all applicable laws, acts, rules, regulations, orders and requirements as aforesaid.

(e)     After commencement of construction of the Parking Garage and continuing until the final completion thereof, the Tribe shall cause to be filed with the Trustee and delivered to each Beneficial Owner, no less frequently than monthly, a report of the Construction Monitor (which shall be based on a physical inspection and review of available documentation) as to the progress of the construction of the Parking Garage, the costs thereof as compared to the proposed budget therefor, the sufficiency of the remaining funds on deposit in the Project Fund to complete construction and such other matters as the Construction Monitor shall determine appropriate.

(f)     The Tribe shall enforce each construction contract, and it will not do or refrain from doing any act whereby the surety on any surety bond may be released in whole or in part from any obligation assumed by such obligor or from any agreement to be performed by such obligor. In the event of any default on the part of any general contractor, architect or other contractor or any subcontractor or

supplier under any contract made by it in connection with any Project or in the event of a breach of warranty with respect to any materials, workmanship or performance guaranty the Tribe will notify the Note Trustee and will proceed, either separately or in conjunction with others, to pursue such remedies against the architect, the general contractor, contractor, subcontractor or supplier so in default and against each surety on any surety bond for the performance of such contract as it may deem advisable. The Tribe shall advise the Note Trustee of the steps it intends to take in connection with any such default. If the Tribe refuses to prosecute any action or proceeding or take any other action against such general contractor, architect, contractor, subcontractor, supplier or surety, the Note Trustee may, but is not required to, proceed to take all such action in the name of the Tribe or in its own name and the Tribe shall pay all expenses in connection therewith.

(g)     The Tribe shall give or cause to be given all notices and comply or cause compliance with all laws, ordinances, municipal rules and regulations and requirements of public authorities applying to or affecting the conduct of the work on the Parking Garage, and the Tribe will defend and save the Note Trustee, its directors, officers, agents and employees, harmless from all fines due to failure to comply therewith. The Tribe shall procure or cause to be procured all permits and licenses necessary for the acquisition and construction of the Parking Garage.

(h)     In the event that the moneys available in the Project Fund are not sufficient to pay all of the costs of construction of the Parking Garage, the Tribe shall pay all costs thereof in excess of such available funds.

(i)     Each Beneficial Owner, by its duly authorized representatives, for purposes of determining compliance with this Indenture, may inspect any part of the Parking Garage upon reasonable prior notice during normal business hours.

(j)     The Note Trustee has no duty or obligation to read or review any of the materials provided to or filed with the Note Trustee under this Section 4.5, nor will it have any duty or obligation to monitor the Tribe's compliance with this Section 4.5. The filing or deposit with the Note Trustee of any materials required by this Section 4.5 shall constitute a certification by the Tribe to the Note Trustee, on which the Note Trustee may conclusively rely without inquiry, that all such materials comply with the requirements of this Section 4.5 and have been delivered to the Note Trustee at the times required by this Section 4.5. Any materials filed with or deposited with the Note Trustee under this Section 4.5 shall be open to inspection by any Beneficial Owner or the Construction Monitor upon reasonable notice to the Note Trustee and during normal business hours.

SECTION 4.6    Moneys to Be Held for All Owners, with Certain Exceptions.

Until applied as herein provided, the moneys and investments held in all funds and accounts and the proceeds of any remedies exercised under Article 6 hereof shall be held in trust for the ratable benefit of the Owners of all Outstanding Notes, except that: (a) on and after the date on which the interest on or principal or Redemption Price of any particular Note or Notes is due and payable from the Note Fund, the unexpended balance of the amount deposited or reserved in such Fund for the making of such payments shall, to the extent necessary therefor, be held for the benefit of the Owner or Owners entitled thereto; and (b) amounts on deposit in the Note Reserve Fund shall be held and applied as provided in Section 4.3 hereof; and (c) the rights of any Owners with respect to principal or interest payments extended by their agreement beyond their due dates thereof shall be subordinate to the rights of Owners with respect to payments not so extended.

**51**

SECTION 4.7    Payments through Paying Agent.

All payments of the principal or Redemption Price of, and all interest on, the Notes shall be made by the Paying Agent. Not later than the opening of business on the due date of each such payment, the Note Trustee (if other than the Paying Agent) shall transfer from the Note Fund, as applicable, to the Paying Agent such amount as shall be necessary to enable the Paying Agent to make the payment then coming due. Any such Paying Agent, upon receipt of funds from the Note Trustee, shall hold the same in trust for the Owners entitled thereto, subject to the provisions hereof governing the Note Fund, until such time as payment is made to the Owners.

SECTION 4.8    Moneys to be Trust Funds.

All moneys deposited under the provisions of this Indenture, either in the name of the Note Trustee or of the Tribe, shall be trust funds hereunder, shall be held in trust by the Note Trustee or the Tribe and applied only for the purposes set forth in this Indenture and, pending the application thereof in accordance with and subject to the limitations of this Indenture, and shall be subject to a lien and charge in favor of the Owners and for the further security of such Owners until paid out as herein provided. All moneys which the Note Trustee shall have withdrawn from the Note Fund and deposited with any Paying Agent for the particular purpose of paying any of the Notes which have become or are about to become due and payable or which have been called for redemption shall be held in trust for the respective Owners of such Notes. Any moneys so held at any time by any Paying Agent shall, upon request of the Note Trustee, be paid by such Paying Agent to the Note Trustee, which shall thereafter hold such moneys in trust for the respective Owners of such Notes, subject to the provisions of Article 11.

SECTION 4.9    Investment or Deposit of Funds.

Moneys on deposit in the Funds established pursuant to this Article 4 shall be invested and reinvested by the Note Trustee as follows:

(a)    Moneys invested in any Fund hereunder shall be invested only in Investment Securities maturing, or subject to repurchase, withdrawal without penalty or redemption on or before the dates on which the amounts invested are reasonably expected to be needed for the purposes hereof; provided, however, that (i) Investment Securities held in the Project Fund shall not have a term longer than the expected time or times of expenditure of the funds invested to pay amounts due in respect of the Project; and (ii) Investment Securities held in the Note Reserve Fund shall not have a term longer than, or shall be subject to redemption or tender for purchase by the obligor at the direction of the Note Trustee at a price of not less than par within a term shorter than, five years.

(b)    All investments shall be made at the direction of the Tribe (given in writing or orally, confirmed in writing). In the absence of any direction from the Tribe as to the investment of any moneys held hereunder, the Note Trustee shall cause such moneys to be invested in any Investment Securities described in clause (g) of the definition thereof. The Note Trustee shall not make any representation as to the accuracy of any quotation of market price of any security or investment (or the accrued interest thereon) in any Fund or Account, and the Tribe shall further be obligated to indemnify and hold harmless the Note Trustee, its officers and employees, from and against any and all liabilities, claims and charges, etc. in connection with or resulting from the Note Trustee's valuation of the investments in any Funds or Accounts as provided in this Indenture.

(c)    All interest, income and gains received in respect of amounts on deposit in any Fund shall be applied as follows: (1) all interest, income and gains received in respect of Investment Securities in

the Note Reserve Fund shall be retained therein until such time as the balance therein equals the Maximum Annual Debt Service Requirements on the Notes and, thereafter, only as and to the extent required to fund any deficiency therein and otherwise shall be transferred to and deposited in the Note Fund, as received, and credited against subsequent deposit requirements; and (2) all interest, income and gains received in respect of Investment Securities in the Note Fund shall be retained therein and credited against subsequent deposit requirements; and (3) all interest income and gains received in respect of Investment Securities in the Project Fund shall be retained therein and applied in the manner provided in Section 4.4 hereof. Whenever any other transfer or payment is required to be made from any particular Fund, such transfer or payment shall be made from such combination of maturing principal, redemption or repurchase prices, liquidation proceeds and withdrawals of principal.

(d)     Neither the Tribe nor the Note Trustee shall be accountable for any depreciation in the value of any Investment Securities or any losses incurred upon any authorized disposition thereof.

(e)     The Note Trustee shall determine the value of the assets in each of the Funds established hereunder as of each Scheduled Interest Payment Date. As soon as practicable after each such valuation date, the Note Trustee shall furnish to the Tribe a report of the status of each Fund as of such date. The Note Trustee shall also advise the Tribe at such time of the amount then available in the Note Fund as a credit against future deposits prior to the next valuation date in direct order of the due dates of such deposits. In computing the value of assets in any Fund or Account, investments shall be valued at the market value thereof, except that Investment Securities of the types described in clause (c) of the definition thereof shall be valued at cost, and all investments therein (valued as aforesaid) and accrued interest thereon shall be deemed a part of such Funds and Accounts.

(f)     The Note Trustee shall deliver to the Tribe and each Beneficial Owner a monthly statement, no later than the 15th day of the month next following the month in which this Indenture is executed, and no later than the same day of each month thereafter, describing the investment or deposit of funds made pursuant to this Section 4.9, the investment income thereon, as applicable, and the transfers to or charges against the various Funds established hereunder.

ARTICLE 5.
REDEMPTION OF NOTES

SECTION 5.1     Notes Subject to Redemption.

The Notes shall be subject to redemption prior to maturity upon such terms as are set forth in the form of Note attached hereto as Exhibit A.

SECTION 5.2     Notice and Effective Date of Redemptions; Redemption in Part.

(a)     The Note Trustee shall cause notice of any redemption of any Notes to be mailed by first class mail to the Owners of all Notes to be redeemed at the registered addresses appearing in the registration books maintained by the Note Registrar. Each such notice shall (i) be mailed at least 30 days and not more than 60 days prior to the date fixed for redemption, (ii) identify the Notes to be redeemed, specifying the name of the issue, the date of the issue, the stated maturity, the CUSIP numbers and certificate numbers assigned to the Notes subject to redemption, (iii) specify the date fixed for redemption and the applicable Redemption Price and (iv) state that on the date fixed for redemption of the Notes called for redemption will be payable at the corporate trust agency office of the Paying Agent designated in such notice upon presentation and surrender thereof, that from that date interest will cease to accrue and that no representation is made as to the accuracy or correctness of the CUSIP numbers printed therein

or on the Notes. Failure to give notice in the manner described in this paragraph with respect to any Note, or any defect in such notice, shall not affect the validity of the proceedings for redemption for any Note with respect to which notice was properly given.

(b)     If at the time of mailing any notice of the optional redemption of any Notes, the Tribe shall not have deposited with the Paying Agent funds sufficient to redeem all the Notes called for redemption, such notice shall state that such redemption is subject to, and conditioned upon, the deposit of such funds with the Note Trustee not later than 10 a.m. on the date fixed for redemption and that such notice shall be of no effect unless such funds are so deposited.

(c)     If, with respect to any Book-Entry Notes, the Note Trustee shall give notice of any redemption to the Securities Depository in the manner required pursuant to the Depository Procedures, the Note Trustee shall not otherwise be required to give notice in accordance with this Section.

(d)     Upon the mailing of the notice provided for above and provided the amount of such Redemption Price shall be irrevocably deposited with the Paying Agent, the Notes or parts thereof designated for redemption shall become due and payable upon the date specified in such notice as the date fixed for redemption at the Redemption Price applicable at such time. Payment of the Redemption Price shall be made to the respective Owners of Notes designated for redemption, upon surrender of such Notes, at the place stated in the notice of redemption, accompanied by duly executed instruments of transfer if applicable.

(e)     After the mailing of the notices provided for above shall have been duly made, then, on or before the date fixed or date specified in such notices for such redemption, funds in an amount sufficient to effect the redemption of the Notes or parts thereof specified in such notices shall be deposited in trust by the Tribe with the Note Trustee or left in trust with the Note Trustee if previously deposited and then available for such purpose. From and after the date fixed for redemption designated in such notices (such funds having been deposited or left with the Note Trustee, as aforesaid), notwithstanding that any Notes so called for redemption shall not have been surrendered for cancellation, no further interest shall accrue upon any of the Notes or parts thereof so called for redemption.

(f)     If less than all the Notes are to be redeemed, the Tribe shall advise the Note Trustee in writing as to the principal amount of such Notes to be redeemed, and the particular Notes to be redeemed shall be selected by the Note Trustee from Outstanding Notes not previously called for redemption by lot or such other method as the Note Trustee shall deem fair and appropriate; provided that following any such selection, both the portion of such Notes to be redeemed and the portion remaining shall be in Authorized Denominations.

(g)     Any Note which is to be redeemed only in part shall be surrendered at the designated corporate trust agency office of the Paying Agent (with due endorsement by, or a written instrument of transfer in form satisfactory to the Paying Agent, duly executed by the Owner or his attorney duly authorized in writing) and the Tribe shall execute and the Note Trustee shall authenticate and deliver to such Owner without service charge, a new Note or Notes of any Authorized Denominations as requested by such Owner in an aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Note so surrendered.

**54**

## ARTICLE 6.
## EVENTS OF DEFAULT AND REMEDIES

SECTION 6.1     Events of Default Defined.

Each of the following events shall be an "Event of Default" hereunder:

(a)     the failure to pay any installment of interest on any Note when it becomes due and payable; or

(b)     the failure to pay the principal or Redemption Price of any Note when it becomes due and payable at maturity, upon redemption or otherwise; or

(c)     the failure by the Tribe to make any payment provided for in Section 4.1 hereof, or to make any payment due under any other Note Document, within ten days of the date when due; or

(d)     the failure of the Tribe to perform or observe any other covenant or agreement in the Notes, in this Indenture, or in the other Note Documents, and such failure continues for 30 days after written notice thereof shall have been given to the Tribe by the Note Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Owners of at least 25% in principal amount of Notes Outstanding; provided, however, that if such performance requires work to be done, actions to be taken or conditions to be remedied, which by their nature cannot be reasonably done, taken or remedied as the case may be, within such 30 day period, no Event of Default shall be deemed to have occurred or exist if, and so long as, the Tribe shall commence such performance within such 30 day period and shall diligently and continuously prosecute the same to completion within 90 days after the initial notice, and the Tribe shall deliver a report to the Note Trustee at least once every 30 days setting forth the status of its attempt to cure such default; or

(e)     the failure of the Tribe to pay any obligation for the payment of borrowed money or the installment purchase price of property or on account of a lease of property, the payment of which ranks on a senior or parity basis with payments on the Notes (a "Credit Obligation") owing by it, or any interest or premium thereon, when due, whether such Credit Obligation shall become due by scheduled maturity, by required prepayment, by acceleration, by demand or otherwise, or to perform any term, covenant or agreement on its part to be performed under any agreement or instrument evidencing or securing or relating to any such Credit Obligation when required to be performed, if the effect of such failure is to accelerate, or to permit the holder or holders of such Credit Obligation to accelerate, the maturity of such Credit Obligation, whether or not such failure to perform shall be waived by the holder or holders of such Credit Obligation, unless such waiver has the effect of terminating the right of such holder or holders to accelerate the maturity of such Credit Obligation as a result of such failure; or

(f)     commencement by the Tribe of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or consent by the Tribe to any such relief or to the appointment of or taking position by any such official in an involuntary case or other proceeding commenced against it, or a general assignment by the Tribe for the benefit of creditors, or failure by the Tribe generally to pay its debts as they become due, or any action by the Tribe to authorize any of the foregoing; or

**55**

(g)    commencement against the Tribe of an involuntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 days, or entry of an order for relief shall be entered against the Tribe under the Federal bankruptcy laws as now or hereafter in effect.

SECTION 6.2    Notice to Owners of Default.

The Note Trustee shall mail to all Owners, at their addresses as they appear on the registration books kept pursuant to Article 2 hereof, written notice of the occurrence of any Event of Default under Section 6.1 hereof within fifteen (15) days after the Note Trustee shall have notice, as provided in Section 7.1(q) hereof, of the same subject to any right of the Tribe to notice and opportunity to cure in accordance with Section 6.2 hereof.

SECTION 6.3    Acceleration.

Upon the occurrence and continuation of an Event of Default hereunder of which the Note Trustee has actual notice or is required to take notice, the Note Trustee may, and at the written direction of a Majority of Owners shall, by notice in writing to the Tribe, declare the principal of all Notes Outstanding, together with the Acceleration Premium (if any) thereon, and the accrued and unpaid interest thereon, to be due and payable immediately (provided, that notwithstanding such declaration, interest shall continue to accrue on all Outstanding Notes in accordance with the terms thereof until payment or provision for payment according to this Indenture has been made); provided, however, that no such declaration shall be made if the Tribe cures such Event of Default prior to the date of the declaration.

If, after the principal of the Notes and the Acceleration Premium (if any) shall have been so declared to be due and payable, all arrears of interest on the Notes and all other sums payable under this Indenture shall have been paid by or on behalf of the Tribe, a Majority of Owners may, subject to the requirements of Section 6.4, annul such declaration as set forth in said Section 6.4 and thereafter the consequences of such declaration and such annulment shall be binding upon the Note Trustee and upon all Owners.

SECTION 6.4    Rescission or Annulment of Defaults.

(a)    The provisions of Section 6.3 are subject to the condition that at any time after the principal of all of the Notes, together with any Acceleration Premium, shall have been so declared due and payable, a Majority of Owners may, by written notice to the Tribe and the Note Trustee, rescind and annul such declaration and its consequences. No such rescission or annulment shall extend to or affect any subsequent default or impair any right of the Note Trustee or the Owners arising therefrom.

SECTION 6.5    Remedies.

(a)    Upon the happening and continuance of any Event of Default, then and in every such case the Note Trustee, before or after declaring the principal of the Notes and any Acceleration Premium to be due and payable as provided above, may, and upon the written direction of a Majority of Owners and the provision of a commercially reasonable indemnity to the Note Trustee shall proceed to protect and enforce its rights and the rights of the Owners under applicable law and under this Indenture and the Note Documents by such suits, actions or special proceedings in equity or at law, or by proceedings in the office of any board or officer having jurisdiction, either for the specific performance of any covenant,

**56**

condition or agreement contained herein or in aid of execution of any power herein granted or for the enforcement of any proper legal or equitable remedy, as the Note Trustee, being advised by Counsel and directed by a Majority of Owners, shall deem most effectual to protect and enforce such rights. The rights and remedies which the Note Trustee may or shall exercise include all or any of the following:

(i)     The right in its own name by mandamus or other suit, action or proceeding at law or in equity to enforce all rights of the Owners, including the right to require the Tribe to carry out the covenants and agreements of the Tribe contained in this Indenture and to require the Tribe to carry out any agreements with or for the benefit of the Owners;

(ii)     The right to bring suit upon the Notes Outstanding hereunder;

(iii)     The right by action or suit in equity to require the Tribe to account as if it were the Note Trustee of an express trust for the Owners;

(iv)     The right by action or suit in equity to enjoin any acts or things which may be unlawful or in violation of the rights of the Owners;

(v)     The right to the appointment of a receiver for or of the Distributable Authority Revenues subject to the Pledge Agreement or any other property of the Tribe and of the revenues and receipts therefrom;

(vi)     The right to apply all moneys and funds held under this Indenture (except moneys and funds which shall theretofore have been set aside for the payment or purchase of particular Notes) to the payments as provided in Section 6.8 hereof; and

(vii)     The right to exercise any or all other rights or remedies provided by any other law (against any of the parties hereto or otherwise) or by any other suit, action or other special proceeding in equity or at law either for the specific performance of any covenant or agreement contained herein or in aid or execution of any power herein granted.

(b)     All rights of action under this Indenture, or under any of the Notes secured hereby, enforceable by the Note Trustee, may be enforced by it without the possession of any of the Notes or the production thereof on the trial or other proceedings relative thereto, and any such suit, action or proceeding instituted by the Note Trustee shall be brought in its name and as Trustee of an express trust for the equal and ratable benefit of the Owners of all Notes, subject to the provisions of this Indenture.

(c)     No remedy herein conferred upon or reserved to the Note Trustee or to the Owners is intended to be exclusive of any other remedy or remedies.

(d)     In case any proceeding taken by the Note Trustee on account of any default shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Note Trustee, then and in every such case the Tribe, the Note Trustee and the Owners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Note Trustee shall continue as though no such proceeding had been taken.

(e)     No delay or omission in respect of exercising any right or power accruing upon any default shall impair such right or power or be a waiver of such default, and every remedy given by this Article may be exercised from time to time and as often as may be deemed expedient.

(f)     It is the purpose and intention of this Article 6 to provide rights and remedies to the Note Trustee and the Owners which may be lawfully granted under applicable law, but, should any right or remedy herein granted be held to be unlawful, the Note Trustee and the Owners shall be entitled, as above set forth, to every other right and remedy provided in this Indenture.

(g)     The remedies conferred in this Article shall be in addition to all remedies provided for in the Pledge Agreement, which remedies are hereby incorporated herein by reference.

(h)     Notwithstanding anything herein to the contrary, the remedies of the Trustee and the Owners hereunder are subject in all respects to the Tribe's limited waiver of sovereign immunity set forth in Section 8.9 hereof.

SECTION 6.6     Powers of Owners.

A Majority of Owners shall have the right to direct the method and place of conducting all remedial proceedings by the Note Trustee hereunder, provided such directions shall not be otherwise than in accordance with law or the provisions of this Indenture and provided that the Note Trustee shall have been given a commercially reasonable indemnity against costs, expenses and liabilities, and that the Note Trustee shall have the right to decline to follow any such direction which in the opinion of the Note Trustee would be unjustly prejudicial to Owners not parties to such direction.

SECTION 6.7     Limitations on Actions by Owners.

(a)     No Owner shall have any right to pursue any remedy hereunder unless (a) the Note Trustee shall have been given written notice of an Event of Default, (b) a Majority of Owners shall have requested the Note Trustee, in writing, to exercise the powers hereinabove granted or to pursue such remedy in its or their name or names, (c) the Note Trustee shall have been offered a commercially reasonable indemnity against costs, expenses and liabilities, and (d) the Note Trustee shall have failed to comply with such request within a reasonable time.

(b)     Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Note Trustee, to be conditions precedent to the execution of the powers and trusts of this Indenture or to any other remedy hereunder; it being understood and intended that no Owner shall have any right in any manner whatever by his action to affect, disturb or prejudice the security of this Indenture, or to enforce any right hereunder or under the Notes, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal and ratable benefit of all Owners of Outstanding Notes affected thereby, subject to the provisions of this Indenture. Nothing in this Indenture contained shall, however, affect or impair the right of any Owner to institute suit for the enforcement of payment of the principal or Redemption Price of, and all accrued and unpaid interest thereon, when due and payable in accordance with its terms, upon redemption or otherwise.

(c)     Notwithstanding the foregoing, or any other provision of this Indenture, a Majority of Owners shall have the right to take any and all actions to enforce the provisions of this Indenture and each Note Document in their own name or, upon providing a commercially reasonable indemnity from a Majority of Owners to the Note Trustee reasonably satisfactory to the Note Trustee for costs and liabilities arising therefrom, in the name of the Note Trustee. In the event that such Owners elect to take such action, they shall notify the Note Trustee in writing of their election and any costs incurred in connection with the taking of such action shall be treated as costs of the Note Trustee and shall be subject to the same repayment, lien and security rights afforded costs of the Note Trustee.

**58**

SECTION 6.8    Application of Moneys.

All moneys received by the Note Trustee or by any receiver under this Article shall, and all moneys and funds held by the Note Trustee under this Indenture (except moneys and funds which shall theretofore have been set aside for the payment or purchase of particular Notes) shall, after the payment of current administration, operating and management expenses incurred by the Note Trustee or receiver be applied by the Note Trustee or receiver in the following order of priority:

(a)     To the payment of all fees and expenses owing to the Note Trustee under Section 7.4 hereof, including without limitation, fees, costs, expenses and liabilities reasonably incurred by the Note Trustee (including reasonable compensation to the Note Trustee, its agents, attorneys and counsel) and to the repayment of all advances made by the Note Trustee;

(b)     Unless the principal of all the Notes Outstanding hereunder, together with any Acceleration Premium, shall have become due, whether at the due dates expressed therein, by proceedings for redemption, or by declaration as herein provided or otherwise, then

(i)     To the payment of any overdue installments of any interest on the Outstanding Notes in the order of the expressed maturity of the installments of such interest, with interest on overdue installments of interest (to the extent that the payment of such interest is enforceable under applicable law) at the respective rates provided in the Notes; and, if the amount to be applied to the payment of any installment of any interest shall not be sufficient to pay such installment in full, then to the payment thereof ratably, according to the amounts due on such installment, to the Persons entitled thereto without any discrimination or preference; and

(ii)     After the payment of all such overdue installments of interest with the interest thereon, then to the payment of the principal of all of the Notes which shall have become due by their express terms, not including Notes called for redemption for the payment of which moneys are held pursuant to the provisions of this Indenture, with interest on such overdue principal at the rate or rates provided for in such Notes from the respective dates upon which they became due in the order of maturity dates expressed in the Notes, and if the amount to be distributed at any particular time shall not be sufficient to pay in full all of the Notes due on any particular date, to the payment thereof ratably according to the amounts due thereon; and

(iii)     After all payments required by the preceding subparagraphs of this paragraph (c) shall have been made, then to the payment of the principal of, and all accrued and unpaid interest on, the Notes in accordance with the provisions of Article 4 hereof.

(c)     In case the principal of all of the Notes outstanding hereunder shall have become due, whether at the due dates expressed therein, by proceedings for redemption, by declaration or otherwise, then

(i)     To the payment of the full amount then owing and unpaid upon all Notes Outstanding for principal and all accrued and unpaid interest, together with interest on such unpaid amounts (to the extent that the payment of such interest is enforceable under applicable law) at the respective rates provided in the Notes then Outstanding, and in case such moneys shall be insufficient to pay the same in full, then to the payment of such principal and all accrued and unpaid interest without preference or priority of principal over interest or of interest over principal or of any installment of interest over any other installment of accrued and unpaid interest ratably to the aggregate of such principal and interest; and

**59**

(ii)     Any surplus thereof remaining after the payment of the full principal of and interest on the Outstanding Notes, together with interest thereon, to the Tribe or to whomsoever may be lawfully entitled to receive the same.

(d)     Whenever moneys are to be applied by the Note Trustee or by any receiver pursuant to the provisions of this Section, such moneys shall be applied by the Note Trustee or receiver at such times, and from time to time, as the Note Trustee or receiver in its sole discretion shall determine, having due regard to the amount of such moneys available for application in the future. The deposit of such moneys with the bank or trust company at which the Notes shall be payable, or otherwise setting aside of such moneys, in trust for the proper purpose, shall constitute proper application by the Note Trustee or receiver; and the Note Trustee or receiver shall incur no liability whatsoever to the Tribe, to any Owner or to any other Person for any delay in applying any such moneys, so long as the Note Trustee or receiver acts without bad faith, willful misconduct or negligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions of this Indenture as may be applicable at the time of application by the Note Trustee or receiver. Whenever the Note Trustee or receiver shall exercise such discretion in applying such moneys, it shall fix the date upon which such application is to be made, including determination of a Special Record Date and the provision of notice thereof as provided in the form of Note, and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Note Trustee or receiver shall give notice of any Special Record Date as provided in the form of Note and shall give such other notice as it may deem appropriate of the fixing of any such date, and shall not be required to make payments to the Owner of any Note until such Note shall be surrendered to the Note Trustee or receiver for cancellation or stamping with reference to such payment.

SECTION 6.9     Trustee May File Proofs of Claim.

(a)     In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding under the United States Bankruptcy Code relating to the Tribe, any other obligor upon the Notes or any property of the Tribe, the Note Trustee (whether or not the principal of the Notes shall then be due and payable by acceleration or otherwise, and whether or not the Note Trustee shall have made any demand upon the Tribe for the payment of overdue principal, redemption premium, if any, and all accrued and unpaid interest) shall be entitled and empowered, by intervention in such proceeding or other means:

(i)     to file and prove a claim for the whole amount of the principal, redemption premium, if any, and all accrued and unpaid interest owing and unpaid in respect of the Notes then Outstanding or for breach of this Indenture and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Note Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Note Trustee, its agents and counsel) and of the Owners allowed in such proceeding; and

(ii)     to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any receiver, assignee, trustee, liquidator, sequestrator or similar official in any such judicial proceeding is hereby authorized by each Owner to make such payments to the Note Trustee, and, in the event that the Note Trustee shall consent to the making of such payments directly to the Owners, to pay to the Note Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Note Trustee, its agents and counsel, and any other amounts due the Note Trustee under this Indenture.

(b)     No provision of this Indenture empowers the Note Trustee to authorize or consent to or accept or adopt on behalf of any Owners of the Notes any plan of reorganization, arrangement, adjustment or composition affecting any of the Notes or the rights of any Owner thereof, or authorizes the Note Trustee to vote in respect of the claim of any Owner in any proceeding described in subsection (a) of this Section.

## ARTICLE 7.
## THE NOTE TRUSTEE

SECTION 7.1     Acceptance of Trust.

(a)     The Note Trustee accepts and agrees to execute the trusts hereby created, but only upon the additional terms set forth in this Article, to all of which the parties hereto, the Tribe and the Owners agree.  The Note Trustee accepts its duties and obligations as Trustee hereunder, but only upon and subject to the express terms and conditions of this Indenture and, in particular, of this Article.

(b)     Except during the continuance of an Event of Default of which it has actual notice as provided in subsection (q) of this Section 7.1, (i) the Note Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Note Trustee, and (ii) in the absence of bad faith on its part, the Note Trustee may conclusively rely, upon certificates or opinions furnished to the Note Trustee and conforming, if applicable, to the requirements of this Indenture as to the truth of the statements and the correctness of the opinions expressed therein;

(c)     In case an Event of Default has occurred and is continuing of which it has actual notice, as provided in subsection 7.1(q) of this Section 7.1, the Note Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

(d)     The Note Trustee shall not be liable for any error of judgment made in good faith by an officer of the Note Trustee, unless it shall be proved that the Note Trustee was negligent in ascertaining the pertinent facts.

(e)     The Note Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority (or such lesser percentage as provided in this Indenture) in principal amount of the Outstanding Notes relating to the time, method and place of conducting any proceeding for any remedy available to the Note Trustee, or exercising any trust power conferred upon the Note Trustee, under this Indenture.

(f)     The permissive right of the Note Trustee to do things enumerated in this Indenture shall not be construed as a duty, and the Note Trustee shall not be answerable for other than its bad faith, willful misconduct or negligence.

(g)     The Note Trustee shall not be required to give any bond or surety with respect to the execution of its rights and duties under the Indenture.

(h)     The Note Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Note Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Note

**61**

Trustee shall determine to make such further inquiry or investigation, it shall be entitled, upon reasonable notice and during regular business hours, and subject further to the Tribe's safety and confidentiality requirements, to examine the books, records and premises of the Tribe personally or by agent or attorney.

(i)     Except as otherwise expressly provided by the provisions of this Indenture, the Note Trustee shall not be obligated and may not be required to give or furnish any notice, demand, report, request, reply, statement, advice or opinion to the Owner of any Note or to the Tribe or any other Person, and the Note Trustee shall not incur any liability for its failure or refusal to give or furnish the same unless obligated or required to do so by express provisions hereof.

(j)     No provision of this Indenture shall require the Note Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, unless it shall have received adequate indemnity, satisfactory to it in its sole discretion against such risk or liability.

(k)     Any request or direction of the Tribe mentioned herein shall be sufficiently evidenced by a certificate of an Authorized Tribal Representative and any resolution shall be sufficiently evidenced by a Certified Tribal Resolution.

(l)     The Note Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any Owner pursuant to this Indenture, unless such Owner shall have offered the Note Trustee a commercially reasonable indemnity from such Owner to the Note Trustee against the costs, expenses and liabilities which might be incurred in complying with such request or direction.

(m)     The Note Trustee shall not be liable with respect to any action taken or omitted to be taken at the direction of the Majority of Owners permitted to be given by them under this Indenture.

(n)     The Note Trustee shall have no responsibility with respect to any information in any offering memorandum or other disclosure material distributed with respect to the Notes or for compliance with securities laws in connection with the issuance and sale of the Notes.

(o)     The Note Trustee shall not be accountable for the application by the Tribe of the proceeds of the Notes authenticated and delivered hereunder.

(p)     The Note Trustee shall have no duty or obligation to record or file any mortgage, financing statement, continuation statement or similar document relating to this Indenture.

(q)     The Note Trustee shall not be required to take notice of any Event of Default described in (d) or (e) of Section 6.1, and shall not be deemed to have actual notice of any default or Event of Default hereunder (other than a payment default under subsections (a), (b) or (c) of Section 6.1), unless the Note Trustee shall be notified specifically of the Event of Default in a written instrument or document delivered to it by the Tribe or any Owner. In the absence of the delivery of a notice satisfying these requirements, the Note Trustee may assume conclusively that there is no such default or Event of Default, except as noted above.

**62**

SECTION 7.2    Recitals Made by Tribe.

The recitals, statements and representations contained in this Indenture and in the Notes, except only the Note Trustee's certificate of authentication upon the Notes, shall be taken and construed as made by and on the part of the Tribe and not by the Note Trustee.

SECTION 7.3    Trustee May Act Through Agents.

The Note Trustee may execute any of the trusts or powers hereof and perform the duties required to be performed by it either directly or by or through attorneys, agents, receivers or employees, and shall be entitled, in good faith, to rely conclusively and be free from all liability for acting or refraining from acting upon the advice of counsel concerning all matters of trust hereof and its duties hereunder, and the Note Trustee shall not be answerable for the actions or default of any such attorney, agent or employee selected by it with reasonable care. The Note Trustee shall not be answerable for the exercise of any discretion or power under this Indenture or for anything whatsoever in connection with the trusts, except only its own bad faith, willful misconduct or negligence.

SECTION 7.4    Compensation and Indemnification of Trustee.

(a)    Subject to the provisions of any contract between the Tribe and the Note Trustee relating to the compensation of the Note Trustee, the Tribe shall pay to the Note Trustee reasonable compensation for all services performed by it hereunder as agreed from time to time by the Tribe and the Note Trustee and also all their reasonable expenses, charges and other disbursements and those of its attorneys, agents (including expert consultants) and employees incurred in and about the administration and the performance of their powers and duties hereunder, and shall indemnify and hold the Note Trustee harmless against any liabilities that they may incur in the proper exercise and performance of their powers and duties hereunder as further provided in subsection (b) below. If the Tribe shall fail to cause any payment required by this Section to be made, the Note Trustee may make such payment from any money in its possession under the provisions of this Indenture and shall be entitled to a preference therefor over any Notes Outstanding hereunder. The Tribe covenants that it shall promptly deposit or cause to be deposited to the credit of the respective fund or account the amount withdrawn therefrom by the Note Trustee to make any such payment, provided sufficient funds are available to pay all costs and expenses, if any, reasonably incurred by the Tribe in connection therewith.

(b)    The Tribe covenants and agrees to indemnify and hold the Note Trustee and its directors, officers, agents and employees (collectively, the "Indemnitees") harmless from and against any and all liabilities, losses, damages, fines, suits, actions, demands, penalties, costs and expenses, including out-of-pocket, incidental expenses, legal fees and expenses, the allocated costs and expenses of in-house counsel and legal staff and the costs and expenses of defending or preparing to defend against any claim ("Losses") that may be imposed on, incurred by, or asserted against, the Indemnitees or any of them for following any instruction or other direction upon which the Note Trustee is authorized to rely pursuant to the terms of this Indenture. In addition to and not in limitation of the immediately preceding sentence, the Tribe also covenants and agrees to indemnify and hold the Indemnitees and each of them harmless from and against any and all Losses that may be imposed on, incurred by, or asserted against the Indemnitees or any of them in connection with or arising out of the Note Trustee's performance under this Indenture provided the Note Trustee has not acted with bad faith, willful misconduct or negligence. Without limiting the generality of the foregoing, the Note Trustee expressly assumes no responsibility for the validity or enforceability of the Tribe's limited waiver of sovereign immunity as set forth in Section 8.9 hereof, and the Tribe expressly agrees to indemnify and hold harmless the Note Trustee from and against any loss, claim, liability or expense arising from any action in connection with such waiver.

PHTRANS\4312165                              - 32 -

63

(c)     Upon the occurrence of an Event of Default hereunder, and only upon the occurrence of an Event of Default hereunder, the Note Trustee shall have a first lien with right of payment prior to payment on account of principal of and premium, if any, and interest on any Note, upon the moneys and other property pledged hereunder for the foregoing fees, charges and expenses incurred by it.

SECTION 7.5     Trustee Not Liable for Insurance.

The Note Trustee shall be under no duty to effect or to renew any policies of insurance, or under any liability for the failure of the Tribe to effect or renew insurance, or to report or file claims or proofs of loss for any loss or damage insured against or which may occur; nor shall the Note Trustee be liable for any insurer.

SECTION 7.6     Trustee May Require Information.

The Note Trustee may at any time require from the Tribe full information and advice as to the performance of any of the covenants, conditions and agreements of the Tribe herein contained, and may further make or cause to be made independent investigations, at the expense of the Tribe, concerning the affairs of the Tribe insofar as such affairs are related to the Tribe or this Indenture. Whenever in the administration of this Indenture the Note Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Note Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon a certificate of an Authorized Tribal Representative.

SECTION 7.7     Trustee Not Obligated to Act.

(a)     Except as otherwise provided by law, the Note Trustee shall be under no obligation to take any action in respect to any default or otherwise, or toward the execution or enforcement of any of the trusts hereby created, or to institute, appear in or defend any suit or other proceeding in connection therewith, unless requested so to do in writing by the Majority of Owners, and, if in its opinion such action may tend to involve it in expense or liability, unless furnished, from time to time and as often as it may require, with security and commercially reasonable indemnity, limited to the par holdings of each Owner, reasonably satisfactory to it; but the foregoing provisions are intended only for the protection of the Note Trustee, and shall not affect any discretion or power given by any provision of this Indenture to the Note Trustee to take action in respect of any default without such notice or request from the Owners or without such security or indemnity.

(b)     The Note Trustee shall not grant any consent or approval, or waive any right of the Note Trustee, except such as would not in the reasonable judgment of the Note Trustee adversely affect the interest of the Owners of the Notes, without the written approval of a Majority of Owners.

SECTION 7.8     Trustee May Make Advances.

If the Tribe shall fail to perform any of the covenants or agreements contained in this Indenture which are applicable to it, the Note Trustee may, in its uncontrolled discretion and without notice to the Owners, at any time and from time to time, make advances to effect performance of the same on behalf of the Tribe or the Tribe, but the Note Trustee shall be under no obligation so to do; and any and all moneys paid or advanced by the Note Trustee for any such purpose, together with interest thereon at the rate of 10% per annum, shall be a lien in favor of the Note Trustee upon any moneys coming into its hands prior to the lien of the Notes; and no such advance shall operate to relieve the Tribe from any default hereunder.

SECTION 7.9     Trustee May Rely in Good Faith Upon Others.

The Note Trustee shall be protected and shall incur no liability in acting or proceeding in good faith upon any resolution, notice, telegram, request, consent, waiver, certificate, statement, affidavit, voucher, bond or other paper or document which it shall in good faith believe to be genuine and to have been passed or signed by the proper board or Person, or to have been prepared and furnished pursuant to any of the provisions of this Indenture, and the Note Trustee shall be under no duty to make any investigation or inquiry as to any statements contained or matters referred to in any such instrument, but may accept and rely upon the same as conclusive evidence of the truth and accuracy of such statements. The Note Trustee shall not be responsible for any loss or damage resulting from any action or inaction taken by the Note Trustee in good faith in reliance upon an Opinion of Counsel or with respect to non-legal matters, upon the report of such other professional as the Note Trustee shall deem appropriate. The Note Trustee shall not be bound to recognize any Person as an Owner of any Note or to take any action at his request unless such Note shall be registered in the name of such Person or satisfactory evidence of the ownership of such Note shall be furnished to the Note Trustee.

SECTION 7.10     Trustee May Deal in Notes.

Subject to Section 2.12 hereof, the Note Trustee, either in its individual capacity or as a fiduciary, and its affiliates may in good faith buy, sell, own, hold and deal in any of the Notes issued hereunder and secured by this Indenture, and may join in any action which any Owner may be entitled to take with like effect as if the Note Trustee were not a party to this Indenture. The Note Trustee and any of its affiliates may also engage in or be interested in any financial or other transaction with the Tribe, and may serve and act upon, or as depository, trustee or agent for, any committee or body of Owners secured hereby or of other obligations of the Tribe as freely as if it were not Trustee hereunder.

SECTION 7.11     Trustee May Construe Indenture.

The Note Trustee may construe any of the provisions of this Indenture insofar as the same may appear to be ambiguous or inconsistent with any other provision hereof, and any construction of any such provisions by the Note Trustee in good faith shall be binding upon the Owners.

SECTION 7.12     Resignation of Trustee.

The Note Trustee may resign and be discharged of the trusts created by this Indenture by executing a written instrument resigning such trusts and specifying the date when such resignation shall take effect, by filing the same with the Secretary of the Tribe and the Tribe not less than 60 days (or such shorter period as is acceptable to the Tribe) before the resignation date specified in such instrument. Concurrently with the giving of such notice the Note Trustee shall also mail copies thereof to the Owners of all Notes at their addresses as shown in the registration books of the Tribe. Such resignation shall take effect on the resignation date specified in such instrument and notice, unless (a) no successor shall theretofore have been appointed and qualified, in which case such resignation shall be of no effect until such a successor Trustee has so accepted and qualified or (b) a successor Trustee previously shall have been appointed as hereinafter provided, in which event such resignation shall take effect immediately on the appointment and acceptance of such successor Trustee.

SECTION 7.13     Removal of Trustee.

The Note Trustee may be removed at any time by the vote of the Majority of Owners. If no Event of Default has occurred and is continuing, the Note Trustee may be removed by the Tribe after

written notice thereof shall have been given by the Tribe to the Note Trustee, provided that the Tribe has first obtained the consent of a Majority of Owners. Any such removal by the Owners or the Tribe shall not take effect until a successor Trustee has been appointed and qualified and has accepted such appointment. If at any time the Note Trustee shall be dissolved, the Note Trustee shall no longer be eligible to act as such and a vacancy shall forthwith and ipso facto exist in the office of Trustee.

SECTION 7.14    Successor Trustees.

(a)    The successor Trustee to any Trustee who shall have resigned, been removed, or become ineligible to act as such may be appointed by the Tribe. Notwithstanding the foregoing, if there shall have occurred and there be continuing any Event of Default, then such successor Trustee shall be appointed only by any Owner or Owners owning, in the aggregate, a majority in principal amount of the Notes then Outstanding hereunder. Until a successor Trustee is appointed to fill any vacancy in the office of Trustee, the Tribe shall, unless an Event of Default shall have occurred and be continuing, appoint a successor Trustee to fill such vacancy by delivering to the successor Trustee a written instrument making such appointment and a Certified Tribal Resolution authorizing the execution and delivery of such instrument. After any such appointment by the Tribe, it shall cause notice of such appointment to be mailed to the Owners. Any successor Trustee so appointed by the Tribe shall immediately and without further action be superseded by a Trustee appointed by the Owners in the manner provided above.

(b)    If at any time the Note Trustee shall have resigned or been removed and no appointment of a successor Trustee shall have been made pursuant to the foregoing provisions of this Article prior to the resignation date for such Trustee as specified in the resignation notice or the effective date of its removal, such former Trustee may forthwith, at the expense of the Tribe, apply to a court of competent jurisdiction for the appointment of a successor Trustee. If, in a proper case, no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Article within two months after a vacancy shall have occurred in the office of Trustee, the Note Trustee or any Owner may apply to any court of competent jurisdiction to appoint such successor Trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor Trustee.

(c)    The Note Trustee which is transferring the trust may not cease to act in such capacity until such Trustee shall have executed and delivered an instrument transferring to the successor Trustee all the trust estate and the rights, powers and trusts hereunder of the Note Trustee so ceasing to act, the successor Trustee shall have executed the instrument and received the moneys, securities and funds described in Section 7.16, and the Note Trustee so ceasing to act shall have taken any action necessary to duly assign, transfer and deliver to its successor all property (including, without limitation, any Notes and all securities and monies in any Fund established hereunder) at the time held by it hereunder.

SECTION 7.15    Required Capital of Trustee.

The Note Trustee is, and each successor Trustee appointed pursuant to the foregoing provisions shall be, a national banking association with trust powers, as trust company or a bank with trust powers, having (or its parent having) combined capital and surplus of at least $50,000,000.

SECTION 7.16    Acknowledgment by Successor Trustee.

Any successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Tribe an instrument accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all the estates, properties, rights, powers, trusts, duties and obligations of its predecessor in the trust hereunder, with like effect as if originally

**66**

named Trustee herein. Upon request of such successor Trustee, the Note Trustee ceasing to act shall pay over to the successor Trustee all moneys, securities and funds at the time held by it hereunder.

SECTION 7.17   Merger of Trustee.

Any corporation or association into which any Trustee hereunder may be merged or with which it may be consolidated, or any corporation or association resulting from any merger or consolidation to which any Trustee hereunder shall be a party, or any corporation or association to which the Note Trustee sells or otherwise transfers all or substantially all of its corporate trust business, shall be the successor Trustee under this Indenture, without the execution or filing of any paper of any further act on the part of the parties hereto, anything herein to the contrary notwithstanding.

SECTION 7.18   Reports of Trustee.

The Note Trustee shall deliver to the Tribe a monthly statement, no later than the 15th day of the month next following the month in which this Indenture is executed, and no later than the same day of each month thereafter, describing the investment or deposit of funds made pursuant to Section 4.7 hereof, the investment income or loss thereon, as applicable, and the transfers to or charges against the various funds established hereunder as directed under Section 4.9 hereof.

SECTION 7.19   Financing Statements.

(a)      The Tribe shall cause to be filed, upon the execution and delivery hereof, such financing statements and other documents, and shall thereafter cause to be filed such continuation statements and other documents, under such applicable law as shall be required for the purpose of perfecting or continuing the perfection of the security interests granted hereunder or under the Pledge Agreement (to the extent such security interests may be perfected by filing). The Note Trustee shall file any and all such statements necessary to maintain the status of such filings, but may from time to time request, and the Tribe shall provide to the Note Trustee upon such request or in any event on an annual basis not later than May 1 in each year, an Opinion of Counsel with respect to the effectiveness of any financing statements filed to perfect such security interests or with respect to any action which may be required to continue such perfection, together with evidence when available of the making of any necessary filings.

(b)      The Tribe hereby authorizes the Note Trustee, and appoints the Note Trustee as its attorney-in-fact, to make any and all such filings described under (a) above as the Note Trustee, upon advice of counsel, shall reasonably determine necessary to protect and maintain the liens and security interest created hereunder or under the Pledge Agreement, whether or not directed or advised by the Tribe to do so.

ARTICLE 8.
GENERAL COVENANTS AND REPRESENTATIONS OF THE TRIBE

SECTION 8.1   Payment of Principal, Interest and Premium.

(a)      The Tribe shall cause to be paid, when due, the principal and Redemption Price of (whether at maturity, by acceleration, by call for redemption or otherwise), and all interest on, the Notes at the places, on the dates and in the manner provided herein and in said Notes according to the true intent and meaning thereof.

(b)     The payment of the principal or Redemption Price of, and all interest on, the Notes constitutes a general obligation of the Tribe to which its full faith and credit is pledged.  Payment of the Notes is secured as otherwise provided or described herein.

SECTION 8.2     Covenant to Perform and Authority of Tribe.

The Tribe shall faithfully perform at all times all of its covenants, undertakings and agreements contained in this Indenture, in any Note executed, authenticated and delivered hereunder, or in any proceedings of the Tribe pertaining thereto.  The Tribe represents that it is duly authorized to issue the Notes authorized hereby, to execute this Indenture; that all action on its part for the issuance of the Notes and the adoption of this Indenture has been duly and effectively taken; and that such Notes in the hands of the Owners are and will be valid, binding and enforceable obligations of the Tribe enforceable according to their terms, subject to bankruptcy, insolvency and other laws affecting creditors' rights generally and usual equitable principles.

SECTION 8.3     Covenants as to Existence, Maintenance of Properties, Etc.

The Tribe shall:

(a)     preserve its existence as a federally recognized Indian tribe and all its rights and licenses to the extent necessary or desirable in the operation of its business affairs and be qualified to do business in each jurisdiction where its ownership of its property or the conduct of its business requires such qualification; provided, however, that nothing herein contained shall be construed to obligate it to retain or preserve any of its rights or licenses no longer used or, in the judgment of its Business Committee, useful in the conduct of its business;

(b)     at all times cause its business to be carried on and conducted in an efficient manner and its property to be maintained, preserved and kept in good repair, working order and condition and all needful and proper repairs, renewals and replacements thereof to be made; provided, however, that nothing herein contained shall be construed (i) to prevent it from ceasing to operate any portion of its property, if in the judgment of its Business Committee it is advisable not to operate the same for the time being, or if it intends to sell or otherwise dispose of the same as permitted hereunder and within a reasonable time endeavors to effect such sale or other disposition, or (ii) to obligate it to preserve, repair, renew or replace any property, leases, rights, privileges or licenses no longer used or, in the judgment of its Business Committee, useful in the conduct of its business;

(c)     conduct its affairs and carry on its business and operations in such manner as to comply with any and all applicable laws of the United States and the several states thereof and duly observe and conform to all valid orders, regulations or requirements of any governmental authority relative to the conduct of its business and the ownership of its properties; provided, nevertheless, that nothing herein contained shall require it to comply with, observe and conform to any such law, order, regulation or requirement of any governmental authority so long as the validity thereof shall be contested in good faith;

(d)     promptly pay all lawful taxes, governmental charges and assessments at any time levied or assessed upon or against it or any of its properties; provided, however, that it shall have the right to contest in good faith by appropriate proceedings any such taxes, charges or assessments or the collection of any such sums and pending such contest may delay or defer payment thereof, provided that, if by non-payment of any such sums, the pledge and security interest of this Indenture will be impaired or any property of the Tribe will be subject to imminent loss or forfeiture, then such sums shall be paid immediately; provided, further, that the Tribe may make such payment under protest and pursue a refund;

**68**

(e)     procure and maintain all licenses, permits, approvals, certifications and accreditations issued by any regulatory bodies which are material to the maintenance of its properties, conduct of its operations and performance of its obligations hereunder; and

(f)     maintain or cause to be maintained insurance with respect to its facilities (including the Resort) with responsible carriers against such risks and in such amounts as is customarily carried by similar businesses with such deductibles, retentions, self-insured amounts and coinsurance provisions as are customarily carried by businesses of similar size, including all insurance required by Section 5.7 of the Resort Development Loan Agreement, and use its best efforts to maintain or cause to be maintained insurance against catastrophic loss in an amount at least equal to the aggregate principal amount of the Notes, any other indebtedness of the Tribe ranking senior to on a parity with the Senior Notes, and all outstanding indebtedness of the East Valley Authority.

SECTION 8.4     Consolidation, Merger, Sale or Conveyance.

The Tribe shall not merge or consolidate with or sell or convey all or substantially all of its assets to any Person.

SECTION 8.5     Books and Records; Financial Statements and Other Information.

The Tribe covenants that it shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and financial affairs of the Tribe, in accordance with generally accepted accounting principles, consistently applied. The Note Trustee and its duly authorized agents shall have the right at all reasonable times to examine and make copies of the books and records of the Tribe. The Tribe shall furnish, or cause to be furnished, to the Note Trustee the following:

(a)     within 90 days after the last day of each Fiscal Year of the Tribe, (i) a copy of the annual Tribal Financial Statements accompanied by an audit report of the Tribe's certified public accountants, and (ii) a letter of an Authorized Tribal Representative to the effect that, to the knowledge of the management and Business Committee of the Tribe, no event has occurred which constitutes or would, with the passage of time or the giving of notice or both, constitute an Event of Default hereunder, or otherwise describing any such event known to the Tribe;

(b)     within 45 days of the end of each month, (i) a copy of the interim Tribal Financial Statements for such month and for the Fiscal Year to date, and (ii) a letter of an Authorized Tribal Representative to the effect that, in the opinion of such officer (A) such unaudited financial statements have been prepared in accordance with generally accepted accounting principles applied on a basis consistent with the annual Tribal Financial Statements and reflect all eliminations and adjustments (consisting only of normal recurring adjustments, except as noted in such letter) necessary for a fair presentation of the Tribe's financial position and results of operation for such month and the year to date, and (B) no event has occurred which constitutes or would, with the passage of time or the giving of notice or both, constitute an Event of Default hereunder, or otherwise describing any such event known to such chief financial officer;

(c)     concurrently with their delivery to the Resort Development Bond Trustee following the end of each fiscal year of the East Valley Authority, a copy of the annual financial statements of the East Valley Authority accompanied by an audit report of the Authority's certified public accountants;

(d) concurrently with their delivery to the Resort Development Bond Trustee following the end of each fiscal month and quarter of the East Valley Authority, a copy of the interim financial statements of the East Valley Authority for such month or quarter and for the fiscal year to date prepared in accordance with generally accepted accounting principles in a manner consistent with the annual audited financial statements of the East Valley Authority provided under (c) above;

(e) prior to the commencement of any fiscal year of the East Valley Authority, a copy of the financial budget of the East Valley Authority prepared in accordance with generally accepted accounting principles in a manner consistent with the annual audited financial statements of the East Valley Authority;

(f) a copy of all other financial information (including related reports and certifications) provided to the holders of the Resort Development Bonds (or the trustee therefore) or to any other holder of long-term debt of the East Valley Authority concurrently with the delivery thereof to the Resort Development Bond Trustee or such other holder;

(g) as soon as possible, but in any event within ten (10) days after the Tribe becomes aware thereof (or should have become so aware with the exercise of reasonable diligence), notice of the occurrence of any Event of Default or of any act, omission, thing or condition which upon the giving of notice or lapse of time, or both, would or might constitute an Event of Default, which notice shall describe the Event of Default or other act, omission, thing or condition in question and shall set forth in detail what action the Tribe proposes to take with respect thereto;

(h) concurrently with its delivery to any of (i) any nationally recognized municipal securities repository, (ii) any other required information repository, (iii) any dissemination agent appointed for such purpose, or (iv) any security holder or holders, or any agent or trustee therefor, a copy of any information statement, filing or other notice required to be filed, delivered or sent by the Tribe, including any agency, or instrumentality of the Tribe, as required to comply with Rule 15c2-12 of the Securities Exchange Act of 1934, as amended, or as required pursuant to any agreement entered into by the Tribe in accordance with such Rule or similar undertaking for the benefit of the holders of securities issued by the Tribe or any agency or instrumentality of the Tribe, including, without limitation, and annual report or other notice prepared and delivered in accordance with the Continuing Disclosure Agreement dated as of June 1, 2003, between the East Valley Authority and the Resort Development Bond Trustee;

(i) to the extent not otherwise provided above, such other information as is required in accordance with Rule 144A(d)(4) promulgated by the Securities Exchange Commission pursuant to the Securities Act of 1933, as amended; and

(j) upon request, or within a reasonable time thereafter, such other information concerning the Tribe and its operations and financial condition and results as a Majority of Owners may reasonably request.

SECTION 8.6 <u>Additional Indebtedness; Indebtedness of the Authority.</u>

(a) The Tribe will not, and will not authorize or permit the East Valley Authority, or any other municipality, governmental authority, Tribal entity, or issuer of loans, bonds, or other forms of indebtedness for the benefit of the Tribe, the East Valley Authority or the operations that comprise the Resort, to incur any additional indebtedness (including additional bonds or indebtedness provided for under any existing or future loan agreements or indentures) ("Additional Debt") without the prior written approval of a Majority of Owners, other than Additional Debt:

(i)    which is issued to refund the Senior Resort Development Bonds to realize a true debt service or interest cost savings or as a result of the extraordinary mandatory redemption of the Senior Resort Development Bonds due to a determination of taxability as provided in the Resort Development Bond Indenture, provided that the aggregate principal amount of such Additional Debt does not exceed 112% of the outstanding principal of the Senior Resort Development Bonds to be refunded; or

(ii)    as to which the Tribe shall have demonstrated in a manner consistent with the determinations required under the Resort Development Loan Agreement that the Resort has generated earnings before depreciation, interest and taxes for each of the immediately preceding two (2) fiscal years in an amount sufficient to achieve a debt service coverage ratio (taking into account for such purpose the maximum annual debt service payable (A) on all long-term debt and other payment obligations of the Tribe, the East Valley Authority or other affiliated entity with respect to the Resort or having any claim to the revenues of or derived from the Resort that rank on a priority or parity basis with the Notes, (B) the debt service payable on the Notes, and (C) the expected debt service payable on the proposed financing) equal to at least 3.0:1.0; or

(iii)    which is either (A) an unsecured general obligation of the Tribe or is secured either by property not constituting a part of the Distributable Authority Revenues and/or by a pledge of the Distributable Authority Revenues that is completely junior and subordinate in all respects to the pledge of Distributable Authority Revenues securing payment of the Notes.

(b)    Additional Debt of the Tribe or the East Valley Authority or other entity issued in accordance with subsection (a)(i) or (a)(ii) above may be paid from, and secured by an assignment of or security interest in, the revenues of the East Valley Authority or the Tribe (including the Distributable Authority Revenues) ranking prior to or on a parity basis with the Senior Notes.

(c)    The Tribe will not, and will not authorize or permit the East Valley Authority, or any other municipality, governmental authority, Tribal entity, or issuer of loans, bonds or other forms of indebtedness for the benefit of the Tribe, the East Valley Authority or the operations that comprise the Resort, to alter any of the terms, covenants, or other conditions of the Senior Resort Development Bonds, or any other indebtedness issued by the Tribe or the East Valley Authority that ranks prior to the Notes in terms of payment priority, unless a Majority of Owners has agreed that the proposed change or changes will have no material adverse effect upon the Beneficial Owners.

SECTION 8.7    Pledge Agreement.

(a)    Payment of the principal or Redemption Price of, and all interest on, the Notes is secured by the pledge and assignment by the Tribe of the Distributable Authority Revenues, which shall be deposited by the Tribe, or by the East Valley Authority for the benefit of the Tribe, in the Custodial Account as described in the Pledge Agreement. The Tribe shall comply in all respects, and shall cause the East Valley Authority to so comply, with the terms and provisions of the Pledge Agreement, which terms and provisions are incorporated herein by reference.

(b)    So long as the Notes are Outstanding, the Tribe shall deposit or cause to be deposited all of the Distributable Authority Revenues into the Custodial Account, and shall not establish, or permit any subsidiary, agency, authority, instrumentality or other sub-unit of the Tribe (including the East Valley Authority) to establish any other deposit or investment account for the collection of the Distributable Authority Revenues, unless prior thereto, the Tribe, the East Valley Authority, the Resort Development Bond Trustee, the Note Trustee and the custodian for such other account shall have entered into an

amendment to or replacement for the Pledge Agreement preserving the rights of the Note Trustee with respect to the Distributable Authority Revenues in form and substance reasonably satisfactory to the Note Trustee and approved in writing by a Majority of Owners.

(c)    So long as the Notes are Outstanding, the Tribe shall not (i) restrict or eliminate the right of the East Valley Authority to conduct gaming operations in a manner that would be materially adverse to the economic interests of the Owners, or (ii) conduct gaming operations directly or through any other entity other than the East Valley Authority.

SECTION 8.8    Rating of Notes.

Within 60 days of receiving a request by or on behalf of the Beneficial Owners of at least 25% of the Outstanding principal amount of the Notes, such request to be made not earlier than the issuance by any Rating Agency of an "investment grade" rating on the Senior Resort Development Bonds, the Tribe shall use its reasonable best efforts to apply for and cause the Notes to be assigned by one or more Rating Agencies as selected by the Tribe, a public credit rating and shall thereafter use its reasonable best efforts to maintain such ratings as long as the Notes are Outstanding.

SECTION 8.9    Limited Waiver of Sovereign Immunity.

(a)    The Tribe does not consent to the entry, enforcement, levy or other execution of any judgment for money or other damages against any assets, real or personal, of the Tribe, except that the Tribe waives its sovereign immunity from unconsented suit or other legal proceeding, and any defense based thereon, as authorized herein, whether such suit or proceedings be brought in law or in equity, or in administrative proceedings or proceedings in arbitration, with respect to enforcement of the covenants and obligations of the Tribe under this Indenture and the Notes and the transactions contemplated hereby, or for the commencement and maintenance of any action by the Note Trustee (or by the Owners or Beneficial Owners of the Notes) to interpret or enforce the terms of this Indenture, the Notes and each other Note Document, and to enforce and execute any order, judgment or ruling resulting therefrom against any assets or revenues of the Tribe other than real property held in trust for the Tribe by the United States, and in all circumstances, as may be necessary to obtain specific performance of the provisions of this Indenture, the Notes and each other Note Document.

(b)    The Tribe waives its immunity from unconsented suit and other legal proceedings, and any defense based thereon, to permit suit by the parties identified in subsection (a) above in the United States District Court for the Central District of California and the California Superior Court for the County of Riverside and all courts to which appeals therefrom are available, and enforcement of any judgment of such court in any court of competent jurisdiction, or arbitrators, appointed and acting under the commercial arbitration rules of the American Arbitration Association, to:

(i)    enforce any remedy provided  under the Note Documents, order the Tribe to perform or comply with any of the provisions applicable to it of the Note Documents, order amounts payable under the Note Documents to be paid in accordance with the terms thereof, award and enforce the award of damages owing as a consequence of a breach of the Note Documents, whether such order or award is the product of litigation, administrative proceedings, or arbitration;

(ii)    order the seizure and sale of any assets of the Tribe, other than any interest in property held in trust for the Tribe by the United States of America, or the exercise of any other remedy available generally in the State of California for judgment creditors;

(iii)   determine whether any consent or approval of the Tribe has been improperly granted or unreasonably withheld;

(iv)   enforce any judgment prohibiting the Tribe from taking any action, or mandating or obligating the Tribe to take any action; and

(v)   as to a court of competent jurisdiction only, but not arbitrators, adjudicate any claim under the Indian Civil Rights Act of 1968, 25 U.S.C. § 1302 (or any successor statute).

(c)   The Tribe expressly waives any right it may otherwise have to require that foregoing matter be considered or heard first in any tribal court of the Tribe, now or hereafter existing, whether because of the doctrine of exhaustion of tribal remedies or as a matter of comity or abstention.

(d)   The Tribe expressly and irrevocably acknowledges and agrees that the rights and remedies of any Owner of the Notes hereunder, and the rights, duties and obligations of the Note Trustee hereunder, shall be governed by and construed in accordance with the laws of the State of California. In particular, the Tribe further acknowledges and agrees, to the extent necessary for the enforcement and perfection of any lien created hereunder or to secure the indebtedness of the Tribe created hereunder that the California Commercial Code, as now or hereafter in effect (the "State UCC"), shall each be applicable to this Indenture, providing the Note Trustee with all rights available to secured parties under the State UCC. The rights of the Note Trustee hereunder shall attach, be effective, and be perfected immediately and without possession by the Note Trustee and without filing or other act (other than the proper recording of any financing statements under the State UCC) notwithstanding the fact that the Tribe might be deemed a "state" or "governmental unit" whose transfers might otherwise be excluded from coverage under the State UCC. The Tribe expressly submits itself to the jurisdiction and applicability of California law with respect to the recordation of any and all documents necessary to perfect or record the pledge and assignment granted herein to the Note Trustee.

(e)   If, and only if, a dispute arises between the parties over a matter for which the Tribe has provided a waiver of immunity under this Indenture (the "Dispute"), and neither the United States District Court for Central District of California nor the California Superior Court for the County of Riverside can or is willing to hear the Dispute, then any party may require the other party to submit the Dispute to binding arbitration of a Dispute in accordance with the procedures set forth herein. To initiate binding arbitration of a Dispute, a party shall notify the other party in writing. The Dispute shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association and subject to California law concerning arbitration, and judgment on the award rendered by the arbitrator may be entered in any court pursuant to California law concerning arbitration. One arbitrator shall preside and shall be selected by the American Arbitration Association.

(f)   Any party described in subsection (a) above, before or during any arbitration, may apply to a court having jurisdiction for a temporary restraining order or preliminary injunction where such relief is necessary to protect its interests pending completion of the dispute resolution proceedings.

(g)   In the event of arbitration, the prevailing party(ies) shall be entitled to all of its costs, including reasonable attorneys' fees, from the nonprevailing party(ies).

(h)   Any arbitration shall take place at a location in an agreed upon city in California. The arbitrator shall render an award within 45 days from the conclusion of the arbitration.

**73**

(i)     The Tribe represents that the transaction represented by this Indenture has not occurred on Indian Lands or on lands that could be defined as "Indian Country" pursuant to federal statutes or case law, but rather on lands within the jurisdiction of the State of California.  The Tribe understands that this representation is offered as an inducement to the Owners of Notes from time to time to purchase the Notes, which representation is and will be material to the decision of the Owners to purchase the Notes and without which the Owners would not purchase the Notes.  The negotiations regarding the Note Documents, and the execution and delivery of the Note Documents have not occurred on Indian Lands or lands which could be defined as "Indian Country" pursuant to federal statutes or case law, but have occurred on lands subject to the jurisdiction of the courts of the State of California.  The representation of this transaction as occurring off-reservation, and the representations concerning the off-reservation negotiations regarding this transaction, together with the off-reservation execution and delivery of the Note Documents, are offered as an inducement by the Tribe to the Owners of Notes from time to time, which representations are acknowledged by the Tribe to be material to the decision by Owners to purchase the Notes.

SECTION 8.10    Certain Approvals.

The Tribe represents and warrants that this Indenture and the other Note Documents, and the transactions contemplated thereby, do not require approval by the United States Department of the Interior under Section 81 or Section 177 of Title 25 of the United States Code.  In the event that it shall be determined that any such approval shall be required, the Tribe covenants to seek and obtain such approval.  The Tribe further covenants that in any claim or cause of action based upon or arising out of or related to any of the Note Documents or the transactions contemplated thereby, or in any action in which the Borrower, the Note Trustee or any Owner or Beneficial Owner of the Notes shall be a party, whether with respect to contract claims, tort claims or otherwise, including without limitation any action, counterclaim or other proceeding which seeks in whole or in part to challenge the validity or enforceability of any of the Note Documents, or any provision thereof, the Tribe shall not assert that any approval of the provisions thereof are required to be approved by the United States Department of the Interior or the Bureau of Indian Affairs.

ARTICLE 9.
AMENDMENTS AND SUPPLEMENTS

SECTION 9.1    Amendments and Supplements Without Consent of Owners.

This Indenture may be amended or supplemented from time to time without the consent of the Owners by a Supplemental Indenture, authorized by a Certified Tribal Resolution filed with the Note Trustee, for one or more of the following purposes:

(i)     to grant to or confer upon the Note Trustee for the benefit of the Owners any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Owners or the Note Trustee which are not contrary to or inconsistent with this Indenture as then in effect or to subject to the pledge and lien of this Indenture additional revenues, properties or collateral;

(ii)    to add additional covenants of the Tribe or to surrender any right or power herein conferred upon the Tribe which addition or surrender is not contrary to the rights and benefits of the Owners hereunder;

(iii)   to reflect a change in applicable law;

**74**

(iv)     to qualify any of the Notes for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended; or

(v)      to qualify this Indenture as an "indenture," under the Trust Indenture Act of 1939, as amended.

SECTION 9.2     <u>Amendments With Consent of Owners.</u>

This Indenture may be amended from time to time, except with respect to (a) the interest payable upon any Note, (b) the dates of maturity, Scheduled Interest Payment Dates, or redemption provisions of any Notes, (c) this Article 9, and (d) the security provisions hereunder, by a Supplemental Indenture approved by a Majority of Owners; provided that no amendment shall be made which affects the rights of some but less than all the Outstanding Notes without the consent of a Majority of Owners of such Notes. Amendments with respect to items (a), (b), (c) or (d) of the first sentence of this Section 9.2 shall be effected only with the unanimous consent of all Owners adversely affected by such amendments.

SECTION 9.3     <u>Trustee Authorized to Join in Amendments and Supplements; Reliance on Counsel.</u>

The Note Trustee is authorized to join with the Tribe in the execution and delivery of any Supplemental Indenture or amendment permitted by this Article 9 and in so doing shall be fully protected by an Opinion of Counsel that such Supplemental Indenture or amendment is so permitted and has been duly authorized by the Tribe and that all things necessary to make it a valid and binding agreement have been done.

SECTION 9.4     <u>Execution of Supplemental Indentures.</u>

The Note Trustee shall join with the Tribe in the execution of any Supplemental Indenture which the Tribe is authorized to execute under the provisions of Section 9.1 or 9.2 upon the delivery by the Tribe to the Note Trustee of the following:

(a)      A Certified Tribal Resolution authorizing the Tribe to enter into such Supplemental Indenture and requesting the execution thereof by the Note Trustee;

(b)      An Opinion of Counsel (i) to the effect that the Tribe and the Note Trustee are authorized to enter into such Supplemental Indenture by the provisions of Section 9.1 hereof and that all conditions precedent to the execution and delivery of such Supplemental Indenture have been satisfied, or (ii) to the effect that the Tribe and the Note Trustee are authorized to enter into such Supplemental Indenture by the provisions of Section 9.2, that the consent of the Owners required by Section 9.2 has been secured, and that all conditions precedent to the execution and delivery of such Supplemental Indenture have been satisfied; and

(c)      If the Opinion of Counsel shall state the Tribe and the Note Trustee are authorized to enter into such Supplemental Indenture by the provisions of Section 9.2, certified copies of the documents evidencing the consent of the Owners as specified in said opinion.

The Note Trustee shall nevertheless not be obligated under any provision of this Indenture to join in any Supplemental Indenture which, in its opinion, adversely affects its own duties, rights or immunities under this Indenture.

PHTRANS\43121615                              - 44 -

**75**

Upon execution of any Supplemental Indenture pursuant to the provisions of this Indenture, this Indenture shall be and be deemed to be modified, amended and supplemented in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Note Trustee, the Tribe, and the Owners of Notes shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications, amendments and supplements, and all the terms and conditions of any such Supplemental Indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

SECTION 9.5   Authentication of Notes After Execution and Delivery of Supplemental Indenture.

The Notes authenticated and delivered after the execution of any Supplemental Indenture pursuant to the provisions of this Article may bear a notation, in form approved by the Note Trustee, as to any matter provided for in such Supplemental Indenture. If the Tribe or the Note Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Note Trustee and the Tribe, to any modification of this Indenture contained in any such Supplemental Indenture may be prepared by the Tribe, authenticated by the Note Trustee and delivered in exchange for the Notes then Outstanding.

ARTICLE 10.
DEFEASANCE

SECTION 10.1   Defeasance of Notes.

(a)   The Notes for the payment or redemption (whether pursuant to optional redemption, mandatory sinking fund redemption or otherwise) of which sufficient funds, including all accrued and unpaid interest to the date of payment or redemption and the premium, if any, or non-callable Government Securities which bear interest at such rates and mature at such times as to provide such funds as and when required for such payment or redemption, shall have been deposited with the Note Trustee, or provisions for such payment satisfactory to the Note Trustee shall have been made with the Note Trustee, whether upon or prior to the maturity or the date fixed for redemption of such Notes, shall be deemed to be paid within the meaning of this Article, except that if such Notes are to be redeemed prior to the maturity thereof, notice of such redemption shall have been duly given or provisions satisfactory to the Note Trustee shall have been made therefor.

(b)   If any Note shall not be presented for payment when the principal thereof shall become due, either at maturity or otherwise, or at the date fixed for the redemption thereof, and if the Tribe shall have deposited with the Note Trustee or left with it in trust if previously so deposited, funds sufficient to pay the principal of such Notes (and the premium, if any, payable upon the redemption thereof), together with all interest due thereon to the date of maturity thereof or to the date fixed for the redemption thereof, for the benefit of the Owner or Owners thereof, respectively, all liability of the Tribe to the Owner of such Note for the payment of the principal thereof and all accrued and unpaid interest thereon (and all liability of the Tribe to the Owner of such Note for the premium, if any), shall forthwith cease, determine and be completely discharged, and thereupon it shall be the duty of the Note Trustee to hold said funds, without investment or liability for interest thereon, for the benefit of the Owner of such Note, who shall thereafter be restricted exclusively to said funds for any claim of whatsoever nature on his part under this Indenture or on, or with respect to, said Note.

(c)   Neither moneys nor the Government Securities deposited with the Note Trustee pursuant to this Article shall be withdrawn or used for any purpose other than, and such Government Securities and

moneys shall be segregated and held in trust for, the payment of the principal or Redemption Price of, premium, if any, on and all accrued and unpaid interest on, the Notes (or portions thereof).

SECTION 10.2    Deposit of Funds for Payment of Notes.

(a)    After the Tribe deposits with the Note Trustee moneys or Government Securities sufficient to pay the principal or Redemption Price on any Note becoming due, either at maturity or by call for redemption or otherwise, together with all interest accruing thereon to the due date, interest on the Note or Notes shall cease to accrue on the due date and all liability of the Tribe with respect to such Note or Notes shall likewise cease except as provided in Section 10.1 and Section 10.3. Thereafter such Note or Notes shall be deemed not to be Outstanding hereunder, and (a) any surplus balance held by the Note Trustee with respect to the Notes over the principal of, premium (if any) on and actual interest accrued on such Notes shall be paid to the Tribe and (b) the Owner or Owners of such Note or Notes shall be restricted exclusively to the funds so deposited for any claim of whatsoever nature with respect to such Note or Notes, and the Note Trustee shall hold such funds, without investment or liability for interest, in trust for such Owner or Owners.

(b)    In connection with the deposit of cash and/or non-callable Government Securities sufficient to pay the principal and Redemption Price of, and interest on the Notes in advance of the date of maturity or prior redemption thereof, the Tribe shall further cause to be delivered to the Note Trustee a report of a certified public accountant verifying the sufficiency of such cash and non-callable Government Securities for such purpose.

(c)    In connection with any defeasance of the Notes effected through the deposit of cash and/or Government Securities prior to the maturity or redemption date for such Notes as provided herein, the Tribe shall use its best efforts to obtain a rating in the highest Rating Category (i.e. AAA/Aaa) from any Rating Agency as may be requested in writing by a Majority of Owners.

(d)    The Note Trustee shall from time to time deliver any unclaimed funds to or as directed by pertinent escheat authority, as identified by the Note Trustee in its sole discretion, pursuant to and in accordance with applicable unclaimed property laws, rules or regulations.  Any such delivery shall be in accordance with the customary practices and procedures of the Note Trustee and the escheat authority.

SECTION 10.3    Discharge of Indenture.

If the Tribe, its successors or assigns, shall (as provided in Section 10.1 and 10.2 hereof) pay or cause to be paid unto the Owners of all Notes Outstanding hereunder the principal and interest to become due thereon and the premium thereon, if any, at the times and in the manner stipulated therein, or if the Tribe, its successors or assigns, shall deliver or cause to be delivered to the Note Trustee for cancellation all Notes Outstanding hereunder, then this Indenture and the estate, title, interest and rights hereby granted shall cease, determine and be void, and thereupon the Note Trustee shall, upon the written request of the Tribe, release, cancel and discharge the lien of this Indenture, and execute and deliver to the Tribe such instruments as shall be requisite to satisfy the lien thereof, shall discharge this Indenture and reconvey to the Tribe the estate, title, interest and rights hereby conveyed, and assign and deliver to the Tribe any money and other property at the time subject to the lien of this Indenture which may then be in the possession of the Note Trustee. The Note Trustee shall be entitled to receive an Opinion of Counsel that all conditions precedent to the discharge of the Indenture have been satisfied.

The release, cancellation and discharge of this Indenture, however, shall be without prejudice to the right of the Note Trustee to be paid any compensation then due to it hereunder, and to be protected

**77**

and saved harmless by the Tribe from any and all losses, liabilities, costs and expenses, including counsel fees and expenses, including the allocated costs and expenses of in-house counsel and legal staff at any time incurred by the Note Trustee hereunder, or connected with any Note issued hereunder, of and from which, if this Indenture had not been released, canceled and discharged, the Tribe would have been obligated by the terms of this Indenture to protect and save the Note Trustee harmless of and from such losses, liabilities, costs and expenses as provided herein.

ARTICLE 11.
MISCELLANEOUS

SECTION 11.1   Limitation on Beneficiaries.

Nothing in this Indenture, expressed or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Tribe, the Note Trustee, the Paying Agent and the Owners, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation hereof; and the covenants, stipulations and agreements in this Indenture contained are and shall be for the sole and exclusive benefit of the Tribe, the Note Trustee, the Paying Agent, and the Owners, and their respective successors and assigns.

SECTION 11.2   Severability.

In case any one or more of the provisions contained in this Indenture or in the Notes shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Indenture or of the Notes, and this Indenture and the Notes shall be construed as if such invalid or illegal or unenforceable provision had never been contained herein.

SECTION 11.3   Unclaimed Funds.

Moneys deposited with the Note Trustee which remain unclaimed two years after the date payment thereof becomes due shall, upon the written request of the Tribe, if the Tribe is not at the time to the knowledge of the Note Trustee in default with respect to any covenant in this Indenture or the Notes be paid to the Tribe; and the Owners for which the deposit was made shall thereafter be limited to a claim against the Tribe; provided, however, that the Note Trustee, before making payment to the Tribe, may, at the expense of the Tribe, cause a notice to be published, stating that the moneys remaining unclaimed will be returned to the Tribe after a specified date. In the absence of any such written request from the Tribe, the Note Trustee shall from time to time deliver such unclaimed funds to or as directed by pertinent escheat authority, as identified by the Note Trustee in its sole discretion, pursuant to and in accordance with applicable unclaimed property laws, rules or regulations. Any such delivery shall be in accordance with the customary practices and procedures of the Note Trustee and the escheat authority. Any money held by the Note Trustee pursuant to this Section 11.3 shall be held uninvested and without any liability for interest.

SECTION 11.4   Notices.

Any notice to or demand upon any party may be made, and shall be deemed to have been sufficiently given, if served or presented at or sent by registered or certified United States mail, fax, hand delivery or overnight courier addressed or sent as follows (or in each case to such other addresses or fax numbers as may be filed in writing with the Note Trustee):

PHTRANS\4312160\5

- 47 -

(i)     To the Designated Office of the Note Trustee, Note Registrar and Paying Agent

Wells Fargo Bank, National Association
707 Wilshire Boulevard, 17th Floor
Los Angeles, CA 90017
Attention: Corporate Trust Department
Fax: (213) 614-3355

(ii)    To the Tribe

Cabazon Band of Mission Indians
84-245 Indio Springs Parkway
Indio, California 92203-3495
Attention: Chief Administrative Officer
Fax: (760) 574-0998

SECTION 11.5     Notices to Beneficial Owners.

So long as any Notes are Outstanding, the Note Trustee shall provide to each Beneficial Owner of the Notes, and to the Underwriter, a copy of each notice, demand, report or other communication, including notice of any Event of Default known to the Note Trustee, sent by the Note Trustee to the Tribe or the Owners in accordance with this Indenture.

SECTION 11.6     Owners' Consents.

(a)     Any consent or other instrument required by this Indenture to be signed by any Owner may be in any number of concurrent documents and may be signed by such Owner or, by the Owner's agent appointed in writing or by the Beneficial Owner of such Notes. Proof of the execution of such instrument or of the instrument appointing an agent and of the ownership of Notes, if made in the following manner, shall be conclusive for any purposes of this Indenture with regard to any action taken by the Note Trustee under the instrument.

(b)     The fact and date of a person's signing an instrument may be proved by the certificate of any officer in any jurisdiction who by law has power to take acknowledgments within that jurisdiction that the person signing the writing acknowledged before the officer the execution of the writing, or by an affidavit of any witness to the signing.

(c)     The fact of ownership of Notes by any Owner, the amount or amounts, numbers and other identification of such Notes and the date of holding shall be proved by the registration books kept pursuant to Section 2.3(a) hereof.

(d)     The fact of beneficial ownership of the Notes by any Beneficial Owner, the amount or amounts, numbers and other identification of such Notes and the date of holding will be proved by the certificates delivered to the Note Trustee pursuant to Section 2.3(b) hereof.

SECTION 11.7     Successors.

All covenants, promises and agreements in this Indenture contained by or on behalf of the Tribe, or by or on behalf of the Note Trustee or Paying Agent shall bind and inure to the benefit of their

respective successors and assigns, whether so expressed or not. Except for the Owners from time to time of the Notes (including any Beneficial Owner), no Person not a party hereto shall have any right, power, privilege or immunity hereunder.

SECTION 11.8    Indenture is a Security Agreement.

This Indenture constitutes a security agreement under the California Uniform Commercial Code. The debtor hereunder is the Tribe, and the secured party is the Note Trustee. Their respective addresses, at which information concerning the security interests established hereunder may be obtained, are set forth in Section 11.4 hereof.

SECTION 11.9    Counterparts.

This Indenture may be executed in any number of counterparts, each of which when so executed and delivered shall be an original; but such counterparts shall together constitute but one and the same instrument.

**80**

IN WITNESS WHEREOF, the Tribe has caused this Indenture to be signed in its name and behalf by its duly authorized officers, and to evidence its acceptance of the trusts hereby created, the Note Trustee has caused this Indenture to be signed in its name and behalf by its duly authorized officers, all as of the date first above written.

CABAZON BAND OF MISSION INDIANS

By: _____
    Tribal Chairman

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: _____
    Authorized Signatory

81

**Exhibit A**
[FORM OF NOTE]

THE OWNER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES AND AGREES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS (COLLECTIVELY, THE "ACTS"), HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR SALE THEREOF, AND MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF U.S. PERSONS EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE OWNER OF THIS NOTE ("HOLDER"): (1) REPRESENTS THAT IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT); (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) TO THE TRIBE, (B) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) WITH RESPECT TO NOTES INITIALLY OFFERED OR SUBSEQUENTLY TRANSFERRED IN RELIANCE ON RULE 144A, PURSUANT TO AN EXEMPTION FROM REGISTRATION IN COMPLIANCE WITH RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) INCLUDING WITHOUT LIMITATION THE EXPIRATION OF THE APPLICABLE HOLDING PERIOD PRESCRIBED BY RULE 144 UNDER THE SECURITIES ACT; (D) WITH RESPECT TO NOTES INITIALLY OFFERED OR SUBSEQUENTLY TRANSFERRED IN RELIANCE ON RULE 144A, IN RELIANCE ON ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE RECEIPT BY THE TRIBE AND THE NOTE TRUSTEE OF A CERTIFICATION OF THE TRANSFEROR AND TRANSFEREE AND AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SUCH PARTIES TO THE EFFECT THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT, OR (E) PURSUANT TO EFFECTIVE REGISTRATION STATEMENTS UNDER THE ACTS; AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

No. R-_____                                                          $_____

CABAZON BAND OF MISSION INDIANS
Senior Note Due July 1, 2026

REGISTERED OWNER:                                                  CUSIP

PRINCIPAL AMOUNT:

CABAZON BAND OF MISSION INDIANS (the "Tribe"), a federally recognized Indian tribe existing under the laws of the United States of America, for value received, promises to pay the Principal Amount shown above to the Registered Owner named above or registered assigns on July 1, 2026, upon surrender hereof, and to pay interest thereon, calculated on the basis of a 360-day year consisting of twelve 30-day months, from the most recent Scheduled Interest Payment Date (hereinafter defined) to which interest has been duly paid or provided for, or, if no interest has been paid hereon, from the Series Issue Date shown hereon, until the principal or Redemption Price hereof has been paid or provided for as aforesaid at the rates of interest specified herein.

PHTRANS\4312165

**82**

The principal of and interest on this Note shall be payable in any coin or currency of the United States of America which, at the time of payment, is legal tender for the payment of public and private debts. The principal of this Note and the redemption premium, if any, are payable upon surrender hereof at the designated corporate trust agency office of Wells Fargo Bank, National Association in Los Angeles, California, or as designated by its successor (the "Paying Agent"). The interest shall accrue and be paid on each applicable Scheduled Interest Payment Date, as further described herein, to the Person in whose name this Note is registered as of the close of business on the applicable Regular Record Date on the registration books maintained by Wells Fargo Bank, National Association or its successor (the "Note Registrar").

Whenever the due date for payment of the principal or Redemption Price of, or any interest on, this Note is not a Business Day (as hereinafter defined) then payment thereof shall be made on the next succeeding day which is a Business Day, with the same force and effect as if made on the original due date, and no interest shall accrue thereon for any period after such due date.

This Note is one of the Notes of the series indicated above issued in the original aggregate principal amount of $56,570,000 pursuant to a Trust Indenture dated June 1, 2006 (the "Indenture"), between the Tribe and Wells Fargo Bank, National Association, Los Angeles, California, as trustee (the "Note Trustee"). All of the Notes are equally and ratably secured under the Indenture.

Reference is hereby made to the Indenture for provisions concerning, *inter alia*: the security for the Notes, the respective rights and obligations of the Tribe and the Note Trustee, provisions relating to rights of the Owners, and the execution of amendments or supplements to the Indenture. The acceptance of the terms of the Indenture (including any amplifications and qualifications of the provisions hereof), a copy of which is available at the Designated Office of the Note Trustee, is an explicit and material part of the consideration of the Tribe's issuance hereof, and the Owner hereof by acceptance of this Note accepts and assents to all such terms as if fully set forth herein.

Additional reference is made to the Indenture, which is hereby incorporated by reference, for a statement of the purposes for which the Notes are issued, a description of the property assigned and pledged for the security of the Notes, a description of the duties and rights of the Tribe and of the Note Trustee, the provisions under which the lien of the Indenture may be defeased, and the extent and manner of enforcement of the rights of the Owners of the Notes. Capitalized terms used but not otherwise defined in this Note have the meanings set forth in the Indenture.

INTEREST PROVISIONS

Accrual and Payment of Interest. Interest on this Note shall accrue from the most recent Scheduled Interest Payment Date to which interest has been duly paid or provided for, or, if no interest has been paid hereon, from the date of original issue of this Note, until the principal or Redemption Price hereof has been fully paid or provided for as aforesaid, at the Interest Rate applicable to each Interest Period as follows:

| Interest Period | Interest Rate |
|---|---|
| Date of Issue to and including June 30, 2012 | 12.00% |
| July 1, 2012 to and including June 30, 2013 | 12.50% |
| July 1, 2013 to and including June 30, 2014 | 13.00% |
| July 1, 2014 to and including June 30, 2015 | 13.50% |
| July 1, 2015 to and including June 30, 2016 | 14.00% |
| July 1, 2016 to and including June 30, 2017 | 14.50% |
| July 1, 2017 and thereafter | 15.00% |

Calculation of Interest.  All interest shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

Payment of Defaulted Interest.  Any accrued interest due and payable on any applicable Scheduled Interest Payment Date which is not paid or duly provided for on such Scheduled Interest Payment Date shall forthwith cease to be payable to the Owner otherwise entitled thereto as of the applicable Regular Record Date, and shall be paid instead on a special interest payment date to be established for payment of such defaulted interest, (any such date being herein referred to as a "Special Interest Payment Date") to the person in whose name this Note is registered as of the close of business on a special record date (any such date being herein referred to as a "Special Record Date").  Notice of any such dates shall be mailed to the registered owners of the Notes at least 10 days prior to the Special Record Date, but not more than 30 days prior to the Special Interest Payment Date, so established.  Payments of interest shall be made by check or draft mailed on the applicable Scheduled Interest Payment Date or Special Interest Payment Date to the Persons entitled thereto at the addresses shown in the aforesaid registration books on the applicable Regular Record Date or Special Record Date; provided, however, that interest on any Note shall be paid by wire transfer to a bank located in the United States of America of immediately available funds to the Securities Depository (if this Note is a Book-Entry Note) or any registered owner of at least $1,000,000 in aggregate principal amount of Notes, at the option of such registered owner, according to wire instructions given to the Paying Agent in writing for such purpose and on file at least 20 days prior to the applicable Regular Record Date or Special Record Date, all as more particularly provided in the Indenture.

## REDEMPTION PROVISIONS

Optional Redemption.  The Notes are subject to redemption prior to maturity at the option of the Tribe, at the direction of the Tribe, on or after July 1, 2012, in whole or in part at any time, and, if in part, as selected by the Note Trustee by lot or such other method as the Note Trustee shall deem fair and appropriate (provided that following any such selection, both the portion of such Notes to be redeemed and the portion remaining shall be in Authorized Denominations), upon payment of a Redemption Price equal to (i) the principal amount of the Notes to be redeemed, plus (ii) a redemption premium equal to a percentage of the principal amount of the Notes to be redeemed as indicated on the table below, plus (iii) all unpaid interest accrued to the redemption date on the Notes to be redeemed:

| Redemption Date | Redemption Premium |
|---|---|
| July 1, 2012 to and including June 30, 2013 | 14% |
| July 1, 2013 to and including June 30, 2014 | 13% |
| July 1, 2014 to and including June 30, 2015 | 11% |
| July 1, 2015 to and including June 30, 2016 | 9% |
| July 1, 2016 to and including June 30, 2017 | 7% |
| July 1, 2017 to and including June 30, 2018 | 6% |
| July 1, 2018 to and including June 30, 2019 | 5% |
| July 1, 2019 to and including June 30, 2020 | 4% |
| July 1, 2020 to and including June 30, 2021 | 3% |
| July 1, 2021 to and including June 30, 2022 | 2% |
| July 1, 2022 to and including June 30, 2023 | 1% |
| July 1, 2023 and thereafter | 0% |

Mandatory Redemption. The Notes are subject to mandatory sinking fund redemption prior to maturity, in part, in direct order of maturity and within a maturity as chosen by lot or such other method as the Note Trustee shall deem fair and appropriate, by application of the moneys deposited in the Sinking Fund Account of the Note Fund established under the Indenture, at a Redemption Price equal to 100% of the principal amount thereof, plus all accrued and unpaid interest thereon, on July 1 in each year (excluding each principal maturity date) and in the amounts, as follows:

| Date (July 1) | Principal Amount |
|---|---|
| 2013 | $  2,295,000 |
| 2014 | 2,310,000 |
| 2015 | 2,350,000 |
| 2016 | 2,420,000 |
| 2017 | 2,520,000 |
| 2018 | 2,660,000 |
| 2019 | 3,060,000 |
| 2020 | 3,520,000 |
| 2021 | 4,050,000 |
| 2022 | 4,655,000 |
| 2023 | 5,355,000 |
| 2024 | 6,155,000 |
| 2025 | 7,080,000 |
| 2026 | 8,140,000 |

* Principal maturity date

In the case of an optional redemption of less than all of the Notes of any maturity prior to maturity, the Tribe shall be entitled to designate whether such payments shall be credited against principal amounts due at maturity or against particular mandatory redemption obligations with respect to the Notes.

Notice of Redemption. The Note Trustee shall cause notice of any redemption of Notes to be given to the Owners of all Notes to be redeemed at the registered addresses appearing in the registration

PHTRANS\312165                                  - 4 -

books maintained by the Note Registrar. Each such notice shall (i) be mailed at least 30 days and not more than 60 days prior to the date fixed for redemption, (ii) identify the Notes to be redeemed, specifying the name of the issue, the date of the issue, the stated maturity, the series designation, the CUSIP numbers and certificate numbers assigned to the Notes subject to redemption, (iii) specify the date fixed for redemption and the Redemption Price and (iv) state that on the date fixed for redemption the Notes called for redemption will be payable at the designated corporate trust agency office of the Paying Agent upon presentation and surrender thereof, that from that date interest will cease to accrue and that no representation is made as to the accuracy or correctness of the CUSIP numbers printed therein or on the Notes. If at the time of mailing of any notice of redemption, the Tribe shall not have deposited with the Note Trustee monies sufficient to redeem all the Notes called for redemption, such notice shall state that such redemption is subject to the deposit of the redemption monies with the Note Trustee not later than 10 a.m. on the date fixed for redemption and shall be of no effect unless such monies are so deposited. Failure to give notice in the manner described in this paragraph with respect to any Note, or any defect in such notice, shall not affect the validity of the proceedings for redemption for any Note with respect to which notice was properly given.

If the Tribe deposits with the Paying Agent funds sufficient to pay the principal amount or Redemption Price of any Notes becoming due at maturity, by call for redemption or otherwise, together with interest on such Notes to the due date, the interest on such Notes will cease to accrue on the due date, and thereafter the Owners will be restricted to the funds so deposited as provided in the Indenture.

In case an Event of Default, as defined in the Indenture, shall have occurred, the principal of all Notes then Outstanding under the Indenture may be declared or may become due and payable. This Note is transferable as provided in the Indenture by the Owner hereof, or such Owner's attorney duly authorized in writing, at the corporate trust agency office of the Note Trustee, upon surrender of this Note accompanied by a duly executed instrument of transfer, in form satisfactory to the Tribe and the Note Trustee, and upon payment of any tax or other governmental charge. Upon such transfer a new fully registered Note or Notes of the same series and in the same aggregate principal amount and bearing the same rate or rates of interest will be issued to the transferee or transferees.

The Person in whose name this Note is registered may be deemed the owner hereof by the Tribe, the Note Trustee, the Paying Agent, and the Note Registrar, and any notice to the contrary shall not be binding upon any such party.

No recourse shall be had for the payment of the principal of or interest on this Note, or for any claim based hereon or on the Indenture, against any member, officer or employee, past, present or future, of the Tribe or of any successor body, as such, either directly or through the Tribe or any such successor body, under any constitutional provision, statute or rule of law, or by the enforcement of any assessment or by any legal or equitable proceeding or otherwise.

Except as otherwise provided in the Indenture, this Note may be transferred, in whole but not in part, only to another nominee of DTC or to a successor of DTC or to the nominee of a successor of DTC. Unless this certificate is presented by an authorized representative of DTC, to the Tribe or its agent for registration of transfer, exchange, or payment, and any certificate issued in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the Owner hereof, Cede & Co., has an interest herein.

This Note is not valid unless the Certificate of Authentication attached hereto is duly executed.

All acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of the Notes in order to make them legal, valid and binding obligations of the Tribe in accordance with their terms and the terms of the Indenture have happened, exist and have been performed as so required.

IN WITNESS WHEREOF, the Cabazon Band of Mission Indians has caused this Note to be duly executed in its name by the manual or facsimile signature of its Tribal Chairman in the presence of the witness identified below.

CABAZON BAND OF MISSION INDIANS

Witness:

_____       By:_____
        Name:                                                Tribal Chairman

PHTRANS\4312165                          - 6 -

**87**

CERTIFICATE OF AUTHENTICATION

This Note is one of the Notes described in the within-mentioned Indenture.

Authentication Date:

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Trustee

By: _____
         Authorized Signatory

88

ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of the within Note, shall be construed as though they were written out in full according to applicable laws or regulations.

TEN COM      -   as tenants in common
TEN ENT      -   as tenants by the entireties
JT TEN       -   as joint tenants with the right of survivorship and
                 not as tenants in common

UNIFORM GIFT MIN ACT      ...............Custodian ...............
                          (Cust)              (Minor)
                          under Uniform Gifts to Minors Act
                          ...............................................
                          (State)

Additional abbreviations may also be used though not in the above list.

PHTRANSW312165                     - 8 -

**89**

## ASSIGNMENT

For value received _____ hereby sells, assigns and transfers unto
_____ (Tax I.D. No. _____) the within Note issued by the Cabazon Band of
Mission Indians, and all rights thereunder, hereby irrevocably appointing Attorney to transfer said Note on
the Note Register, with full power of substitution in the premises.

Date:

Signature: _____

Signature Guaranteed:

Notice:  The Assignor's signature to this assignment
must correspond with the name as it appears upon the
face of the within Note in every particular without
alteration or any change whatever

_____

PHTRANS\4312165

- 9 -

EXHIBIT B

FORM OF PROJECT FUND REQUISITION

WELLS FARGO BANK, NATIONAL                              Requisition No. ___
ASSOCIATION, as Trustee
700 South Flower Street, Suite 500
Los Angeles, CA  90017
Attention:  Corporate Trust Department


Date: _____

Dear Sirs:

      You are hereby requested to make disbursement of funds deposited in the Project Fund (the "Project Fund") created by that certain Trust Indenture (the "Indenture") of the CABAZON BAND OF MISSION INDIANS (the "Tribe") dated as of June 1, 2006 for the following purposes:

      Description of purpose for which payment is to be made or project components for which the Tribe seeks payment or reimbursement:

Payee:                            Reimbursement To Tribe*      Yes ___   No ___


Address:


Amount to be Paid:      $ _____

Description:


In connection herewith, I certify that the work to which the above amount relates has been accomplished in a manner satisfactory to the Tribe and that the above amount does not exceed the obligation for which payment is made.  I further certify that: (i) the obligation has been properly incurred by the Tribe and is a proper charge against the Project Fund; (ii) the amount requisitioned is either due and unpaid or is to be paid to the Tribe as reimbursement for Costs previously paid by the Tribe that have not been the subject of a previous requisition; (iii) if the amount to be requisitioned is payable to the Tribe as reimbursement for costs and expenses incurred by reason of work performed or supervised by officers or employees of the Tribe and does not exceed the actual costs thereof to the Tribe; (iv) no Event of Default has occurred and is continuing; and (v) the Tribe has received no written notice of any lien, right to lien or attachment upon, or other claim affecting the rights of the payee to receive payment of any of the monies covered hereby or if any of the foregoing has been received it has been released or discharged or will be released or discharged upon payment.

Date: _____                    CABAZON BAND OF MISSION INDIANS

                                     By: _____
                                          Authorized Officer

   *Capitalized terms used and not defined herein shall have the meaning ascribed to such terms in the Indenture.*

**92**

THE OWNER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES AND AGREES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS (COLLECTIVELY, THE "ACTS"), HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR SALE THEREOF, AND MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF U.S. PERSONS EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF, THE OWNER OF THIS NOTE ("HOLDER"): (1) REPRESENTS THAT IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT); (2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE EXCEPT (A) TO THE TRIBE, (B) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) WITH RESPECT TO NOTES INITIALLY OFFERED OR SUBSEQUENTLY TRANSFERRED IN RELIANCE ON RULE 144A, PURSUANT TO AN EXEMPTION FROM REGISTRATION IN COMPLIANCE WITH RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) INCLUDING WITHOUT LIMITATION THE EXPIRATION OF THE APPLICABLE HOLDING PERIOD PRESCRIBED BY RULE 144 UNDER THE SECURITIES ACT, (D) WITH RESPECT TO NOTES INITIALLY OFFERED OR SUBSEQUENTLY TRANSFERRED IN RELIANCE ON RULE 144A, IN RELIANCE ON ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE RECEIPT BY THE TRIBE AND THE NOTE TRUSTEE OF A CERTIFICATION OF THE TRANSFEROR AND TRANSFEREE AND AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO SUCH PARTIES TO THE EFFECT THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT, OR (E) PURSUANT TO EFFECTIVE REGISTRATION STATEMENTS UNDER THE ACTS; AND (3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

No. R-1                                                          $56,570,000

**CABAZON BAND OF MISSION INDIANS**
Senior Note Due July 1, 2026

REGISTERED OWNER:   **** CEDE & CO. ****                    CUSIP
                                                            126791 AF9

PRINCIPAL AMOUNT:   **FIFTY SIX MILLION FIVE HUNDRED SEVENTY THOUSAND DOLLARS**

CABAZON BAND OF MISSION INDIANS (the "Tribe"), a federally recognized Indian tribe existing under the laws of the United States of America, for value received, promises to pay the Principal Amount shown above to the Registered Owner named above or registered assigns on July 1, 2026, upon surrender hereof, and to pay interest thereon, calculated on the basis of a 360-day year consisting of twelve 30-day months, from the most recent Scheduled Interest Payment Date (hereinafter defined) to which interest has been duly paid or provided for, or, if no interest has been paid hereon, from the Series Issue Date shown hereon, until the principal or Redemption Price hereof has been paid or provided for as aforesaid at the rates of interest specified herein.

**EXHIBIT B**

**93**

The principal of and interest on this Note shall be payable in any coin or currency of the United States of America which, at the time of payment, is legal tender for the payment of public and private debts. The principal of this Note and the redemption premium, if any, are payable upon surrender hereof at the designated corporate trust agency office of Wells Fargo Bank, National Association in Los Angeles, California, or as designated by its successor (the "Paying Agent"). The interest shall accrue and be paid on each applicable Scheduled Interest Payment Date, as further described herein, to the Person in whose name this Note is registered as of the close of business on the applicable Regular Record Date on the registration books maintained by Wells Fargo Bank, National Association or its successor (the "Note Registrar").

Whenever the due date for payment of the principal or Redemption Price of, or any interest on, this Note is not a Business Day (as hereinafter defined) then payment thereof shall be made on the next succeeding day which is a Business Day, with the same force and effect as if made on the original due date, and no interest shall accrue thereon for any period after such due date.

This Note is one of the Notes of the series indicated above issued in the original aggregate principal amount of $56,570,000 pursuant to a Trust Indenture dated June 1, 2006 (the "Indenture"), between the Tribe and Wells Fargo Bank, National Association, Los Angeles, California, as trustee (the "Note Trustee"). All of the Notes are equally and ratably secured under the Indenture.

Reference is hereby made to the Indenture for provisions concerning, *inter alia*: the security for the Notes, the respective rights and obligations of the Tribe and the Note Trustee, provisions relating to rights of the Owners, and the execution of amendments or supplements to the Indenture. The acceptance of the terms of the Indenture (including any amplifications and qualifications of the provisions hereof), a copy of which is available at the Designated Office of the Note Trustee, is an explicit and material part of the consideration of the Tribe's issuance hereof, and the Owner hereof by acceptance of this Note accepts and assents to all such terms as if fully set forth herein.

Additional reference is made to the Indenture, which is hereby incorporated by reference, for a statement of the purposes for which the Notes are issued, a description of the property assigned and pledged for the security of the Notes, a description of the duties and rights of the Tribe and of the Note Trustee, the provisions under which the lien of the Indenture may be defeased, and the extent and manner of enforcement of the rights of the Owners of the Notes. Capitalized terms used but not otherwise defined in this Note have the meanings set forth in the Indenture.

## INTEREST PROVISIONS

Accrual and Payment of Interest. Interest on this Note shall accrue from the most recent Scheduled Interest Payment Date to which interest has been duly paid or provided for, or, if no interest has been paid hereon, from the date of original issue of this Note, until the principal or Redemption Price hereof has been fully paid or provided for as aforesaid, at the Interest Rate applicable to each Interest Period as follows:

| Interest Period | Interest Rate |
|---|---|
| Date of Issue to and including June 30, 2012 | 12.00% |
| July 1, 2012 to and including June 30, 2013 | 12.50% |
| July 1, 2013 to and including June 30, 2014 | 13.00% |
| July 1, 2014 to and including June 30, 2015 | 13.50% |
| July 1, 2015 to and including June 30, 2016 | 14.00% |
| July 1, 2016 to and including June 30, 2017 | 14.50% |
| July 1, 2017 and thereafter | 15.00% |

Calculation of Interest.  All interest shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

Payment of Defaulted Interest.   Any accrued interest due and payable on any applicable Scheduled Interest Payment Date which is not paid or duly provided for on such Scheduled Interest Payment Date shall forthwith cease to be payable to the Owner otherwise entitled thereto as of the applicable Regular Record Date, and shall be paid instead on a special interest payment date to be established for payment of such defaulted interest, (any such date being herein referred to as a "Special Interest Payment Date") to the person in whose name this Note is registered as of the close of business on a special record date (any such date being herein referred to as a "Special Record Date").  Notice of any such dates shall be mailed to the registered owners of the Notes at least 10 days prior to the Special Record Date, but not more than 30 days prior to the Special Interest Payment Date, so established.  Payments of interest shall be made by check or draft mailed on the applicable Scheduled Interest Payment Date or Special Interest Payment Date to the Persons entitled thereto at the addresses shown in the aforesaid registration books on the applicable Regular Record Date or Special Record Date; provided, however, that interest on any Note shall be paid by wire transfer to a bank located in the United States of America of immediately available funds to the Securities Depository (if this Note is a Book-Entry Note) or any registered owner of at least $1,000,000 in aggregate principal amount of Notes, at the option of such registered owner, according to wire instructions given to the Paying Agent in writing for such purpose and on file at least 20 days prior to the applicable Regular Record Date or Special Record Date, all as more particularly provided in the Indenture.

## REDEMPTION PROVISIONS

Optional Redemption.  The Notes are subject to redemption prior to maturity at the option of the Tribe, at the direction of the Tribe, on or after July 1, 2012, in whole or in part at any time, and, if in part, as selected by the Note Trustee by lot or such other method as the Note Trustee shall deem fair and appropriate (provided that following any such selection, both the portion of such Notes to be redeemed and the portion remaining shall be in Authorized Denominations), upon payment of a Redemption Price equal to (i) the principal amount of the Notes to be redeemed, plus (ii) a redemption premium equal to a percentage of the principal amount of the Notes to be redeemed as indicated on the table below, plus (iii) all unpaid interest accrued to the redemption date on the Notes to be redeemed:

| Redemption Date | Redemption Premium |
|---|---|
| July 1, 2012 to and including June 30, 2013 | 14% |
| July 1, 2013 to and including June 30, 2014 | 13% |
| July 1, 2014 to and including June 30, 2015 | 11% |
| July 1, 2015 to and including June 30, 2016 | 9% |
| July 1, 2016 to and including June 30, 2017 | 7% |
| July 1, 2017 to and including June 30, 2018 | 6% |
| July 1, 2018 to and including June 30, 2019 | 5% |
| July 1, 2019 to and including June 30, 2020 | 4% |
| July 1, 2020 to and including June 30, 2021 | 3% |
| July 1, 2021 to and including June 30, 2022 | 2% |
| July 1, 2022 to and including June 30, 2023 | 1% |
| July 1, 2023 and thereafter | 0% |

**Mandatory Redemption.**  The Notes are subject to mandatory sinking fund redemption prior to maturity, in part, in direct order of maturity and within a maturity as chosen by lot or such other method as the Note Trustee shall deem fair and appropriate, by application of the moneys deposited in the Sinking Fund Account of the Note Fund established under the Indenture, at a Redemption Price equal to 100% of the principal amount thereof, plus all accrued and unpaid interest thereon, on July 1 in each year (excluding each principal maturity date) and in the amounts, as follows:

| Date (July 1) | Principal Amount |
|---|---|
| 2013 | $ 2,295,000 |
| 2014 | 2,310,000 |
| 2015 | 2,350,000 |
| 2016 | 2,420,000 |
| 2017 | 2,520,000 |
| 2018 | 2,660,000 |
| 2019 | 3,060,000 |
| 2020 | 3,520,000 |
| 2021 | 4,050,000 |
| 2022 | 4,655,000 |
| 2023 | 5,355,000 |
| 2024 | 6,155,000 |
| 2025 | 7,080,000 |
| 2026 | 8,140,000 |

\* Principal maturity date

In the case of an optional redemption of less than all of the Notes of any maturity prior to maturity, the Tribe shall be entitled to designate whether such payments shall be credited against principal amounts due at maturity or against particular mandatory redemption obligations with respect to the Notes.

**Notice of Redemption.**  The Note Trustee shall cause notice of any redemption of Notes to be given to the Owners of all Notes to be redeemed at the registered addresses appearing in the registration books maintained by the Note Registrar.  Each such notice shall (i) be mailed at least 30 days and not

more than 60 days prior to the date fixed for redemption, (ii) identify the Notes to be redeemed, specifying the name of the issue, the date of the issue, the stated maturity, the series designation, the CUSIP numbers and certificate numbers assigned to the Notes subject to redemption, (iii) specify the date fixed for redemption and the Redemption Price and (iv) state that on the date fixed for redemption the Notes called for redemption will be payable at the designated corporate trust agency office of the Paying Agent upon presentation and surrender thereof, that from that date interest will cease to accrue and that no representation is made as to the accuracy or correctness of the CUSIP numbers printed therein or on the Notes.  If at the time of mailing of any notice of redemption, the Tribe shall not have deposited with the Note Trustee monies sufficient to redeem all the Notes called for redemption, such notice shall state that such redemption is subject to the deposit of the redemption monies with the Note Trustee not later than 10 a.m. on the date fixed for redemption and shall be of no effect unless such monies are so deposited.  Failure to give notice in the manner described in this paragraph with respect to any Note, or any defect in such notice, shall not affect the validity of the proceedings for redemption for any Note with respect to which notice was properly given.

If the Tribe deposits with the Paying Agent funds sufficient to pay the principal amount or Redemption Price of any Notes becoming due at maturity, by call for redemption or otherwise, together with interest on such Notes to the due date, the interest on such Notes will cease to accrue on the due date, and thereafter the Owners will be restricted to the funds so deposited as provided in the Indenture.

In case an Event of Default, as defined in the Indenture, shall have occurred, the principal of all Notes then Outstanding under the Indenture may be declared or may become due and payable. This Note is transferable as provided in the Indenture by the Owner hereof, or such Owner's attorney duly authorized in writing, at the corporate trust agency office of the Note Trustee, upon surrender of this Note accompanied by a duly executed instrument of transfer, in form satisfactory to the Tribe and the Note Trustee, and upon payment of any tax or other governmental charge.  Upon such transfer a new fully registered Note or Notes of the same series and in the same aggregate principal amount and bearing the same rate or rates of interest will be issued to the transferee or transferees.

The Person in whose name this Note is registered may be deemed the owner hereof by the Tribe, the Note Trustee, the Paying Agent, and the Note Registrar, and any notice to the contrary shall not be binding upon any such party.

No recourse shall be had for the payment of the principal of or interest on this Note, or for any claim based hereon or on the Indenture, against any member, officer or employee, past, present or future, of the Tribe or of any successor body, as such, either directly or through the Tribe or any such successor body, under any constitutional provision, statute or rule of law, or by the enforcement of any assessment or by any legal or equitable proceeding or otherwise.

Except as otherwise provided in the Indenture, this Note may be transferred, in whole but not in part, only to another nominee of DTC or to a successor of DTC or to the nominee of a successor of DTC.  Unless this certificate is presented by an authorized representative of DTC, to the Tribe or its agent for registration of transfer, exchange, or payment, and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the Owner hereof, Cede & Co., has an interest herein.

This Note is not valid unless the Certificate of Authentication attached hereto is duly executed.

**97**

All acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of the Notes in order to make them legal, valid and binding obligations of the Tribe in accordance with their terms and the terms of the Indenture have happened, exist and have been performed as so required.

IN WITNESS WHEREOF, the Cabazon Band of Mission Indians has caused this Note to be duly executed in its name by the manual or facsimile signature of its Tribal Chairman in the presence of the witness identified below.

CABAZON BAND OF MISSION INDIANS

Witness:

Name: ANGELA ROOSEVELT

By: _____
Tribal Chairman

**99**